**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LEINANI DESLANDES, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 1:17-cv-04857 |
| McDONALD'S USA, LLC, a Delaware limited liability company, McDONALD'S CORPORATION, a Delaware corporation; and DOES 1 through 10, inclusive, | ) ) ) ) ) | Hon. Jorge L. Alonso, U.S.D.J.<br><br>Jury Trial Demanded |
| Defendants. | ) | |

**AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

*Page*

NATURE OF THE ACTION ................................................................................................ 2

THE PARTIES ................................................................................................................... 6

JURISDICTION AND VENUE .......................................................................................... 7

FACTS COMMON TO ALL COUNTS ............................................................................. 9

    A.    The McDonald's Model: "Freedom Within A Framework" ................................. 9

    B.    McDonald's Has Continually Sought to Cut Employee Wages .......................... 11

    C.    Plaintiff and the Putative Class Members Work as Employees at McDonald's McOpCo Restaurants or at McDonald's Franchise Restaurants ......................... 14

    D.    McDonald's Model Is Designed to Encourage Competition With Regard to Sales Between and Among Franchisees and McOpCo Stores ...................................... 18

    E.    The "No Hire" Agreement .................................................................................... 21

    F.    Other Evidence of a Horizontal Agreement among Competing Franchisees and McDonald's .......................................................................................................... 24

    G.    The "No-Hire" Agreement Is Against the Independent Interests of the Franchisees and of the McOpCo Restaurants in their Capacity as Competitors .................... 25

    H.    Employment with Non-McDonald's Brands is Not a Reasonable Substitute for McDonald's Employees ....................................................................................... 26

    I.    Plaintiff and the Class Members Have Suffered Antitrust Injury ........................ 28

CLASS ALLEGATIONS ................................................................................................. 28

CLAIMS FOR RELIEF ................................................................................................... 31

COUNT I: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT .................................. 31

COUNT II: VIOLATIONS OF THE ILLINOIS ANTITRUST ACT ...................................... 33

COUNT III: VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ................................................................... 34

PRAYER FOR RELIEF ................................................................................................... 38

JURY DEMAND ............................................................................................................. 40

Plaintiff, Leinani Deslandes, on behalf of herself and all others similarly situated, with knowledge as to her own actions and events, and upon information and belief as to other matters, complains and alleges as follows:

## NATURE OF THE ACTION

1.      This action challenges under Section 1 of the Sherman Act a no-solicitation and no-hiring contract, combination, or conspiracy between and among Defendants McDonald's USA, LLC, McDonald's Corporation (together, "Defendant" or "McDonald's") and their franchisees, pursuant to which McDonald's and the franchisees agreed not to recruit or hire each other's employees.  McDonald's, at its principal place of business located in Oak Brook, Illinois, was intimately involved in forming, monitoring, and enforcing this anti-competitive contract, combination, or conspiracy.  McDonald's orchestrated, dispersed, and enforced the agreement among itself and all franchisees, at least in part, through an explicit contractual prohibition contained in standard McDonald's franchise agreements.  That standard agreement was executed by McDonald's and by franchisees alike—at least up until the time that this lawsuit was commenced.  *That is, apparently in response to this lawsuit, McDonald's removed the no-hire and no-solicit provision from its standard franchise agreement on a going-forward basis.*  The practice at issue reflects a naked horizontal restraint of competition and a per se violation of the antitrust laws.

2.      McDonald's is the world's leading global food service retailer with over 36,000 locations in over 100 countries.  More than 80% of McDonald's restaurants worldwide are franchise businesses that are independently owned and operated, and are separate and distinct entities from McDonald's.

3.      In the U.S., approximately 90% of McDonald's restaurants are operated by independently-owned and –operated franchisees who have executed a standard form franchise

agreement with either McDonald's USA, LLC or McDonald's Corporation. Some or all of the remaining U.S. McDonald's restaurants are operated by McDonald's itself.

4. McDonald's boasts on its corporate website that in the U.S. market, it possesses "a unique and **powerful field organization structure** that, when optimized, gives us a significant competitive advantage."[1] McDonald's also considers itself an "iconic brand, moving toward the future" with "commitments to our people, our communities and our world."[2]

5. As part of McDonald's system to maintain its significant competitive advantage, together with its franchisees, McDonald's has colluded to suppress the wages of the restaurant-based employees who work not only at McDonald's in Orange County, Florida, but also throughout the United States. In particular, McDonald's and its franchisees have contracted, combined, and/or conspired to neither hire nor solicit each other's employees. McDonald's effects this plan, in part, through an explicit contractual "no hire" and "no solicitation" clause in its franchise agreements that expressly prohibits its franchisees from "employ[ing] or seek[ing] to employ any person" who at the time is, or within the preceding six months has been, employed by McDonald's, by any of its subsidiaries, or by any other franchisee. This agreement, which is or was evidenced by express contractual provisions in the standard McDonald's franchise agreement, is an unreasonable restraint of trade.

--------

[1] Available at http://corporate.mcdonalds.com/mcd/investors/company-overview/company-overview-segment-information.html (emphasis supplied) (last visited September 18, 2017).

[2] Available at http://corporate.mcdonalds.com/mcd/our_company.html (last visited April 1, 2017).

3

6.     As further described below, this also is or was not merely a one-way agreement by *franchisees* to not solicit or hire employees away from McDonald's company-owned stores or from other franchisees; rather, *McDonald's itself* adheres to the same agreement in the operation of its company-owned stores.

7.     As the Department of Justice Antitrust Division and Federal Trade Commission's joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third party intermediary, are per se illegal under the antitrust laws."[3]  The *Guidance* further elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services. It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[4]

8.     The principle of free competition applies to the labor market as well as to trade. "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers," says Joseph Harrington, Wharton professor of business economics and public policy, in his description of a no-poaching agreement.

9.     According to Peter Cappelli, Wharton management professor and director of

---

[3] Available at https://www.justice.gov/atr/file/903511/download (last visited September 17, 2017).
[4] *Id.*

Wharton's Center for Human Resources, no-poaching agreements are unfair to employees and such a pact "benefits the companies at the expense of their employees." Mr. Cappelli notes that the reason such agreements are illegal and violate both anti-trust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."

10. The collusion of employers to refrain from hiring each other's employees restricts employee mobility and competition in the labor market. This raises employers' power at the expense of employees and diminishes employee bargaining power for workers within franchise chains. This is especially harmful to employees of McDonald's and its franchises as those employees are usually paid below a living wage[5], and their marketable skills acquired through their work at McDonald's primarily have value only to other McDonald's restaurants and do not transfer to other fast food restaurants or similar businesses.

