UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LEINANI DESLANDES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17 C 4857 |
| ) | |
| v. ) | |
| ) | Judge Jorge L. Alonso |
| McDONALD'S USA, LLC, ) | |
| McDONALD'S CORPORATION, and ) | |
| DOES 1 through 10, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

After a no-hire agreement prevented plaintiff from obtaining a position with a rival employer, plaintiff Leinani Deslandes ("Deslandes") filed suit asserting, among other things, that defendants' no-hire agreement violates the Sherman Antitrust Act, 15 U.S.C. § 1. Defendants McDonald's USA, LLC and McDonald's Corporation move to dismiss. For the reasons set forth below, the Court grants in part and denies in part defendants' motion to dismiss [34].

**I.    BACKGROUND**

Plaintiff's story is one of employment success: she started as an entry-level crew member paid $7.00 per hour at a McDonald's franchise and worked her way up into management. When she applied for a better-paying position with a competing McDonald's restaurant, she was foiled by a no-hire agreement which forbid the competing McDonald's restaurant to hire both current employees of other McDonald's restaurants and anyone who had worked for a competing McDonald's restaurant in the last six months. Given that most individuals in the low-skill employment market do not have the luxury of being unemployed by choice for six months, the no-hire provision effectively prevented competing McDonald's

franchises (as well as the company-owned stores) from competing for experienced, low-skill employees. The following facts are from plaintiff's complaint and are taken as true.

Defendant McDonald's USA, LLC is a wholly-owned subsidiary of defendant McDonald's Corporation. Plaintiff generally refers to them collectively as "McDonald's." The ubiquitous purveyor of hamburgers serves 68,000,000 customers per day from some 36,000 outlets around the world. According to plaintiff's complaint, nearly two million people work for McDonald's or its franchisees.

Many McDonald's-brand restaurants are owned and operated by McDonald's Operating Companies ("McOpCos"), which are direct or indirect subsidiaries of McDonald's Corporation. McDonald's also franchises McDonald's-brand restaurants. Thus, many McDonald's-brand restaurants are independently owned and operated by franchisees. McDonald's receives revenue from the franchisees in the form of rent, royalties and fees.

McDonald's restaurants compete with one another. Franchisees are not granted exclusive rights or territories and are specifically warned that they may face competition from other franchisees, new franchisees and restaurants owned by McOpCos. Thus, restaurants owned by McOpCos compete directly with McDonald's franchisees (who, in turn, compete with each other) to sell hamburgers and fries to customers.

When franchising restaurants, McDonald's enters a standard franchise agreement with its franchisees.[1] Because the agreement is standard, franchisees know the basic contents of each other's agreements. Generally, each franchise agreement lasts for twenty years. In addition to a franchise fee, franchisees agree to pay McDonald's a percentage of gross revenue. McDonald's

---

[1] Plaintiff alleges that McDonald's Corporation is the franchisor for franchise agreements signed before 2005 and that McDonald's USA, LLC is the franchisor for franchise agreements signed from 2005 to the present.

has an incentive to promote revenue growth in its franchisees' restaurants and encourages competition between franchisees for food sales.

Under the standard franchise agreement, each franchisee is an independent business responsible for the operation of its particular McDonald's-brand restaurant. Under the agreement, franchisees are required to purchase supplies from approved suppliers. They can, however, seek approval of new suppliers, and they negotiate directly with the suppliers as to purchasing terms, such as price.

Franchisees, as independent business owners, are also responsible for the day-to-day operations of their respective restaurants and for, among other things, employment matters. Franchisees make their own decisions with respect to hiring, firing, wages and promotions. The standard franchise agreement specifically states that franchisees are not agents of McDonald's and that McDonald's is not a joint employer with respect to the franchisees' employees.