11. This no-solicitation and no-hiring agreement between and among McDonald's and McDonald's franchisees, pursuant to which McDonald's and its franchisees agreed not to recruit each other's employees (even those employees that approached another McDonald's restaurant for a job on their own volition) eliminated franchisees' and company-owned stores' incentives and ability to compete for employees, and restricted employees' mobility. This agreement, far from being a "commitment to [its] people," instead harmed employees by

_____

[5] In 2014, the average hourly wage of fast food employees is $9.09 or less than $19,000 per year for a full time worker. The poverty level of a family of four in the U.S. is $23,850. Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack,* CNN Money (May 20, 2014) http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited May 17, 2017).

lowering salaries and benefits employees otherwise would have commanded in an open marketplace, and deprived such employees of better job growth opportunities.

12.     The agreement between and among McDonald's and McDonald's franchisees is a naked restraint of trade that is per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

## THE PARTIES

13.     Plaintiff Leinani Deslandes ("Plaintiff") is a resident of Orange County, Florida. Plaintiff was an employee of Bam-B Enterprises of Central Florida, Inc., which owned and operated the McDonald's store located at 3114 South Semoran Boulevard, Apopka, Florida.

14.     Plaintiff has suffered reduced wages, loss of professional growth opportunities, and worsened, illegal working conditions because of the express restraint of trade agreed to between and among McDonald's and its franchisees, prohibiting each from "employ[ing] or seek[ing] to employ" anyone who works (or in the last six months has worked) as an employee at McDonald's, a McDonald's subsidiary, or any other McDonald's franchise.  Specifically, Plaintiff sought employment at a McDonald's corporate-owned restaurant nearby to the one where she worked that would have paid her significantly more money, but because of the no-solicitation and no-hiring agreement between and among the franchisees and Defendant McDonald's, the prospective employer could not offer her the position.  Despite being qualified, Plaintiff was not hired for a position that paid more and had better growth potential simply because she was currently employed by another franchise.

15.     Defendant McDonald's USA, LLC is a Delaware limited liability company with its principal place of business in Oak Brook, Illinois.  It is a wholly-owned subsidiary of its parent and predecessor, McDonald's Corporation, which is a Delaware corporation with its principal place of business in Oak Brook, Illinois.  McDonald's is in the business of selling food

to customers primarily through independently owned and operated franchise restaurants. It has multiple McDonald's franchise restaurants in Illinois, Florida, and every state in the United States. It owns and operates multiple company-owned McDonald's restaurants in Illinois, Florida, and approximately 35 other U.S. states and territories.

16.     Plaintiff is ignorant of the true names and capacities, whether individual, corporate, or associate, of those defendants fictitiously sued as DOES 1 through 10 inclusive and so Plaintiff sues them by these fictitious names. Plaintiff is informed and believes that the DOE defendants 1 through 10 reside in the United States, the State of Illinois, and/or the State of Florida, and are all in some manner responsible for the conduct alleged herein. Upon discovering the true names and capacities of these fictitiously named defendants, Plaintiff will amend this Complaint to show the true names and capacities of these fictitiously named defendants.

## CO-CONSIPRATORS

17.     Various other corporations and persons not made defendants in this Amended Complaint, including McDonald's franchisees and the McDonald's operating companies that operate company-owned restaurants, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged.

## JURISDICTION AND VENUE

18.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendant for the injuries sustained by Plaintiff by virtue of Defendant's violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and to enjoin further violations. The Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, under Section 4 of the Sherman Act, 15 U.S.C. § 4, and under 28 U.S.C. §§ 1331, 1332, 1337

and 1367 to prevent and restrain the Defendant from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

19.     Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391(b)(2), (c)(2).  McDonald's transacts or has transacted business in this district and has its principal place of business here. Based on information and belief, a substantial part of the events that gave rise to this action occurred here, namely, the decision to implement the no-solicit and no-hire contract, combination, or conspiracy, the drafting of the no-solicit and no-hire clause in the franchise agreements, McDonald's entry into that agreement, and the selection of Illinois law to interpret and govern that agreement. McDonald's standard franchise agreement states that the provisions and terms of the agreement are to be interpreted in accordance with and governed by the laws of the state of Illinois.  It specifies that all notices are to be directed and delivered to McDonald's address at its principal place of business, in Oak Brook, Illinois.

20.     McDonald's is in the business of selling food to consumers, in part, through independently owned and operated franchise restaurants.  These restaurants are in each state in the United States, and McDonald's has substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the owner of the franchise.

21.     McDonald's also sells food to consumers through its own company-owned stores. These restaurants are owned by McDonald's Operating Companies ("McOpCo's"), which are indirect or direct subsidiaries of Defendant McDonald's Corporation. More than 35 U.S. states and territories, including both Florida and Illinois, boast multiple McOpCo McDonald's restaurants. More than 1,000 McOpCo McDonald's restaurants have operated in the U.S. every

year since 2010. McDonald's engages in substantial business activities with the McOpCo restaurants.

22.     McDonald's engages in substantial activities at issue in this Amended Complaint that are in the flow of and substantially affect interstate commerce.

## FACTS COMMON TO ALL COUNTS

### A.     The McDonald's Model:  "Freedom Within A Framework"

23.     McDonald's is one of the world's largest restaurant chains, serving approximately 68 million customers daily in 120 countries across approximately 36,899 outlets.  McDonald's primarily sells hamburgers, cheeseburgers, chicken products, french fries, breakfast items, soft drinks, milkshakes, wraps, and desserts.

24.     A McDonald's restaurant is operated by either a franchisee, an affiliate, or, in the case of company-operated stores, by a McOpCo. McDonald's revenues come from the rent, royalties, and fees paid by the franchisees, as well as from sales in the McOpCo restaurants.

25.     Currently, McDonald's has franchised approximately 90% of its U.S. restaurants, while the remainder are owned and operated by the company.  Most McDonald's franchisees are subject to a standard 20-year franchise license agreement.

26.     Any existing McDonald's franchise agreement entered into (and not later amended or superseded) prior to approximately 2005 is an agreement in which McDonald's Corporation is the franchisor.  Any existing McDonald's franchise agreement entered into since approximately 2005 is an agreement in which McDonald's USA, LLC is the franchisor.

27.     Each franchise is operated by an entity that is a separate legal entity from McDonald's USA, LLC and McDonald's Corporation.  Each franchise is an independently owned and independently managed business.

28.     In McDonald's ownership and operation of the McOpCo company-owned restaurants, McDonald's acts as a competitor of independently-owned and –operated McDonald's franchisee restaurants.

29.     There are approximately 420,000 employees that work for McDonald's or its franchise restaurants in the United States.  McDonald's had a net income of $4.686 billion for the fiscal year 2016.  McDonald's current valuation is over $90 billion.

30.     According to a BBC report published in 2012, McDonald's franchises are the world's second largest private employer, with 1.5 million employees working for franchises.

31.     According to *Fast Food Nation* by Eric Schlosser (2001), nearly one in eight workers in the United States has at some time been employed by a McDonald's restaurant.