Although franchisees make most of their employment decisions independently, their hiring decisions are restricted in one respect by the standard franchise agreement. The standard agreement that was used until some point in 2017 contained a no-hire provision. Specifically, the relevant provision stated:

> *Interference With Employment Relations of Others*. During the term of this Franchise, Franchisee shall not employ or seek to employ any person who is at the time employed by McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant or otherwise induce, directly or indirectly, such person to leave such employment. This paragraph [] shall not be violated if such person has left the employ of any of the foregoing parties for a period in excess of six (6) months.

(Am. Complt. ¶ 87). Although McDonald's stopped including the no-hire provision in new franchise agreements at some point in 2017, the provision remains in the franchise agreements

3

applicable to some 13,000 currently-operating McDonald's-brand restaurants. McDonald's has applied the same restraint to hiring by the McOpCos.

Franchisees ignore the no-hire provision at their peril. A breach of the no-hire provision gives McDonald's the right not to consent to a transfer of the franchise. With repeated breaches, McDonald's has the right to terminate the franchise. Plaintiff alleges that the provision promoted collusion among franchisees, because each knew the other had signed an agreement with the same provision. Plaintiff alleges that the no-hire provision is against each franchisee's individual interest, because it denies each franchisee opportunities to hire the best employees. Plaintiff also alleges that, so long as the other franchisees also refrain from poaching employees, the no-hire provision helps franchisees keep costs low by allowing them to pay below-market wages to their own employees.

Although franchisees are generally responsible for their own employment decisions (so far as they do not violate the no-hire agreement, anyway), many McDonald's-brand restaurants are staffed in similar ways. Many stores have managers with varying titles, such as swing manager, assistant manager and store manager. Assistant and store managers are responsible for such tasks as payroll processing, time-sheet updating, tracking supplies and orders and training entry-level employees. McDonald's requires franchisees to enroll present and future managers in training programs at McDonald's training centers. The cost of the training is borne by the franchisees.

A McDonald's franchise in Florida ("Bam-B") first hired plaintiff in 2009. Plaintiff started as an entry-level employee earning $7.00 per hour, and, within three months, plaintiff had earned a promotion to shift manager, with a wage bump to $10.00 per hour. By 2011, plaintiff was a Department Manager for Guest Services, earning $12.00 per hour. At that point, plaintiff

began coursework to become eligible for a position as General Manager. Plaintiff's employer enrolled her in a week-long training course at McDonald's Hamburger University. The training was scheduled to take place in April 2015, but plaintiff's supervisors canceled her training when they learned plaintiff was pregnant.[2]

Fed up, plaintiff decided to put her skills to work elsewhere. Plaintiff found an opening for a position similar to hers at a nearby McDonald's restaurant. The restaurant was owned and operated by a McOpCo, which was a subsidiary of defendant McDonald's USA, LLC and which was subject to the no-hire provision. The positon at the McOpCo restaurant offered a wage of $13.75 per hour to start, with an expected bump to $14.75 after a 90-day probationary period. Plaintiff applied online and received a call from the store manager, who told plaintiff she would like to hire her. Plaintiff told the store manager that she worked for Bam-B. The next day, plaintiff received a call from a McDonald's corporate employee who told plaintiff the restaurant could neither interview nor hire her unless she was "released" by Bam-B to work for the McOpCo restaurant.

When plaintiff arrived at work the next day, she asked Bam-B to release her to work for the McOpCo restaurant. Bam-B said no, because plaintiff was "too valuable." Plaintiff continued to work for Bam-B for several months, but, ultimately, she took an entry-level job with Hobby Lobby for less money, $10.25 per hour. Plaintiff alleges that some of the skills she developed as a manager of a McDonald's outlet were not transferable to management positions at employers outside of the McDonald's brand, so she had to start over at the bottom elsewhere.