32.     Overall, franchising is very important to McDonald's profitability.  The chart below illustrates the margins McDonald's receives from this part of its business:

### Franchised margins

| In millions | 2012 | 2011 | 2010 |
|---|---|---|---|
| U.S. | $ 3,594 | $ 3,436 | $ 3,239 |
| Europe | 2,352 | 2,400 | 2,063 |
| APMEA | 924 | 858 | 686 |
| Other Countries & Corporate | 567 | 538 | 476 |
| Total | $ 7,437 | $ 7,232 | $ 6,464 |

### Percent of revenues

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| U.S. | 83.9% | 83.9% | 83.4% |
| Europe | 79.0 | 79.1 | 78.2 |
| APMEA | 88.8 | 89.5 | 89.3 |
| Other Countries & Corporate | 85.6 | 86.1 | 86.0 |
| Total | 83.0% | 83.0% | 82.4% |

33.     In McDonald's operated restaurants/franchises, the company develops and refines operating standards, marketing concepts, and product and pricing strategies.

34.     McDonald's also regularly leases to the franchisee the property where the McDonald's franchise is operated.

35.     McDonald's license agreements and operator's lease agreement both provide that the franchisees are independent of McDonald's and are responsible for all obligations and liabilities of the business, and responsible for the day-to-day operations of the business.

36.     The franchise agreement specifies that McDonald's franchisees have no exclusive, protected, or territorial rights in the contiguous market area of their restaurant location(s).  Franchisees are informed and McDonald's discloses that franchisees may face competition from other franchisees, new franchisees, and new McDonald's restaurants owned and operated by McDonald's itself.

37.     Franchise agreements entered into with McDonald's franchisees before the initiation of this lawsuit included express language that contractually prohibited franchisees from employing, or seeking to employ, any person who is at the time employed by McDonald's, any of its subsidiaries, or any of its other franchises, unless the employee has left that employment for a period in excess of six (6) months.  The same franchise agreements contractually prohibited franchisees from inducing, directly or indirectly, such persons to leave such employment.

38.     As described herein, McDonald's has treated this as a bilateral prohibition, precluding McDonald's company-owned stores from hiring persons employed by franchisees.

**B.      McDonald's Has Continually Sought to Cut Employee Wages**

39.     Since the late 1990s, McDonald's has continually attempted to reduce labor costs. This included replacing employees with electronic kiosks which would perform actions such taking orders and accepting money.  In 1999, McDonald's first tested "E-Clerks" in suburban Chicago, Illinois, and Wyoming, Michigan, with the devices being able to "save money on live staffers" and attracting larger purchase amounts than average employees.

11

40.     A study conducted by Anzalone Liszt Grove Research and released by *Fast Food Forward* showed that approximately eighty-four percent (84%) of all fast food employees working in New York City in April 2013 had been paid less than their legal wages by their employers.

41.     From 2007 to 2011, fast food workers in the U.S. drew an average of $7 billion of public assistance annually resulting from receiving low wages.

42.     Because McDonald's franchise employees were paid less than a living wage, McResource, the McDonald's intranet website, advised employees to break their food into smaller pieces to feel fuller, seek refunds for unopened holiday purchases, sell possessions online for quick cash, and to "quit complaining" as "stress hormone levels rise by 15 percent after ten minutes of complaining."[6]

43.     In December 2013, McDonald's shut down the McResource website amidst negative publicity and criticism.

44.     The *Roosevelt Institute* accuses some McDonald's restaurants of actually paying less than the minimum wage to entry positions due to "rampant" wage theft.[7]

_____

[6] Susanna Kim, *McDonald's Defends Telling Workers to 'Quit Complaining' to Reduce Stress*, ABC News (November 21, 2013) http://abcnews.go.com/Business/mcdonalds-defends-employees-tips-deemed-offensive-clueless-sdovcacy/story?id=20954354 (last visited April 1, 2017).
[7] Harmony Goldberg, *How McDonald's gets away with rampant wage theft,* Salon, (April 6, 2015), http://www.salon.com/2014/04/06/how_mcdonalds_gets_away_with_rampant_wage_theft_partn er/ (last visited April 1, 2017).

45.    For example, in South Korea, McDonald's pays part-time employees $5.50 per hour and is accused of paying less with arbitrary schedules, adjustments and pay delays, thereby taking full advantage when there are little to no legal protection of employees.

46.    In late 2015, anonymous aggregated data collected by *Glassdoor* concluded that McDonald's pays entry-level employees in the United States between $7.25 per hour and $11 per hour, with an average of $8.69 per hour.  Shift managers are paid an average of $10.34 per hour. Assistant managers are paid an average of $11.57 per hour.

47.    In 2015, McDonald's CEO, Steve Easterbrook, earned an annual salary of $7.9 million, a 368% raise over his 2014 salary; all while low-wage McDonald's workers are striking around the world for a livable income.

48.    McDonald's workers have on occasion decided to strike over pay, with most of the employees on strike seeking to be paid $15.00.  McDonald's has helped franchise owners beat back union-backed strikes calling for living wages.

49.    When interviewed about the strikes, former McDonald's CEO Ed Rensi argued that increasing employee wages would take away from entry-level jobs: "It's cheaper to buy a $35,000 robotic arm than it is to hire an employee who's inefficient making $15 per hour bagging french fries."[8]  McDonald's attitude towards working conditions is not much better than its attitude toward wages.  In March 2015, McDonald's workers in 19 U.S. cities filed 28 health and safety complaints with OSHA, which allege that low staffing, lack of protective gear, poor

_____

[8] Kate Taylor, *McDonald's ex-CEO just revealed a terrifying reality for fast-food workers*, Insider (May 25, 2016), http://www.businessinsider.com/mcdonalds-ex-ceo-takes-on-minimum-wage-2016-5 (last visited April 1, 2017).

training and pressure to work fast have resulted in injuries. The complaints also allege that,

because of a lack of first aid supplies, workers were told by management to treat burn injuries

with condiments such as mayonnaise and mustard.

50.     Despite the objections of McDonald's, the term "McJob" was added to Merriam-

Webster's Collegiate Dictionary in 2003. The term is defined as "a low-paying job that requires

little skill and provides little opportunity for advancement."[9]

**C.      Plaintiff and the Putative Class Members Work as Employees at McDonald's McOpCo Restaurants or at McDonald's Franchise Restaurants**

51.     Like other fast food chains in the industry, McDonald's restaurants maintain

teams of staff in order to oversee operations and guide entry-level employees through daily

responsibilities.

52.     Specific job titles falling under the category of "management" include shift or

swing manager, assistant manager, and store manager.

53.     Swing managers may work part-time or full-time, depending on the needs of the

specific location.

54.     Assistant managers and store managers usually work full-time schedules of

40 hours or more per week. Processing payroll, updating time sheets, demonstrating protocol,

tracking supply and shipment orders and communicating with the company regional offices are

additional job duties of assistant and store managers.

---

[9] Available at https://www.merriam-webster.com/dictionary/McJob (last visited September 18, 2017).