Based on these allegations, plaintiff asserts that defendants violated § 1 of the Sherman Antitrust Act. Plaintiff alleges that defendants and their franchisees engaged in concerted

---

[2] Bam-B, plaintiff's former employer, is not a defendant in this action, and plaintiff has not asserted a claim for discrimination.

activity to restrict competition among them for employees, thereby lowering their employment costs and limiting the employees' ability to earn higher wages. Plaintiff also asserts that the alleged conduct violates the Illinois Antitrust Act and the Illinois Consumer Fraud and Deceptive Trade Practices Act. Defendants move to dismiss.

## II. STANDARD ON A MOTION TO DISMISS

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not provide detailed factual allegations, but mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. To survive a motion to dismiss, a claim must be plausible. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Allegations that are as consistent with lawful conduct as they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In considering a motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws permissible inferences in favor of the plaintiff. *Boucher v. Finance Syst. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). Conclusory allegations "are not entitled to be assumed true," nor are legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 & 681 (2009) (noting that a "legal conclusion" was "not entitled to the assumption of truth[;]" and rejecting, as conclusory, allegations that "'petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement"). The notice-pleading rule "does

not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-679.

### III. DISCUSSION

#### A. Plaintiff's Sherman Act claim

Plaintiff seeks relief under § 4 of the Clayton Act, 15 U.S.C. § 15, which provides a private right of action for treble damages to any person "injured in his business or property by reason of anything forbidden in the antitrust laws[.]" 15 U.S.C. § 15.

The antitrust laws protect market competition, which usually, though not always, means the goal is enhancing output and reducing price. *See Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 348 (1982) ("The *per se* rule 'is grounded on faith in price competition as a market force'") (citations omitted); *Leegin Creative Leather Products v. PSKS, Inc.*, 551 U.S. 877, 895 (2007) ("the antitrust laws are designed primarily to protect interbrand competition, from which lower prices can later result"). Accordingly, a plaintiff must allege antitrust injury, an injury attributable to "an anti-competitive aspect of the practice under scrutiny[.]" *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). This case involves a restraint affecting competition in the supply of an input (labor) for a final product. Usually a cheaper input means a cheaper final price—something the antitrust laws traditionally prefer. Nonetheless, defendants do not dispute (nor could they) that plaintiff has alleged antitrust injury in this case, just like other suppliers do when they allege a restraint in a supply market. *Eichorn v. AT&T Corp.*, 248 F.3d 131, 142 (3d Cir. 2001) (employees challenging no-hire agreement had antitrust standing to sue); *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 545 (10th Cir. 1995) (employee had antitrust standing to challenge agreement between employers not to hire each other's employees); Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law: An Analysis of Antitrust Principles and Their*

*Application*, ¶352a (3rd and 4th Editions, 2018 Cum. Supp. 2010-2017) ("Employees may challenge antitrust violations that are premised on restraining the employment market . . . Standing for employees thus parallels that for 'suppliers' generally[.]"); *Doe v. Arizona Hosp. and Healthcare Ass'n*, Case No. CV 07-1292, 2009 WL 1423378 at *3 (D. Ariz. March 19, 2009) ("Price-fixing agreements among buyers, like those among sellers, are prohibited by the Sherman Act, even where the damages caused by the agreement is to sellers and not consumers."); *cf. Mandeville Island Farms v. American Chrystal Sugar Co.*, 334 U.S. 219 (1948) (sugar beet suppliers had antitrust claim for price-fixing against sugar beet refiners).

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . " 15 U.S.C. § 1. This language has long been interpreted to "outlaw only *unreasonable* restraints" of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Some restraints are deemed so anti-competitive (and, thus, unreasonable) that they are illegal *per se*, while other restraints, which may have procompetitive effects, are judged under the rule of reason (or its subset: the quick look).

As the Supreme Court has explained, restraints that are "unlawful *per se*" are those that "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit" that it is obvious they are unreasonable restraints of trade. *Khan*, 522 U.S. at 10. The *per se* rule applies to restraints "'"that would always or almost always tend to restrict competition and decrease output."'" *Leegin*, 551 U.S. at 886. Accordingly, the *per se* rule is reserved for restraints with respect to which "courts have had considerable experience" such that they "can predict with confidence that [the restraint] would be invalidated in all or almost all instances under the rule of reason[.]" *Leegin*, 551 U.S. at 886-87.