55.     Wages and salaries for employees of franchised stores are not dictated in any way by McDonald's, but average pay scales start out at $8.00 per hour for inexperienced shift managers and eventually rise to roughly $12.00 per hour for highly qualified or tenured shift managers.

56.     Assistant manager positions yield annual salary options slightly varied by location but usually falling between $20,000 and $30,000.

57.     Store managers may begin at $30,000 per year and receive raises or pay increases.

58.     Each franchise (and McDonald's itself, for the McOpCo restaurants) is its own economic decision-maker on employment issues, so wages are not uniform among the competing franchisee and McOpCo stores. Low wages, however, are consistent across the McDonald's empire of company and franchise-owned restaurants, and have allowed McDonald's shareholders and executives, and thousands of its franchise owners, to become very wealthy while full-time, hardworking employees have to seek government benefits just to put food on their own tables. A significant reason that gross inequity exists between McDonald's and franchise owners on the one hand, and their employees on the other, is that McDonald's is stifling employee wages through its no-hire prohibition.

## PLAINTIFF DESLANDES

59.     In 2009, Plaintiff began working for Bam-B at its franchised McDonald's-brand restaurant in Apopka, Florida. At all relevant times herein, Plaintiff was paid on an hourly basis and properly recorded all of her hours worked.

60.     Between 2009 and 2010, Plaintiff received various promotions and raises and did exemplary work.

61.     Plaintiff started as an entry-level crew person earning $7.00 per hour. After about three months, Plaintiff was promoted to Shift Manager earning $10.00 per hour.

62.     In 2011, Plaintiff was promoted to Department Manager of Guest Services
earning $12.00, where she was responsible for guest services and managing the cash.  There
were two other Department Managers on her level.  One was in charge of employees and human
resources, and the other was in charge of kitchen and ordering.

63.     After becoming Department Manager, Plaintiff began course work to become
eligible for a General Manager position. McDonald's offers proprietary training programs
necessary in order to advance through the McDonald's system.  Plaintiff took on required
weeklong training courses, online classes, and phone conferences put on by McDonald's.  In
continuing her knowledge, expertise, and education in the McDonald's system, Plaintiff tolerated
a difficult work environment at Bam-B, where Bam-B required her to work overtime, but failed
to pay overtime wages; provided her difficult shifts in which she had to sacrifice time with her
children to meet management expectations; and failed to provide raises and bonuses.

64.     Before Plaintiff could become a General Manager, she had to complete one final
weeklong proprietary McDonald's training course at McDonald's "Hamburger University" in
Illinois.  The training was scheduled for April 2015; however, before Plaintiff could go, her
supervisors found out she was several months pregnant and they cancelled her training.  Plaintiff
was not due until more than six months later.  It was clear that this franchise that had suppressed
her wages and abused the overtime laws was now going to hinder her McDonald's system
education and promotion because she was pregnant.

65.     Plaintiff immediately decided to look for another managerial job that would
appreciate her skills, not violate overtime law, not discriminate against her because she was
pregnant, and would give her the pay and promotion opportunities she deserved based on her
performance. For reasons that are further described below, the experience and education Plaintiff
developed over the previous four years at Bam-B and in McDonald's training had significant

16

value in the McDonald's organization made up of thousands of different franchises and McOpCo restaurants, but they did not translate to restaurants outside of the McDonald's system.

66.     Soon thereafter, Plaintiff located a departmental manager opening at a nearby McDonald's restaurant, located at 451 S. Goldenrod Road, in Orlando. That McDonald's restaurant is a McOpCo restaurant, owned by McDonald's Restaurants of Florida, Inc. Defendant McDonald's USA, LLC is the immediate parent of McDonald's Restaurants of Florida, Inc., and Defendant McDonald's Corporation is the ultimate parent.

67.     For performing the same job Plaintiff had fulfilled at Bam-B, the McOpCo restaurant position in Orlando started at $13.75 per hour, a substantial 15 percent raise for Plaintiff, and after a 90-day probation period, the pay would increase to $14.75 per hour, which would have been a 23 percent increase in pay from her stagnated $12.00 per hour at Bam-B. Further, the McOpCo McDonald's restaurant did not appear to be violating overtime laws, which would either give Plaintiff an additional effective increase in pay, or give her more time with her family.

68.     This appeared to be a very good opportunity to leave a business that was underpaying employees, denying promotions and raises, and violating labor laws.  Plaintiff applied for this position online.  She spoke with the manager of the McOpCo McDonald's restaurant, who called Plaintiff and expressed a desire to hire Plaintiff with more pay, better promotion opportunities, and a better shift.  Plaintiff informed the manager that she was currently employed at Bam-B's restaurant and that she wanted to leave.  The next day, Plaintiff received a call from a McDonald's corporate employee, who explained that the McOpCo restaurant could not even interview (much less hire) Plaintiff because she was currently employed by a McDonald's franchisee and it could not hire employees working at other McDonald's franchises unless she was "released" by the Bam-B franchise.

69.     The next day Plaintiff reported for her 8 a.m. to 4 p.m. shift and asked her supervisors at Bam-B to "release" her so that she could pursue this opportunity. Her supervisors informed her that her request was denied and they would not release her because she was "too valuable." She continued working for Bam-B, unable to use her skills, expertise and education at McDonald's to secure a raise or promotion. However, Plaintiff had a family to feed; therefore, she continued to work for Bam-B.

70.     In January 2016, Plaintiff finally quit her job with Bam-B because she continued to work without raises, promotions or promotion opportunities,[10] all while Bam-B continued to engage in violation of overtime laws. It was clear that things were not going to change, and Bam-B was not going to release her to use her skills, education and experience at another McDonald's location.

71.     Plaintiff's training was in McDonald's management, which is only valuable and transferrable within the McDonald's system. Plaintiff knew it would be futile to obtain employment in another McDonald's store. The no-solicit and no-hire prohibition plus disenchantment with the McDonald's organization for allowing this to happen, meant that she had to start work with a new organization, back at an entry level position. Plaintiff consequently took employment with Hobby Lobby, a retail store, at a significantly lower pay rate of $10.25 per hour.

**D.      McDonald's Model Is Designed to Encourage Competition With Regard to Sales Between and Among Franchisees and McOpCo Stores**

---

[10] Plaintiff never received any further opportunity to complete her Hamburger University training to become a General Manager (despite the fact she was assigned to perform many of the general manager duties as there was a constant rotation of general managers).

72.     While McDonald's implemented policies to actively thwart competition for employees between and among it and franchises in order to suppress employee wages, it encouraged competition between franchises in food sales that benefitted McDonald's and it emphasized that franchisees are independent of McDonald's.

73.     McDonald's public disclosures and agreements with McDonald's franchisees emphasize that McDonald's franchisees operate separately from each other and from McDonald's.