8

Most restraints are not *per se* unlawful but are instead analyzed under the rule of reason. *Khan*, 522 U.S. at 10. Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Khan*, 522 U.S. at 10. Generally, this requires a plaintiff to show the defendant has "market power—that is the ability to raise prices significantly without going out of business—without which the defendant could not cause anticompetitive effects on market pricing." *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). In this case, market power would be the power to suppress wages.

Courts sometimes apply a third test of reasonableness, the quick look, which is a short form of rule of reason analysis. *Illinois Corp. Travel, Inc. v. American Airlines, Inc.*, 806 F.2d 722, 727 (7th Cir. 1986) ("This is the sort of short form or quick look Rule of Reason analysis endorsed in *NCAA v. Board of Regents*, 468 U.S. 85, 109-10 & n. 42 (1984)). As the Seventh Circuit has explained:

> the quick-look approach can be used when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets,' but there are nonetheless reasons to examine the potential procompetitive justifications.

*Agnew*, 683 F.3d at 336 (internal citation omitted) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)). Under quick-look analysis, if the defendant lacks legitimate justifications for facially anticompetitive behavior then the court "condemns the practice without ado" without resort to analysis of market power. *Agnew*, 683 F.3d at 336; *Chicago Prof. Sports Ltd. Partnership v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992); *see also National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 109-10 n. 42 (1984) ("While the 'reasonableness' of a

9

particular alleged restraint often depends on the market power of the parties involved, because a judgment about market power is the means by which the effects of the conduct on the market place can be assessed, market power is only one test of 'reasonableness.' And where the anticompetitive effects of conduct can be ascertained through means short of extensive market analysis, and where no countervailing competitive virtues are evident, a lengthy analysis of market power is not necessary.").

In this case, plaintiff has styled her Sherman Act claim as a restraint that is either unlawful *per se* or is unlawful under quick-look analysis. Defendant disagrees. Defendant argues that the restraint at issue in this case is most appropriately analyzed under the rule of reason such that plaintiff must include allegations of market power in the relevant market in order to state a claim. As defendants point out, plaintiff has not included allegations of market power in a relevant market. To decide which standard to apply, the Court must first consider the alleged restraint.

Here, plaintiff argues that she has alleged the existence of a horizontal agreement in restraint of trade. Plaintiff alleges that McDonald's franchisees signed written franchise agreements pursuant to which each agreed not to hire employees (including former employees who left within the prior six months) from other McDonald's restaurants. Specifically, the franchisees were not allowed to hire anyone who was employed (or had been employed in the prior six months) by "McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant[.]" (Am. Complt. ¶ 87). Plaintiff alleges that the McOpCos were similarly restricted.

Defendants argue that this is merely a vertical restraint, because it was spearheaded by the entity at the top of the chain. The Court agrees that the restraint has vertical elements, but the

10

agreement is also a horizontal restraint. It restrains competition for employees among horizontal competitors: the franchisees and the McOpCos. Plaintiff has alleged that McOpCos run McDonald's-brand restaurants and, thus, compete directly with franchisees for employees. Plaintiff has also alleged that the McOpCos are subsidiaries of defendant McDonald's and that the restraint explicitly restricts franchisees from hiring employees of McDonald's subsidiaries, i.e., the franchisees' competitors. Thus, McDonald's, by including the no-hire provision in its agreement with franchisees, was protecting its own restaurants (i.e., *itself*) from horizontal competition for employees. *Cf. Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) ("the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act"). The Court finds that plaintiff has alleged a horizontal restraint of trade.