74.     McDonald's standard franchise agreement itself contains a provision with the header "***Franchisee Not an Agent of McDonald's***" (emphasis in original), that characterizes franchisees as "independent contractors."  Pursuant to that provision, McDonald's and franchisees agree that, "Franchisee shall have no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose. … Further, Franchisee and McDonald's are not and do not intend to be partners, associates, or joint employers in any way and McDonald's shall not be construed to be jointly liable for any acts or omissions of Franchisee under any circumstances."

75.     Unlike other franchise business models, McDonald's does not permit its franchisees an exclusive geographic territory within which they will not face competition from other McDonald's restaurants, including McOpCo restaurants. The McDonald's Franchise Disclosure Document ("FDD") states at the outset that franchisees "should not have any expectation that the economic and demographic factors that exist at your McDonald's restaurant location will remain constant.  In addition, other McDonald's restaurants (including those that we develop in the future) may have an effect on the sales of your McDonald's restaurant, since

customers typically patronize various McDonald's restaurants depending on their travel patterns and other factors."

76.      McDonald's FDD specifies that the Franchise Agreement "does not contain any exclusive grant, exclusive area, exclusive territorial rights, protected territory, or any right to exclude, control, or impose conditions on the location or development of future McDonald's restaurants at any time.  You will not receive an exclusive territory."

77.      The FDD further stresses that the franchisee "may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control[,] and that "[t]he sales and customer trading patterns . . . . do not represent any continuing franchisee entitlement or expectation.  McDonald's may establish other franchisee or … McOpCo company-owned outlets that may alter customer trading patterns and affect the sales of, and compete with, your location."  The FDD notes that McDonald's reserves the right to use McDonald's trademarks and to sell similar goods and services through "any other channel of distribution."

78.      McDonald's standard franchise agreement itself specifies that the franchisee is authorized to use the McDonald's system (for a specified period of time) only at the particular restaurant specified therein.  It also states that the franchisee has no "'exclusive,' 'protected,' or other territorial rights in the contiguous market area" of the specified restaurant location.

79.      While franchisees are required to pay to McDonald's a percentage of gross sales revenues, franchisees are free to negotiate purchasing terms with approved suppliers and to seek approval of new suppliers.

80.      Franchisees may also compete with each other by allowing customers to use certain credit and debit cards or certain gift cards, neither of which is a system-wide requirement.

81.     A franchisee's profitability is a function of a number of inputs, including its cost of labor, which McDonald's specifically identifies as a franchisee operating expense. Franchisees are required to enroll present and future managers at McDonald's training centers, the travel cost and expense of which is borne by franchisees.

82.     According to McDonald's Senior Director of U.S. Franchising, franchisees are responsible for the day-to-day operations of their restaurants, including employment matters and legal compliance.

83.     But for the no-hire agreement, each McDonald's franchise (and McDonald's itself in its McOpCo stores) is its own economic decision-maker with respect to hiring, firing, staffing, promotions and employee wages.  But for the no-hire agreement, each McDonald's franchise (and McDonald's itself) would compete with each other for the best-performing employees.

**E.     The "No Hire" Agreement**

84.     While independent business owners should be encouraged to compete with each other for employees, McDonald's and its franchisees have agreed not to compete among each other for employees.

85.     Franchises are made available on standardized terms, so a franchisee who enters into a franchise agreement knows that the same terms it has agreed-to also apply to other franchisees.

86.     Until sometime in 2017, McDonald's and its franchisees entered into express contractual agreements forbidding competition for employees among franchisees and McDonald's company-owned stores.  In particular, the standard language in McDonald's franchise agreements with all franchisees who executed franchise agreements prior to sometime in 2017 includes an express "no-solicit" and "no-hire" provision that prohibits franchisees from hiring employees of other McDonald's franchisees or of McDonald's or its subsidiaries.

87.  The relevant provision from the McDonald's franchise agreement states:

*Interference With Employment Relations of Others.*  During the term of this Franchise, Franchisee shall not employ or seek to employ any person who is at the time employed by McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant or otherwise induce, directly or indirectly, such person to leave such employment.  This paragraph [] shall not be violated if such person has left the employ of any of the foregoing parties for a period in excess of six (6) months.

88.  As described above, this provision was interpreted and enforced by McDonald's itself as applying not only to franchisee hiring, but also to McDonald's hiring in its company-owned McOpCo stores.  Plaintiff applied for a position with a McOpCo store in Orlando, Florida, and was informed by a McDonald's corporate representative that the McOpCo store could neither interview nor hire her unless she was "released" by her employer, Bam-B.

89.  According to the standard franchise agreement, any breach of this no-hire and no-solicitation provision would give McDonald's the right to seek judicial enforcement of its rights and remedies, including injunctive relief, damages, or specific performance.  An uncured breach qualifies as sufficient reason for McDonald's to withhold approval of its consent to any assignment or transfer of the franchisee's interest in the franchise, and repeated breaches could constitute grounds for termination of the franchise.

90.  The no-hire and no-solicitation provision quoted above appeared in the standard McDonald's franchise agreement appended to its 2013 FDD (with "Issuance Date" of May 1, 2013, "as amended October 25, 2013").

91.  The no-hire and no-solicitation provision quoted above also appeared (unchanged) in the standard McDonald's franchise agreement appended to its 2014 FDD, amended in 2015 (with "Issuance Date" of May 1, 2014, "as amended" on both November 6, 2014 and January 25, 2015).

92.     In 2017, apparently after the filing of this lawsuit, McDonald's removed the no-hire and no-solicitation provision from its standard franchise agreement.  The no-hire and no-solicitation provision is no longer a part of the standard McDonald's franchise agreement appended to McDonald's current FDD.  The current FDD states an "Issuance Date" of May 1, 2017, "as amended August 1, 2017."  The current FDD disclosure of "Litigation – Pending Cases" includes a one-paragraph description of this lawsuit, which was filed on June 28, 2017.

93.     At the beginning of 2017, McDonald's had more than 13,000 restaurants operating under existing franchise agreements.  None of these franchisees executed the form of standard franchise agreement first issued in 2017 after the filing of this lawsuit.  The franchise agreement executed by each such franchisee included the no-solicitation and no-hire provision quoted above.

94.     Any new provisions of the 2017 standard franchise agreement (including the absence of the express no-hire and no-solicitation provision) do not govern McDonald's contractual franchise relationship with existing franchisees.  Those franchisees are governed by the franchise agreements that they previously executed with McDonald's, typically with 20-year terms.  Execution of a new franchise agreement typically requires the franchisee to pay a new franchise fee (currently $45,000) for a new term, if approved by McDonald's.

95.     The franchise agreement itself contains an integration clause stating that the agreement "constitutes the entire agreement between the parties and supersedes all prior and contemporaneous, oral or written, agreements or understandings of the parties."  It states further that nothing in the agreement "is intended to disclaim the representations made in the [FDD] furnished to the Franchisee."