Naked horizontal agreements (i.e., those among competitors) to fix prices or to divide markets are *per se* unlawful. *Leegin*, 551 U.S. at 886; *Federal Trade Comm'n v. Superior Court Trial Lawyers Assoc.*, 493 U.S. 411 (1990) (horizontal agreement among lawyers not to accept appointments to represent indigent criminal defendants until fees increased was a naked price restraint and *per se* unlawful); *Blackburn v. Sweeney*, 53 F.3d 825, 827 & 828 (7th Cir. 1995) ("reciprocal agreement [among attorneys] to limit advertising to different geographical regions was . . . an agreement to allocate markets so that the *per se* rule of illegality applies"). This includes naked agreements to set wages. *Arizona Hosp.*, 2009 WL 1423378 at * 3 (plaintiff's allegations that hospital association set prices for temporary nurses stated claim for *per se* violation of the Sherman Act).

A horizontal agreement not to hire competitors' employees is, in essence, a market division. *See United States v. eBay, Inc.*, 968 F.Supp. 2d 1030, 1039 (N.D. Cal. 2013) ("The

11

court thus finds that the United States' allegations concerning agreement between eBay and Intuit [not to hire each other's employees] suffice to state a horizontal market allocation agreement."). The Department of Justice, which enforces rather than interprets the law, has warned employers that it considers naked no-hire agreements to be *per se* unlawful. (Press Release, U.S. Dep't of Justice, *Justice Department and Federal Trade Commission Release Guidance for Human Resource Professionals on How Antitrust Law Applies to Employee Hiring and Compensation* (Oct. 20, 2016), *available at* https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-release-guidance-human-resource-professionals.). Thus, because a no-hire agreement is, in essence, an agreement to divide a market, the Court has no trouble concluding that a naked horizontal no-hire agreement would be a *per se* violation of the antitrust laws. Even a person with a rudimentary understanding of economics would understand that if, say, large law firms in Chicago got together and decided not to hire each other's associates, the market price for mid-level associates would stagnate. With no competition for their talent (aside from lower-paying in-house or government jobs), associates would have no choice but to accept the salary set by their firms or to move to another city. Thus, such a claim would be suitable for *per se* treatment.

  Not all horizontal restraints are *per se* unlawful, however. Some horizontal restraints are *ancillary* to agreements that are procompetitive, usually in the sense of enhancing output (i.e., producing either a greater quantity of goods or a new good that would not otherwise exist). *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985) ("A court must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote."). A restraint is ancillary if it "promoted enterprise

12

and productivity when it was adopted." *Polk Bros.*, 776 F.2d at 189. When a restraint is ancillary, it is judged either under the rule of reason or given a "quick look." For example, no-hire agreements that are ancillary to the sale of a business can have procompetitive effects, so they are judged under the rule of reason. *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001).

Similarly, where the horizontal restraint is necessary in order for the product to exist at all, a restraint will not be judged *per se* unlawful but rather will be judged under the rule of reason, including by "quick look." *Law v. National Collegiate Athletic Assoc.*, 134 F.3d 1010 (10th Cir. 1998); *see also Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1 (1979); *National Collegiate Athletic Ass'n. v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984). In *Law*, a group of college basketball coaches brought suit challenging the NCAA's rule limiting annual salaries for certain assistant basketball coaches to $16,000 per year. Because some restraints were necessary in order to make college sports available, the court concluded that the horizontal price restraint should be analyzed under the rule of reason, and, in particular, the "quick look." *Law*, 134 F.3d at 1018 & 1020 ("We find it appropriate to adopt such a quick look rule of reason in this case.")