96.     The FDD confirms that there are "No modifications generally" of the agreement, but that operations and training manuals may be subject to change.  Further, "Only the terms of

the Franchise Agreement are binding (subject to state law)." The FDD also specifies that "Internal policies which McDonald's may apply and modify periodically in connection with decisions to develop new restaurants are not part of the Franchise Agreement and do not involve any contract right granted to [the franchisee]." Franchisees that executed franchise agreements prior to 2017 continue to be bound by the terms of those agreements.

> **F.**     **Other Evidence of a Horizontal Agreement among Competing Franchisees and McDonald's**

97.     Public corporate filings reveal that McDonald's admits that its success depends in part on its "System's ability to recruit, motivate and retain a qualified workforce to work in our restaurants in an intensely competitive environment" and the "[i]ncreased costs associated" with retaining qualified employees applies to its franchisees.

98.     Employment applications available online for McDonald's restaurants ask applicants whether they have worked for McDonald's before. That question is separate and apart from the history of employment portion on the application. This helps the prospective employer easily flag current employees employed by competing McDonald's franchisees or McOpCo stores and prevents violation of the no-hire provision.

99.     The "no-solicit" and "no-hire" agreement embodies norms that are widely accepted across the fast-food industry and familiar to franchisees. In advising new restaurant owners on how to hire their first general manager, one industry expert instructs that, "you have to be careful that you do not earn a reputation for stealing other people's employees."

100.     The potential for broader collusion in franchise chains is clearly enhanced when no-poaching agreements are in place. Collusion is promoted when the no-poach agreements can be easily generated and monitored amongst a concentrated group of competitors who all stand to gain profits from the collusion while maintaining similar costs.

101.     Plaintiff was a direct victim of the "no-solicit" and "no-hire" agreement, in that it was adhered to by both a McOpCo McDonald's restaurant and by an independent franchise owner (Bam-B) in order to prevent Plaintiff from using competition to obtain a living wage, promotion opportunities, and find comparable and/or better employment.  It was a McDonald's corporate employee (and not the manager of the Orlando McOpCo restaurant at which she applied) who informed Plaintiff that she could not be hired or even interviewed for the McOpCo restaurant position due to her employment at another McDonald's location.

G.     **The "No-Hire" Agreement Is Against the Independent Interests of the Franchisees and of the McOpCo Restaurants in their Capacity as Competitors**

102.     This no-hire provision is short-sighted and ultimately not in the independent interests of the franchisees or the McOpCo restaurants in their capacity as competitors of each other, even though it is in the collective interest of the conspirators as a whole when acting together.  Employees are critical to the success of McDonald's franchisees and McOpCo restaurants.

103.     It is the sales in franchise-operated restaurants that brings the most revenue to McDonald's, so McDonald's profits hinge on the success or failure of its franchisees.  A significant component of making the franchise profitable is hiring qualified, motivated, and superior employees.

104.     Therefore, it is in the independent interest of each McDonald's franchisee to compete for the most talented and experienced restaurant employees.

105.     By adhering to the no-hire agreement, franchisees and McOpCo restaurants artificially restrict their own ability to hire other employees in a manner that is inconsistent with their own unilateral economic interests.  By acting in concert, however, they also artificially protect themselves from having their own employees poached by other franchises or locations

that see additional value in those employees, such as their training, experience and/or work ethic. This allows franchisees or McOpCo restaurants to retain their best employees without having to pay market wages to these employees or compete in the market place relative to working conditions and promotion opportunities.

106.    The "no-hire" agreement does not serve the interests of ensuring that McDonald's restaurants produce a quality product.

107.    The "no-hire" agreement does not serve employees because it does not incentivize McDonald's franchisees and McOpCo restaurants to invest in higher wages, benefits, and working conditions.  It also dis-incentivizes employees to perform their best work as their opportunities by doing so are limited.  Alternatively, competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment.

108.    The "no-hire" agreement does not serve fast-food customers because it does not incentivize McDonald's franchisees or McOpCo restaurants to invest in training workers to improve the McDonald's food, experience and service.

109.    Consumers can gain from competition among employers because a more competitive workforce may create more or better goods and services.  Furthermore, unemployment has reached a 16-year low and job openings are at an all-time high, yet wage growth has remained surprisingly sluggish with fast-food workers relying on public assistance to supplement their income.  Higher wages will lessen the strain on public benefits, benefiting all consumers.

### H.    Employment with Non-McDonald's Brands is Not a Reasonable Substitute for McDonald's Employees

110.    Consistent with Plaintiff's experience, online reviews for employment at McDonald's restaurants report that there was little or no way "to advance after working for nearly two years;" "management told [employees] they were easily replaceable;" "advancement

never an option" and working at McDonald's offered "no real opportunity for advancement." That is all made possible by the "no-hire" prohibition. If franchisees and McOpCo restaurants had to either pay and promote good employees, or lose them to competitor locations, they would be forced to pay competitive wages and provide competitive promotion opportunities. However, because of the no-hire prohibition, and because the education, training and experience within the McDonald's enterprise are unique to McDonald's and not transferrable to other restaurants, McDonald's franchisees and McOpCo restaurants do not have to compete with non-McDonald's businesses for their employees except at the entry-level position.

111.    Training, education, and experience within the McDonald's system are not transferrable to other restaurants for a number of reasons. McDonald's franchises utilize McDonald's own proprietary computer systems and platforms, including proprietary applications and data systems, which new franchises must purchase through McDonald's approved suppliers. Franchises electronically submit their store financial information to McDonald's via a separate proprietary web-based system. Experience with these systems is of little value to other restaurants.

112.    McDonald's franchises also utilize proprietary store operating procedures, McDonald's methods of inventory control and bookkeeping/accounting procedures, and McDonald's-prescribed equipment. Training is also accomplished through proprietary curricula and systems. According to McDonald's Franchise Disclosure Document, training is designed to provide the "specific skill sets in the various facets of the conduct of a McDonald's restaurant, including such areas as equipment, standards, controls, and leading people." The Disclosure informs that it takes "approximately two years" to complete all of the learning plans from Shift Manager through General Manager.

113. A no-hire agreement like this one reduces workers' outside options and lowers their quit rate, increasing the share of net-returns captured by employers. Further, a franchise-wide no-hire agreement increases the specificity of human capital investment, as training that is productive throughout the franchise chain can only be used at one franchisee under the agreement.

114. Because Plaintiff was unable to transfer her skills and experience to a competing McDonald's restaurant at significantly more money, her only option was to quit and start over at an entry-level job and salary in another industry.

**I.    Plaintiff and the Class Members Have Suffered Antitrust Injury**

115. Because of the "no-solicit" and "no-hire" agreement, Plaintiff and the putative class have suffered injury in the form of reduced wages and worsened working conditions.

116. Suppressed wages due to employers' agreement not to compete with each other is injury of the type the antitrust laws were intended to prevent and flows from that which makes the "no-hire" and "no-solicit" agreement unlawful.

**CLASS ALLEGATIONS**

117. Plaintiff brings this action on her own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3).

Nationwide Class:

> All persons in the United States who are current or former employees and/or managers at all McDonald's restaurants whether operated by McDonald's itself or by a McDonald's Franchisee.