In this case, plaintiff has alleged a horizontal restraint that is ancillary to franchise agreements for McDonald's restaurants. Each time McDonald's entered a franchise agreement, it increased output of burgers and fries, which is to say the agreement was output enhancing and thus procompetitive. (That is not to say that the provision itself was output enhancing. The very fact that McDonald's has managed to continue signing franchise agreements even after it stopped including the provision in 2017 suggests that the no-hire provision was not necessary to encourage franchisees to sign.) Because the restraint alleged in plaintiff's complaint is ancillary

to an agreement with a procompetitive effect, the restraint alleged in plaintiff's complaint cannot be deemed unlawful *per se*. Plaintiff's claim does not rise and fall on *per se* treatment, though. She claims in the alternative that the restraint is unlawful under quick-look analysis.

The next question, then, is whether plaintiff has plausibly alleged a restraint that might be found unlawful under quick-look analyis. The Court thinks she has. Even a person with a rudimentary understanding of economics would understand that if competitors agree not to hire each other's employees, wages for employees will stagnate. Plaintiff herself experienced the stagnation of her wages. A supervisor for a competing McDonald's restaurant told plaintiff she would like to hire plaintiff for a position that would be similar to plaintiff's position but that would pay $1.75-2.75 more per hour than she was earning. Unfortunately for plaintiff, the no-hire agreement prevented the McOpCo from offering plaintiff the job. When plaintiff asked her current employer to release her, plaintiff was told she was too valuable. The Court agrees that an employee working for a below-market wage would be extremely valuable to her employer.

Defendants, nonetheless, argue that their restraint has pro-competitive benefits. Specifically, defendants argue that the no-hire restriction promotes interbrand competition, by which they mean the competition between McDonald's and Burger King, rather than the intrabrand competition between the McDonald's restaurant at, say, 111 W. Jackson and the McDonald's at, say, 233 W. Jackson. It makes sense for McDonald's franchisees and the McOpCos to cooperate to promote intrabrand competition for hamburgers, because a customer who is satisfied with a hamburger she buys today at the McDonald's at 111 W. Jackson might tomorrow prefer a hamburger from the McDonald's at 233 W. Jackson to a hamburger from Burger King. This case, though, is not about competition for the sale of hamburgers to consumers. It is about competition for employees, and, in the market for employees, the

14

McDonald's franchisees and McOpCos within a locale are direct, horizontal, competitors.[3] A way to promote intrabrand competition for employees would be an advertising campaign extolling the virtues of working for McDonald's. That is not what defendants are alleged to have done here. Here, they are alleged to have divided the market for employees by prohibiting restaurants from hiring each other's current or former (for the prior six months, anyway) employees. In the employment market, the various McDonald's stores are competing brands. Dividing the market does not promote intrabrand competition for employees, it stifles interbrand competition.

Defendants argue that the no-hire restriction promotes intrabrand competition for hamburgers by encouraging franchisees to train employees for management positions. Presumably, the theory is that better service equals happier customers. The Court has no doubt, as defendants argue, that McOpCos and franchisees were concerned about training and then losing employees. The restraint, though, is not limited to management employees who had received expensive training at Hamburger University. The restraint applies even to entry-level employees with no management training. Nor was the restraint limited to a reasonable period of time (say six months) after the employee had received the expensive training at Hamburger University. In any case, every employer fears losing the employees it has trained. That fear does not, however, justify, say, law firms agreeing not to hire each other's associates. Employers have plenty of other means to encourage their employees to stay without resorting to unlawful market division. Those options include paying higher wages/salaries and contracting directly with each employee to set an employment term.

---

[3] Realistically, only restaurants within the same locale compete for employees. A McDonald's restaurant in Chicago does not compete for employees with a McDonald's restaurant in Florida.