118. Alternatively, Plaintiff brings this action on her own behalf, and on behalf of a Class of Florida residents pursuant to Rule 23(a), 23(b)(2), and/or 23(b)(3).

Florida Class:

> All persons in the State of Florida who are current or former employees and/or managers at all McDonald's restaurants whether operated by McDonald's itself or by a McDonald's Franchisee.

119.     Except where necessary to differentiate, the Nationwide Class, the Florida Class, and their members shall be referred to herein as the "Class," the "Classes" or "Class Members." Excluded from the Classes are Defendant McDonald's, its affiliates, officers and directors, and the Judge(s) assigned to this case.  Plaintiff reserves the right to modify, change, or expand the Class definitions on discovery and further investigation.

120.     Numerosity:  Upon information and belief, the Classes are so numerous that joinder of all members is impractical; there are over 14,000 McDonald's restaurants in the United States.  While the exact number and identities of the individual Members of the Classes are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that thousands of Class Members are the subjects of the Class.

121.     Existence and Predominance of Common Questions of Fact and Law:  Common questions of fact and law exist as to all Members of the Class.  These questions predominate over the questions affecting individual Class Members.  These common legal and factual questions include, but are not limited to, whether:

> a.     Defendant engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;
>
> b.     Defendant's conduct constituted unfair competition;
>
> c.     Defendant's conduct constituted unlawful, unfair, and fraudulent business acts and practices;

     d.      Defendant violated the Sherman Antitrust Act, 15 U.S.C. §§ 1, *et seq.*;

     e.      Defendant violated the Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*;

     f.      Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

     g.      Defendant should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

     h.      Plaintiff and Class Members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, and/or other relief; and

     i.      The amount and nature of such relief to be awarded to Plaintiff and the Class.

122.    Typicality:  All of Plaintiff's claims are typical of the claims of the Class inasmuch as Plaintiff was a McDonald's franchisee restaurant manager/employee, and each Member of the Class either was or is a McDonald's owned or franchisee restaurant employee/manager subject to the same agreements and rules as Plaintiff.  Further, Plaintiff and all the Members of the Class sustained the same monetary and economic injuries of being subjected to artificial suppression of compensation, wages, benefits, and growth opportunity, and the remedy sought for each is the same in which Plaintiff seeks relief against Defendant for herself and all absent Class Members.

123.    Adequacy:  Plaintiff is an adequate representative because her interest does not conflict with the interest of the Classes that she seeks to represent, she has retained counsel competent and highly experienced in complex Class Action litigation, and she intends to prosecute this action vigorously.  The interest of the Class will be fairly and adequately protected by Plaintiff and her counsel.

124.    Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Classes.  The injuries suffered by each individual Class Member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  It would be virtually impossible for members of the Classes individually to redress effectively the wrongs done to them.  Even if the Members of the Classes could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, Members of the Classes can be readily identified and notified based on, inter alia, Defendant's employment records and franchisees' records.

125.    Defendant has acted, and refuses to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## CLAIMS FOR RELIEF

## COUNT I: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

## 15 U.S.C. § 1, *et seq.*

(By Plaintiff on Behalf of the Nationwide Class and, Alternatively,

the Florida Class)

126.    Plaintiff, on behalf of herself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint, and further alleges against Defendant as follows:

127.     Beginning no later than 2013, Defendant entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

128.     Defendant engaged in predatory and anticompetitive behavior by restricting competition among and between business franchisees and itself in McOpCo restaurants, which unfairly suppressed employee wages, and unreasonably restrained trade.

129.     Defendant's conduct included concerted efforts, actions and undertakings among the Defendant and franchisee owners with the intent, purpose and effect of: (a) artificially suppressing the compensation of Plaintiff and Class Members; (b) eliminating competition among Defendant and franchise owners for skilled labor; and (c) restraining employees' ability to secure better compensation, advancement, benefits, and working conditions.

130.     Defendant perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendant and franchise owners.

131.     Defendant's conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by its respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

132.     Plaintiff and Class Members have received lower compensation from Defendant and independent franchise businesses than they would otherwise would have received in the absence of Defendant's unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

133.     Defendant's contracts, combinations, and/or conspiracies are per se violations of Section 1 of the Sherman Act.

134.    In the alternative, Defendant is liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

135.    Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

136.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

137.    Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Sherman Act alleged herein.


## COUNT II: VIOLATIONS OF THE ILLINOIS ANTITRUST ACT
### 740 ILCS 10/1, *et seq.*

(By Plaintiff on Behalf of the Nationwide Class and, Alternatively,

the Florida Class)

138.    Plaintiff, on behalf of herself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint, and further alleges against Defendant as follows:

139.    Defendant engaged in unlawful contracts, combinations, and/or conspiracies in restraint, trade or commerce in violation of Illinois Antitrust Act, 740 ILCS 10/1, *et seq*.

140.    As alleged above, Defendant engaged in predatory and anticompetitive behavior to not solicit restaurant-based employees and/or managers from other McDonald's restaurants.

The no-hire agreements were unknown to workers and were not an agreement involving traditional labor disputes traditionally subject to state and federal labor laws.

141.     Defendant's specific intent has been to substantially lessen competition in the market for employee and/or manager positions among McDonald's restaurants and limit the compensation, benefits, and opportunities for such positions.

142.     A substantial amount of trade and commerce has been affected and will continue to be affected, in the market for McDonald's employees and/or managers as a result of Defendant's unreasonable restraint of trade and commerce.

143.     A substantial portion of Defendant's behavior constituting the violations alleged above occurred in the State of Illinois and has had a substantial impact of trade or commerce within the State of Illinois.

144.     As alleged above, Defendant's contract, combination, and/or conspiracy constitutes unreasonable restraints on trade and commerce, all of which are per se violations of the Illinois Antitrust Act, 740 ILCS 10/3, *et seq.*, or in the alternative, violations under the rule of reason.

145.     As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

146.     Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Illinois Antitrust Act alleged herein.

## COUNT III: VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

**815 ILCS 505/1, *et seq.***

(By Plaintiff on Behalf of the Nationwide Class or, Alternatively,

the Florida Class)

147.    Plaintiff, on behalf of herself and all others similarly situated, re-alleges and

incorporates by reference the allegations contained in the preceding and succeeding paragraphs

of this Complaint, and further alleges against Defendant as follows:

148.    At all times relevant, Plaintiff, the Class, and Defendants are all persons within

the meaning of 815 ILCS 505/1(c).

149.    At all relevant times, Plaintiff and the Class are consumers within the meaning of

815 ILCS 505/1(e).  Plaintiff and the Class are consumers within the meaning of the Illinois

Consumer Fraud Act given that Defendant's practices were addressed to the market generally

and/or otherwise implicate consumer protection issues, including, but not limited to, the fact that

a lack of competitive workforce in the franchise industry prevents better goods and services,

restricts wages and mobility of the workforce, creates a strain on public assistance, and thereby

affects all consumers generally.