Though the Court has concluded that plaintiff has stated a claim for a restraint that might be unlawful under quick-look analysis, the evidence at a later stage may not support it. As defendants have pointed out, plaintiff has not attempted to plead a claim under the rule of reason. This is perhaps unsurprising. To state a claim under the rule of reason, a plaintiff must allege market power in a relevant market. The relevant market for employees to do the type of work alleged in this case is likely to cover a relatively-small geographic area. Most employees who hold low-skill retail or restaurant jobs are looking for a position in the geographic area in which they already live and work, not a position requiring a long commute or a move. That is not to say that people do not move for other reasons and then attempt to find a low-skill job; the point is merely that most people do not search long distances for a low-skill job with the idea of then moving closer to the job. Plaintiff, though, seeks to represent a nationwide class, and allegations of a large number of geographically-small relevant markets might cut against class certification. Nonetheless, if plaintiff decides she would like to include a claim under the rule of reason, she has leave to amend, but she must do so soon, within 28 days.

### B.     Plaintiff's state-law claims

Plaintiff also asserts two state-law claims. First, in Count II, plaintiff asserts a claim under the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.* The Illinois Antitrust Act states, in relevant part, that it is unlawful to "[m]ake any contract . . . (a) for the purpose or with the effect of fixing, controlling, or maintaining the price . . . or the fee . . . paid for any service . . . received by the parties thereto[.]" 740 ILCS 10/3(a)(1). The Illinois Antitrust Act goes on to state that "'[s]ervice' shall not be deemed to include labor which is performed by natural persons as employees of others." 740 ILCS 10/4.

Defendants argue that the plaintiff's claim is, thus, excluded from coverage under the Illinois Antitrust Act. The Court agrees that the plain language of the statute excludes plaintiff's claim, which alleges that the no-hire agreement artificially suppressed her wage, i.e., the price paid for her service. *See O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1066 (7th Cir. 1997) ("[T]o the extent [plaintiff's] claims relate to an alleged market for labor services, they are specifically excluded by § 10/4 of the [Illinois Antitrust] Act."). Although plaintiff suggests this is merely an exception for collective bargaining, the statute includes a separate labor exemption. 740 ILCS 10/5(1) ("No provisions of this Act shall be construed to make illegal: (1) the activities of any labor organization or of individual members thereof which are directed solely to labor objectives which are legitimate under the laws of either the State of Illinois or the United States.").

Accordingly, defendants' motion to dismiss is granted as to Count II, and Count II is dismissed with prejudice.

Next, in Count III, plaintiff asserts a claim for violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act. Defendants move to dismiss, and the Court agrees that plaintiff cannot move forward on this claim.

To begin with, as defendants point out, the Illinois Supreme Court has concluded that the Illinois Consumer Fraud Act aims to protect consumers from fraud, not to provide extra enforcement of the antitrust laws. *Laughlin v. Evanston Hosp.*, 133 Ill.2d 374, 390 (Ill. 1990). There, the Illinois Supreme Court said:

> There is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism. The language of the Act shows that its reach was to be limited to conduct that defrauds or deceives consumers or others. The title of the Act is consistent with its content.

*Laughlin*, 133 Ill.2d at 390.  Thus, plaintiff cannot use the ICFA to bring her antitrust claim.  According to plaintiff's allegations, she was injured because a no-hire agreement prohibited a potential employer from hiring her.  Plaintiff was harmed in her capacity as an employee, which is to say in her capacity as a supplier of services.  She was not defrauded as a consumer of hamburgers, and she cannot state a claim under the ICFA.  *Hess v. Kanoski & Assoc.*, 668 F.3d 446, 454 (7th Cir. 2012) ("[Plaintiff] has no claim under the Illinois Consumer Fraud Act . . . because [she] was an employee, not a 'consumer.'").

Count III is dismissed with prejudice.

## IV.     CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part defendants' motion to dismiss [34].[4]  The motion is denied as to Count I.  The motion is granted as to Counts II and III, which are dismissed with prejudice.  This case is set for status on 8/15/18 at 9:30 a.m.

SO ORDERED.                                              ENTERED:   June 25, 2018

_____
**JORGE L. ALONSO**
**United States District Judge**

---

[4] In their motion, defendants also request that the Court dismiss plaintiff's demand for injunctive relief.  Defendants have not sufficiently developed this argument, so the request is denied without prejudice.