150.    At all times material, Defendant's acts and omissions occurred in the course of

trade and commerce within the meaning of 815 ILCS 505/1(f).

151.    Section 2 of the Illinois Consumer Fraud Act provides, in relevant part:

> Unfair methods of competition and unfair or deceptive acts or
> practices, including but not limited to the use of or employment of
> any deceptive, fraud, false pretense, false promise,
> misrepresentation or the concealment, suppression or omission of
> any material fact, with intent that others rely upon the
> concealment, suppression or omission of such material fact, or the
> use of employment of any practice described in Section 2 of the
> "Uniform Deceptive Trade Practices Act," approved August 5,
> 1965, in the conduct of any trade or commerce are hereby declared
> unlawful whether any person has in fact been misled, deceived or
> damaged thereby.  In construing this section consideration shall be
> given to the interpretations of the Federal Trade Commission and

35

the federal courts relating to Section 5(a) of the Federal Trade
Commission Act.

815 ILSC 505/1 (footnotes omitted).

152. Defendant's actions to restrain trade and fix the total compensation of the Class
Members constitutes unfair competition and unlawful, unfair, and fraudulent business acts and
practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,
815 ILCS 505/1, *et seq*.

153. Defendant illegally participated in an agreement among competitors that
restrained employees from engaging in a lawful profession, trade, or business. Defendant
perpetrated the scheme with the purpose of fixing lower costs to the benefit of Defendant and
franchise owners.

154. Defendant has committed unfair or deceptive acts by engaging in the acts and
practices alleged herein. Defendant's conduct included concerted efforts, actions and
undertakings among the Defendant and franchise owners with the intent, purpose and effect of:
(a) creating and carrying out restrictions in trade and commerce; (b) artificially suppressing the
compensation of Plaintiff and Class Member; (c) eliminating competition among Defendant and
franchise owners for skilled labor; (d) restraining employees' ability to secure better
compensation, advancement, benefits, and working conditions; (e) fixing the compensation of
Class Members at artificially low levels; and (f) creating a burden on public assistance,
constituting unfair competition and unlawful, unfair, and fraudulent business acts and practices
within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815
ILCS 505/1, *et seq*. Defendant's conduct violates public policy by unfairly suppressing employee
wages, and unreasonably restrained trade, and Plaintiff and the Class were unaware of the "no-
hire" clause and had no choice but to submit, thereby preventing Plaintiff and the Class from

negotiating better wages and conditions, causing substantial injury by interfering with prospective relations and stifling competition.

155.    Defendant's conduct, individually and in concert as alleged above and herein is immoral, unethical, oppressive, unjust, unconscionable and unscrupulous, and caused and continues to cause substantial economic injury to Plaintiff and the Class.

156.    Defendant's conduct is driven by greed, profiteering, and conspiracy to artificially suppress the supply and demand for workers to the detriment of Plaintiff and the Class as alleged herein.

157.    Defendant intended that Plaintiff and the Class rely on material misrepresentations, deceptions, unfair practices, and/or omissions alleged herein.

158.    Defendant's unfair and deceptive conduct are willful and wanton, constitute intentional violations of the relevant statutes.

159.    As a result of Defendant's violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Defendant has unjustly enriched itself at the expense of Plaintiff and the Classes.  The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and practices continue.

160.    The conduct is unfair, unlawful, or unconscionable under Illinois law.

161.    To prevent their unjust enrichment, Defendant and its co-conspirators should be required to disgorge their illegal gains for the purpose of making full restitution to all injured Class Members identified hereinabove.

162.    Defendant should also be permanently enjoined from continuing its violations of the Illinois Consumer Fraud and Deceptive Business Practices Act.

163.    A substantial portion of Defendant's behavior constituting the violations alleged above occurred in the State of Illinois and has had a substantial impact of trade or commerce within the State of Illinois.

164.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Members of the Class have suffered and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and Members of the Class, requests that this Court:

A.    determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.    appoint Plaintiff as the representative of the Class and her counsel as Class Counsel;

C.    declare that Defendant's actions as set forth in this Complaint violate the law;

D.    award Plaintiff and the Class damages in an amount according to proof against Defendant for Defendant's violations of 15 U.S.C. §1, to be trebled in accordance with those laws;

E.    award Plaintiff and the Class damages in an amount according to proof against Defendant for Defendant's violations of 740 ILCS 10/1 *et seq.*, to be trebled in accordance with those laws;

F.      award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class Members are entitled;

G.      grant equitable relief, including a judicial determination of the rights and responsibilities of the parties;

H.      grant a permanent injunction enjoining Defendant from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

I.      declare Defendant be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

J.      grant judgment against Defendant and in favor of Plaintiff and each Member of the Class she represents, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them and/or imposing a constructive trust upon Defendant's ill-gotten gains, freezing Defendant's assets, and/or requiring Defendant to pay restitution to Plaintiff and to all Members of the Class of all funds acquired by means of any act or practice declared by this Court to be unlawful, unfair, or fraudulent;

K.      declare Defendant to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class Members;

L.      award pre-judgment and post-judgment interest on such monetary relief;

M.      award reasonable attorneys' fees and costs; and

N.      grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Date:   September 18, 2017

Respectfully Submitted,

**LEINANI DESLANDES**

*s/ Derek Y. Brandt*
*One of the Attorneys for Plaintiff*

Derek Y. Brandt
Illinois State Bar No. 6228895
**Brandt Law LLC**
P.O. Box 487
Edwardsville, Illinois 62025
Tel: (618) 307-6116 / Fax: (618) 307-6161
derek@brandtlawllc.com

Richard D. McCune (*pro hac vice*)
California State Bar No. 132124
Michele M. Vercoski (*pro hac vice*)
California State Bar No. 244010
Emily J. Kirk
Illinois State Bar No. 6275282
**McCune Wright Arevalo, LLP**
3281 E. Guasti Road, Suite 100
Ontario, CA 91761
Tel: (909) 557-1250 / Fax: (909) 557-1275
rdm@mccunewright.com
mmv@mccunewright.com
ejk@mccunewright.com

Jason K. Whittemore*
Florida State Bar No.: 0037256
WAGNER MCLAUGHLIN, P.A.
601 Bayshore Blvd., Suite 910
Tampa, Florida 33606-2786
Tel: (813) 225-4000 / Fax: (813) 487-1007
Jason@wagnerlaw.com

*\*Pro Hac Vice* Application to be Submitted

Attorneys for Plaintiff

40

## <u>CERTIFICATE OF SERVICE</u>

I, Derek Y. Brandt, hereby certify that the foregoing **AMENDED CLASS ACTION COMPLAINT** was electronically filed on September 18, 2017 and will be served electronically via the Court's ECF Notice system upon the registered parties of record.

*s/ Derek Y. Brandt*
Derek Y. Brandt