**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LEINANI DESLANDES, on behalf of herself and all others similarly situated,<br><br>    Plaintiff<br><br> v.<br><br>McDONALD'S USA, LLC, *et al.*<br><br>    Defendants. | Civil Case No. 17-cv-04857<br><br>Judge Jorge L. Alonso<br>Magistrate Judge M. David Weisman |
| STEPHANIE TURNER, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br> v.<br><br>McDONALD'S USA, LLC, *et al.*<br><br>    Defendants. | Civil No. 19-cv-05524 |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    STATEMENT OF FACTS ............................................................................ 3

    A.    The McDonald's System Equips Workers With Brand-Specific Skills That Are Of Value Principally to Other McDonald's Employers ................................. 3

    B.    Franchisees Are Independent Entities That Compete With McOpCo and Each Other ................................................................................................ 6

    C.    McDonald's and Franchisees Share a Common Wage Structure .......................... 7

    D.    McDonald's and its Franchisees Agreed Not to Compete for Each Other's Workers ................................................................................................ 9

        1.    McDonald's Standard Franchise Agreement Prohibited Franchisees from Hiring Workers from Each Other or From McOpCo ................................................................................. 9

        2.    McDonald's Reciprocated the Agreement by Not Hiring Managers From Franchisees ........................................................................ 12

        3.    In 2015 McDonald's Expanded its Reciprocation of the No-Hire Agreement to Include Franchisee Crew, in Order to Prevent Wage Competition ........................................................................... 14

        4.    McDonald's Announced the End of the Agreement in July 2018 ........... 15

III.    ARGUMENT ............................................................................................ 16

    A.    Legal Standards ...................................................................................... 16

    B.    The Class Satisfies Rule 23(a) ................................................................. 17

        1.    Numerosity ........................................................................... 17

        2.    Commonality .......................................................................... 17

        3.    Typicality .............................................................................. 18

        4.    Adequacy .............................................................................. 19

    C.    The Class Satisfies Rule 23(b) ................................................................. 20

        1.    Common Questions of Liability, Impact, and Damages Predominate Over Individualized Issues ................................................ 20

            a.    Common Evidence Will Prove An Unlawful Agreement to Restrain Competition ..................................................... 21

            b.    Common Evidence Will Prove Class-wide Impact .................... 22

- i -

**TABLE OF CONTENTS**
**(continued)**

Page

      c.     Common Evidence Provides a Reliable Method of Measuring Class-wide Damages ................................................... 29

     2.     A Class Action Is A Superior Way to Litigate These Claims ................. 30

IV.     CONCLUSION ........................................................................................... 30

CERTIFICATE OF SERVICE ......................................................................... 33

- ii -

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Products, Inc. v. Winsor*,
  521 U.S. 591 (1997)................................................................................................... 20, 30

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)........................................................................................................ 17

*Baumann Farms, LLP v. Yin Wall City, Inc.*,
  Case No. 16-CV-605, 2017 WL 3669616 (E.D. Wis. Aug. 25, 2017) .................................... 17

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) ........................................................................................... 30

*Carnegie v. Household Int'l, Inc.*,
  376 F.3d 656 (7th Cir. 2004) ........................................................................................... 30

*D&M Farms v. Birdsong Corp.*,
  No. 2:19-cv-463, 2020 WL 7074140 (E.D. Va. Dec. 2, 2020)............................................... 18

*Hawaii v. Standard Oil Co. of Cal.*,
  405 U.S. 251 (1972)........................................................................................................ 17

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  No. 06-MD-1775 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ............................. 25

*In re Bromine Antitrust Litig.*,
  203 F.R.D. 403 (S.D. Ind. 2001).................................................................................. 18, 20

*In re Capacitors Antitrust Litig. (No. III)*,
  Case No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) .......................... 25

*In re Fla. Cement & Concrete Antitrust Litig.*,
  No. 09-23187-CIV, 2012 WL 27668 (S.D. Fla. Jan. 3, 2012)............................................... 18

*In re High-Tech Emp. Antitrust Litig.*,
  985 F. Supp. 2d 1167, (N.D. Cal. 2013) .......................................................... 17, 28, 29, 30

*In re Packaged Seafood Prods. Antitrust Litig.*
  332 F.R.D. 308 (S.D. Cal. 2019) ...................................................................................... 25

*In re Ready-Mixed Concrete Antitrust Litig.*,
  261 F.R.D. 154 (S.D. Ind. 2009)...................................................................................... 18

*In re Sulfuric Acid Antitrust Litig.*,
  MDL No. 1536, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007)............................................... 19

*In re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002).......................................................................................... 21

- iii -

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Johnson v. Ariz. Hosp. & Healthcare Ass'n,*
  No. 07-1292, 2009 WL 5031334 (D. Ariz. July 14, 2009) ................................................... 29

*Kleen Prod. LLC v. Int'l Paper Co.,*
  831 F.3d 919 (7th Cir. 2016) ......................................................... 21, 22, 29, 30

*Kleen Prods. LLC v. Int'l Paper,*
  306 F.R.D. 585 (N.D. Ill. 2015), *aff'd sub nom* ............................................... passim

*Loeb Indus., Inc. v. Sumitomo Corp.,*
  306 F.3d 469 (7th Cir. 2002) ......................................................................... 29

*Merenda v. VHS of Mich., Inc.,*
  296 F.R.D. 528 (E.D. Mich. 2013) ................................................................. 29

*Messner v. Northshore Univ. HealthSystem,*
  669 F.3d 802 (7th Cir. 2012) ...................................................................... 16, 22

*Nitsch v. DreamWorks Animation SKG Inc.,*
  315 F.R.D. 270 (N.D. Cal. 2016) .................................................................... 29

*Ploss v. Kraft Foods Grp., Inc.,*
  431 F. Supp. 3d 1003 (N.D. Ill. 2020) ................................................................ 18

*Reiter v. Sonotone Corp.,*
  442 U.S. 330 (1979) ................................................................................... 17

*Rohlfing v. Manor Care, Inc.,*
  172 F.R.D. 330 (N.D. Ill. 1997) ................................................................... 18, 22

*Rosario v. Livaditis,*
  963 F.2d 1013 (7th Cir. 1992) ....................................................................... 18

*Seaman v. Duke University,*
  1:15-CV-462, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018) ........................................... 28, 29

*Sebo v. Rubenstein,*
  188 F.R.D. 310 (N.D. Ill. 1999) ...................................................................... 18

*Serv. Spring, Inc. v. Cambria Spring Co.,*
  Nos. 81 C 1835, 82 C 3901, 1984 WL 2925 (N.D. Ill. Jan. 6, 1984) .................................... 18

*Smith v. Family Video Movie Club, Inc.,*
  311 F.R.D. 469 (N.D. Ill. 2015) ...................................................................... 17

*Suchanek v. Sturm Foods, Inc.,*
  764 F.3d 750 (7th Cir. 2014) ...................................................................... 22, 30

*Tyson Foods, Inc. v. Bouaphakeo,*
  136 S.Ct. 1036 (2016) ................................................................................. 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*United States v. Alex. Brown & Sons, Inc., et al.*;
  Stipulation & Order & Competitive Impact Statement, 61 Fed. Reg. 40433-01, 1996
  WL 430790 (Aug. 2, 1996) ................................................................................... 10

*Villanueva v. Davis Bancorp, Inc.*,
  No. 09 CV 7826, 2011 WL 2745936 (N.D. Ill. July 8, 2011) ................................ 17

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
  395 F.3d 416 (7th Cir. 2005) ................................................................................. 24

**Rules**

Fed. R. Civ. P. 23(a) .................................................................................................. 16

Fed. R. Civ. P. 23(b)(3).................................................................................. 16, 20, 30

**Other Authorities**

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in REFERENCE MANUAL
  ON SCIENTIFIC EVIDENCE 305 (3rd ed. 2011) ........................................................ 23

David Kaye & David Freedman, *Reference Guide on Statistics*, in REFERENCE MANUAL
  ON SCIENTIFIC EVIDENCE 251-252 (3rd ed. 2011).................................................. 24

I.       **INTRODUCTION**

Plaintiffs Leinani Deslandes and Stephanie Turner seek to represent a Class of employees of McDonald's-branded restaurants whose wages were suppressed by an unlawful agreement among McDonald's and its franchisees not to hire each other's workers (the "No-Hire Agreement").  From at least 1973 to 2017, McDonald's standard Franchise Agreement contained this provision in paragraph 14:

> Franchisee shall not employ or seek to employ any person who is at the time employed by McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant or otherwise induce, directly or indirectly, such person to leave such employment. This paragraph 14 shall not be violated if such person has left the employ of any of the foregoing parties for a period in excess of six months.[1]

Because McDonald's workers are trained to McDonald's specific brand standards, their skills have the most value to other McDonald's employers.  But through the No-Hire Agreement, McDonald's restrained competition for McDonald's workers among McDonald's employers, and thereby curtailed competitive pressure on wages.  McDonald's announced its abandonment of the No-Hire Agreement in July 2018 pursuant to a settlement with the Washington State Attorney General.

Plaintiffs' claims merit class certification.  The same evidence will be used to prove every Class member's claim that McDonald's conduct unlawfully depressed their wages.  Accordingly, Plaintiffs respectfully request the Court certify the following class under Federal Rules of Civil Procedure 23(a) and (b)(3):  "All persons who were employed at a McDonald's-branded restaurant in the United States from June 28, 2013 to July 12, 2018.  Excluded from the Class are Defendants' directors and officers, the Judge, and the Judge's staff and immediate family members."

---

[1] *See, e.g.*, Declaration of Anne Shaver In Support Of Class Certification ("Shaver Decl."), Ex. 2 at -844 (1973); Ex. 3 at -884 (1998); Ex. 4 at -233-34 (2017).

The proposed Class satisfies Rule 23(a). The Class is numerous, numbering in the hundreds of thousands.[2] There are common questions of law and fact, including the existence of the No-Hire Agreement and its unlawfulness under the antitrust laws, the overriding common issue in every Class member's claim. Plaintiffs Deslandes and Turner have claims that are typical of the absent Class members: they received artificially suppressed compensation as a result of the No-Hire Agreement. Finally, they are adequate representatives, there are no intra-class conflicts, and they are represented by experienced and capable counsel.

The proposed Class also satisfies Rule 23(b)(3). Plaintiffs will demonstrate all three elements of their antitrust claim—agreement, impact, and damages—with common proof. As to agreement, common proof comes from McDonald's standard Franchise Agreements, as well as corporate witness testimony, emails, and call center records showing McDonald's nationwide enforcement of the No-Hire Agreement.

Common evidence will also prove impact and damages. Plaintiffs retained two leading economists to examine the evidence in this case and opine on whether the No-Hire Agreement would have impacted Class members' pay. First, Dr. Hal Singer is a Senior Fellow at the George Washington Institute of Public Policy and an Adjunct Professor at Georgetown University, McDonough School of Business. He is an expert in antitrust economics. Dr. Singer reviewed record evidence about Paragraph 14 and its effects, analyzed franchisees' and corporate-owned stores' compensation data, and applied standard econometric techniques to analyze Class members' compensation during and after the alleged conspiracy, controlling for other relevant factors. Dr. Singer found that common evidence and standard statistical methods regularly used in antitrust cases show that the No-Hire Agreement: (1) resulted in substantial and statistically significant harm through wage suppression; and (2) reduced the pay of all or nearly all Class members. Dr. Singer also measures aggregate Class damages, using standard econometric methods and evidence that is common to the Class. Singer Rep., ¶ 5.

---

[2] Shaver Decl., Ex. 5 (Expert Report of Dr. Hal Singer ("Singer Rep.")), ¶ 85.

Second, Dr. Peter Cappelli is the George W. Taylor Professor of Management and Director of the Center for Human Resources at the Wharton School, University of Pennsylvania. His expertise focuses on industrial relations, including specifically how employers set pay. He found that: (1) Class members receive training that imparts specific skills that are of high value to McDonald's-branded restaurants and of limited value to outside employers, such that the No-Hire Agreement would have impacted Class member pay despite the availability of non-McDonald's employment options; and (2) McDonald's and franchisees maintain linked compensation structures that would transmit wage suppression broadly across the Class. Shaver Decl., Ex. 6 (Expert Report of Dr. Peter Cappelli ("Cappelli Rep.")), ¶ 9.

Finally, the resolution of these common issues predominates over any issues specific to any particular Class member, making a class action superior to thousands of individual claims.

This case should proceed as a class action. Class members all complain about the same thing: the No-Hire Agreement. They all assert the same theory of harm: wage suppression. Common evidence—documents, testimony, data, economic theory and research, and econometric analysis—proves all elements necessary to prevail on Plaintiffs' claims. The resolution of these common issues predominates over any issues specific to any particular Class member, making a class action superior to thousands of individual claims. Plaintiffs therefore respectfully request the Court certify the proposed Class, appoint them as a Class representatives, and appoint Lieff Cabraser Heimann & Bernstein LLP, McCune Wright Arevalo LLP; and Scott+Scott Attorneys at Law as Class Counsel.

## II.    STATEMENT OF FACTS

### A.    The McDonald's System Equips Workers With Brand-Specific Skills That Are Of Value Principally to Other McDonald's Employers

There are approximately 14,000 McDonald's restaurants in the United States. Singer Rep., n.2. Of these, between 90-95% were owned and operated by franchisees (also known as "owner/operators") during the Class Period, and 5-10% were owned and operated by McDonald's (called "McOpCo's"). *Id.* All McDonald's-branded restaurants are part of the

"McDonald's System," which requires adherence to "███████████████████████

███████████████████████████████████████████████████████████████████████

███████" Shaver Decl., Ex. 7 at -052. McDonald's intensive oversight of franchisees'

conformity to the McDonald's System ensures a degree of uniformity in the customer experience

that will bring customers back to the McDonald's brand, with the expectation that they can get

the exact same product at any McDonald's restaurant. *Id*. This is the very purpose of a

franchised operation and McDonald's is zealous in enforcing it. *See* Cappelli Rep. ¶¶ 10-43

(explaining that the franchise model relies on franchisees' adherence to detailed corporate

processes and the various methods McDonald's uses to ensure that adherence).

 To achieve that uniformity of experience, McDonald's needs employees to perform their

jobs in the same ways, whether at franchised restaurants or McOpCos, whether in Jacksonville,

Florida or Detroit, Michigan. All restaurants use the same major job classifications: ██████████

█████████████████████████████████████████████████████████████ Shaver

Decl., Ex. 8. McDonald's provides specific training criteria and standards of completion for

each position. *Id*., Ex. 9 (Operations & Training Manual).

 At the manager level, ████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████ Shaver Decl., Ex. 7 at -095. Similarly, McDonald's requires that ██████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ *Id*., Ex. 10 at -503; *id*., Ex.

11 (Lopez Dep.) at 260:23-261:8.

 For non-manager (crew) positions, McDonald's training is technically ████████████

██████████████████████████████████████████████ Shaver Decl., Ex. 12 at -640, but a

former HR Senior Director testified that in practice the corporate Operations & Training Manual

is the ████████████████████████████████████████████████████████████████

██████████████████████████████ *Id.*, Ex. 13 (Langhorn Dep.) at 69:5-15.[3]  He continued, ███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ *Id.* at 69:20-70:24.  McDonald's former Chief People Officer, Karen King, confirmed that "████████████████████████████████

██████████████████████████████████████ Shaver Decl., Ex. 14 (King Dep.) at 30:13-16.  *See also id.* 57:12-16 (explaining that ████████████████

████████████████████████████████████████████████

██████████████████); *id.* 224:1-225:16 (confirming that ████████████████

██████████████████████████████████████).

These requirements are not trivial.  On penalty of suspension, franchisees must maintain compliance with McDonald's National Franchising Standards, which require that ████████

████████████████████████████████████████████████

████████████████████████████████████████ Shaver Decl., Ex. 10 at -503. ██████████████████████████████████████

██████████████████████████████ *Id.*, Ex. 11 (Lopez Dep.) at 93:16-95:5.

Employees with McDonald's experience have the most value to another McDonald's employer because they are already trained on the McDonald's System.  ████████████

████████████████████████████████████████████████

██████████████████████████████ Shaver Decl., Ex. 9 at -432.

---

[3] McDonald's takes the proprietary nature of its training seriously, █████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Shaver Decl., Ex. 15 at -171-72.

As Dr. Cappelli explains, McDonald's training requirements result in employees with brand-specific skills that are valuable primarily to other McDonald's employers and not transferable to non-McDonald's employers because they are tied to McDonald's equipment and systems. Cappelli Rep. at ¶¶ 44-61. His report details the training requirements specific to each job and how they are specific to McDonald's. *Id.*

### B. Franchisees Are Independent Entities That Compete With McOpCo and Each Other

While all McDonald's restaurants must adhere to detailed brand standards, McDonald's and its franchisees agree that each franchisee is its own independent business. Shaver Decl., Ex. 7 at -101 ██████████████████████████████████████████████████████████



██████████████████). [4] This is particularly so with respect to franchisee employment matters. *See id.*, Ex. 18 at -992 ██████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████"); *id.*, Ex. 17 (Brethauer Dep.)[5] at 99:13-23

(██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████).

McDonald's cautions in its standard Franchise Disclosure Document that ██████████████

██████████████████████████████████ *Id.*, Ex. 7 at -062 ████████████████

████████████████████████████████████████████████████████

███████████). It also acknowledged ██████████████████████████████████

████████████████████████████████████████. *Id.*, Ex. 19 at -699.

---

[4] *See also* ECF 69 in Case 17-cv-04857 at ¶¶ 27, 35, 58 (McDonald's Answer to operative complaint admitting that franchisees are independently owned and independently managed; responsible for their own day-to-day operations; and are their own economic decision-makers on employment matters); ECF 67 in Case 19-cv-05524 at ¶¶ 31, 39, 62 (same).

[5] Mr. Brethauer was the Vice President of U.S. Franchising from 2014 to 2017.

### C. __McDonald's and Franchisees Share a Common Wage Structure__

McDonald's maintains a uniform wage structure across its organization, which it refers to

as the ██████████ *See* Shaver Decl., Ex. 20 at -623 ("████████████████████

████████████████████████████████). McDonald's head of US Rewards,

Lori Duggan, explained it as follows: "████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ *Id.*, Ex. 21 (Duggan

Dep.) at 51:16-22. "████████████████████████ *Id.*,

Ex. 22 at -176. Then, ████████████████████████████████

████████████████████ *Id.*, Ex. 23 at -004. ████████████████

████████████████████████████████████████████ *Id.*,

Ex. 22 at -176. An important aspect of the framework is accounting for compression, which

McDonald's defines as something that causes ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ *Id.*, Ex. 63.

McDonald's shared its wage structure with franchisees and encouraged them to

implement the same structure, in several ways. First, McDonald's provided franchisees with its

own actual rates of pay for positions in McOpCo restaurants. *See, e.g.*, Shaver Decl., Ex. 24 at -

529 to 30 ████████████████████████████████████

████████████████████████); *id.*, Ex. 25 at -233 (████████████

████████████████████████████████); *id.*, Ex. 26 at

-860 (████████████████████████████████████████

████████████████████████████████████████

████████). ████████████████████████████████████

- 7 -



█████████ *Id.*, Ex. 27 at -034.  Second, McDonald's trained franchisees on how to build a wage structure exactly like its own.  For example, ████████████████████████████████████ ████████████████████████████████████ ████████████████████. *Id.*; *see also* Shaver Decl., Ex. 21 (Duggan Dep.) at 36:16-37:18 (███████████████████ ████████████████████. ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████ *Id.*, Ex. 29 at -444. Lori Duggan characterized █████████████████████████ ████████████████████ *Id.*, Ex. 21 (Duggan Dep.) at 97:2-8.  Another example is a ████████████████████████████████████ ████████████████. *Id.* at 39:8-40:11; Shaver Decl., Ex. 30 (███████████ ████████████████████); *id.*, Ex. 31 (same).  Finally, ██████████ ████████████████████████████████████ ████████████████████████████████████

██████     *See* Singer Rep. at ¶¶ 77-82 (excerpting and describing tables).

McDonald's is careful to state that these tools and trainings are offerings only and are not mandatory, "████████████████████████████████ Shaver Decl., Ex. 29 at -445, consistent with its legal position that it is not a joint employer.  However, Plaintiffs' experts confirm what common sense tells us: McDonald's did not devote these resources to franchisees for no reason.  First, Dr. Singer finds econometric evidence of a Classwide compensation structure.  His compensation structure regression models show to a very high

---

[6] ████████████████████████████████████ ████████ Shaver Decl., Ex. 28 at -455-56.

degree of statistical confidence that pay increases (or decreases) are shared broadly across the Class, including when controlling for other relevant factors. Singer Rep. ¶¶ 72-74. And Dr. Cappelli explains that "McDonald's institutionalized the practice of adjusting pay levels across jobs in response to increases in the pay for individual jobs" and "[e]ven if the Franchisees stray from [McDonald's] precise guidelines, what matters is that there are structured relationships between the compensation of employees in different job titles." Cappelli Rep. ¶¶ 119-133.

### D. McDonald's and its Franchisees Agreed Not to Compete for Each Other's Workers

The experiences of Named Plaintiffs Deslandes and Turner illustrate the mechanics of McDonald's No-Hire Agreement. Plaintiff Deslandes was employed as a Department Manager (DM) for a franchisee. Shaver Decl., Ex. 32 (Deslandes Dep.) at 60:16-23. Unhappy with her employer, she decided to look for another job and found an opening for a DM at a nearby McOpCo that paid 15% more than her current job. *Id*. 242:18-243:1. She applied online and the manager called her and expressed a desire to interview her. *Id.* at 237:7-18. Ms. Deslandes mentioned her current employment. The next day she received a call from a McDonald's corporate employee who told her that the McOpCo restaurant could not interview her, much less hire her, unless her franchisee employer first agreed to it by granting a "release." *Id*. at 243:17-25. The franchisee denied the release. *Id.* at 213:16-215:6. Similarly, Plaintiff Turner considered moving from a McOpCo restaurant to a franchisee-owned restaurant closer to her home, but her supervisor told her she could not do so without a release unless she stopped working at McDonald's for six months first. Shaver Decl., Ex. 33 (Turner Dep.) at 166:3-12. Ms. Turner received the same answer from a different manager years later when she again asked about transferring restaurants. *Id.* at 267:6-269:8. Plaintiffs' experiences were not unique but rather reflect McDonald's common, Classwide practice.

### 1. McDonald's Standard Franchise Agreement Prohibited Franchisees from Hiring Workers from Each Other or From McOpCo

From at least 1973 until April 2017, paragraph 14 of McDonald's standard Franchise Agreement contained the same No-Hire clause, whereby every franchisee in the McDonald's

System agreed that it "shall not employ or seek to employ any person who is at the time employed by McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant . . . This paragraph 14 shall not be violated if such person has left the employ of any of the foregoing parties for a period in excess of six months."[7]  In a communication to franchisees, McDonald's characterized Paragraph 14 as having "████████

████████████████████████████████████████████████████████."  Shaver Decl., Ex. 35 at -771.  McDonald's corporate witnesses confirmed this plain reading of Paragraph 14.  *Id.*, Ex. 17 (Brethauer Dep.) at, *e.g.*, 124:24-126:10, 161:2-12; *id.*, Ex. 36 (Lowery Dep.) at 25:22-26:25; *id.*, Ex. 37 (Kramer Dep.) at 251:14-18.  The restraint described in Paragraph 14 was *identical* across every franchisee in the nation.

Paragraph 14 was not a mere formality; McDonald's long took an active role in enforcing franchisee compliance.  A 1995 memo to franchisees from a Regional Vice President stated,



Shaver Decl., Ex. 38.  It is clear that franchisees received this message loud and clear.  For example, citing the 1995 memo *twenty years later* in 2015, a franchisee stated, "████████

████████████████████████████████████████

█████████████████████████████" *Id.*,

---

[7] *See*, *e.g.*, Shaver Decl., Ex. 2 at -844 (1973); *id.*, Ex. 3 at -884 (1998); *id.*, Ex. 4 at -233-34 (2017).  A 1958 Franchise Agreement contains a no-hire clause, though it was in a different paragraph and had slightly different provisions. *Id.*, Ex. 34.

[8] "Piracy was a common way for McDonald's and its franchisees to denigrate and discourage the lawful competition that the antitrust laws promote and protect.  This is a typical phenomenon among price-fixers: deviations from the conspiracy are considered unethical and result in punishment.  For instance, NASDAQ market makers were trained to believe that offering certain competitive terms was "unethical" or "unprofessional."  *United States v. Alex. Brown & Sons, Inc., et al.*; Stipulation & Order & Competitive Impact Statement, 61 Fed. Reg. 40433-01, 1996 WL 430790, at *40442 (Aug. 2, 1996).

- 10 -

Ex. 39 at -198.[9]  A similar 2011 memo to franchisees from another Regional Vice President and

an HR Director, 

*Id.*, Ex. 40 at -647.  Juan Marcos, then HR Officer for

McDonald's West Division (later, Chief People Officer for the United States),

*Id.*

Indeed,

*Id.*, Ex. 1 at -077; *id.*, Ex. 17 (Brethauer Dep.) at 151:2-9.

    McDonald's franchising staff fielded complaints from franchisees about other

owner/operators engaging in "piracy," and intervened to enforce the agreement.  *See*, *e.g.*,

Shaver Decl., Ex. 41 at -342

); *id.*, Ex. 42 at -738 (

); *id.*, Ex. 43 (

); *id.*, Ex. 44 at -074

[9] *See also* Shaver Decl., Ex. 60 (compendium of 71 communications about letters of release).

- 11 -

2054105.8

### 2. McDonald's Reciprocated the Agreement by Not Hiring Managers From Franchisees

Paragraph 14's written terms constrained franchisees from competing for labor amongst themselves and with McOpCo, but in practice McDonald's reciprocated the agreement. As former Chief People Officer and Chief Field Officer Karen King, who worked with McDonald's from high school to retirement four decades later, explained, " ███████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████ Shaver Decl., Ex. 14 (King Dep.) at 54:20-55:3 (emphasis added). Ms. King confirmed ███████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████ *Id.* 55:9-56:21.

Pursuant to this mutual understanding, McDonald's did not allow McOpCo's to hire managers who had worked for a franchisee within the past six months without permission, via a "letter of release," from the franchisee. Deb Leon, a McOpCo recruiter, testified that ███ ███████████████████████████████████████████████████████████ ███████████████████████████████████████ Shaver Decl., Ex. 45 (Leon Dep.) at 32:21-33:2. ███████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ *Id.* 33:3-14 & 37:21-38:15; Shaver Decl., Ex. 46. ████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████ ██████████████████████████████████████████████████████ *Id.*, Ex. 45 (Leon Dep.) at 58:7-59:6. ████████████

---

[10] *See, e.g.*, Shaver Decl., Exs. 46 through 52.

- 12 -



*Id.* at 55:16-56:20; 71:13-72:2.  Ms. Leon's fellow recruiters also followed and enforced this rule; as her manager Joe Nassar wrote: "███████████████████████████████████████[11]  So did McOpCo restaurant managers: ███████████████████████████████████████████████████████ Shaver Decl., Ex. 53 at -474.  *See also id.*, Ex. 56 at -946 ████████████████); *id.,* Ex. 57 ████████████████████████████); *id.,*Ex. 58 at -120 ████████████████████████████████████████████); *id.,* Ex. 59 at -367 ████████████████████████████████).

McDonald's Human Resource Consulting ("HRC") team's call logs confirm that the hiring restraint applied to McOpCos and franchisees alike.  The call logs, which date from January 2013 to December 2018, evidence ███████████████████████████████████████████████████████████████████████████████████████████

---

[11] Shaver Decl., Ex. 53. *See also id.*, Ex. 54 (████████████████████████████); *id.*, Ex. 55 (███████████████████████████).
[12] Shaver Decl., ¶ 3.
[13] *Id.*
[14] *Id.*



certainly the tip of the iceberg.[17]

### 3. In 2015 McDonald's Expanded its Reciprocation of the No-Hire Agreement to Include Franchisee Crew, in Order to Prevent Wage Competition

On April 1, 2015, McDonald's announced that effective July 1, 2015, it would raise starting wages at all McOpCo restaurants to at least $1 above the local minimum wage. Shaver Decl., Ex. 62. Workers already above the starting wage would also receive pay increases to avoid wage compression. *Id.*, Ex. 63. The move was designed to attract and retain talent and stay competitive with the external market. *Id.*, Ex. 64.

Franchisees were ██████████████████████ Shaver Decl., Ex. 65. They knew McDonald's announcement would place significant pressure on them to raise their wages, too, or risk losing their employees to a better-paying McOpCo restaurant. *See*, *e.g.*, *id.* (██████ ████████████████████████████████████████ ████████████████████); Shaver Decl., Ex. 66 at -309 (███████████████████ ████████████████████████████████████████ ████████████████████).

Indeed, McDonald's itself foresaw that the wage hike would have an impact on franchisees. ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

---

[15] *Id.*

[16] *Id.*

[17] *Id.* Deb Leon's files show additional examples of releases being denied. *See*, *e.g.*, Shaver Decl., Ex. 46 ("cannot get a letter of release."); *id.*, Ex. 61 ("I informed him that I did not receive his letter of release. He states that he is not able to get one.").

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████ *Id.* 97:14-99:22.

To placate franchisees, McDonald's agreed to adopt a hiring moratorium, announced just six days after the wage hike announcement. ███████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████,"

Shaver Decl., Ex. 67. *See also id.*, Ex. 68 (████████████████████████████

████████████████████████████████████████████████████████"); *id.*,

Ex. 69 (███████████████████████████████████████████████

████████). McOpCo President Charles Robeson later summarized the events in an April 15,

2015 memorandum: "███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████" *Id.*, Ex. 70. Joe Nassar confirmed to his team of McOpCo recruiters that the hiring

moratorium did not change the standing rules not to hire managers: ███████████████████

███████████████████████████████████████████[18]

### 4. McDonald's Announced the End of the Agreement in July 2018

In March 2017, McDonald's Franchising leadership and General Counsel sent an email to

all U.S. Operations announcing that "████████████████████████████████████

██████████████████████████████████████████████████ Shaver

Decl., Ex. 71 at -150 (emphasis added). However, franchisees – and even some McOpCo

---

[18] Shaver Decl., Ex. 72. Another HR manager similarly wrote: "███████████████████████

████████████████████ *Id.*, Ex. 53 at -475.

personnel – continued to enforce the No-Hire Agreement.[19]  McDonald's later entered into an "Assurance of Discontinuance" with the Washington State Attorney General on July 12, 2018, which provides that "McDonald's will no longer include paragraph 14 or similar provisions in any of its future franchise agreements nationwide [and] will continue not to enforce paragraph 14 in any of its existing franchise agreements nationwide."  *Id.*, Ex. 73 at -775.  This was publicly filed and discussed in the press.[20]

## III.    ARGUMENT

### A.    Legal Standards

"To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)."  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).  Under Rule 23(a), certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  Rule 23(b)(3) requires that "questions of law or fact common to Class members predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

"In conducting this analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits."  *Messner*, 669 F.3d at 811.  "Merits questions

---

[19] Shaver Decl., Ex. 79; *id*., Ex. 78 (MCDAT00376796 at CASE_IDs 5356144, 5540592, and 5530952; MCDAT00376797 at CASE_ID 5713111).

[20] McDonald's USA LLC Assurance of Discontinuance, *In Re Franchise No Poaching Provisions,* No. 18-2-17229-2SEA (King Cnty. Super. Ct. July 12, 2018); *see also* Press Release, Wash. State Att'y Gen., "*AG Ferguson announces fast-food chains will end restrictions on low-wage workers nationwide*," (July 12, 2018) [hereafter, AG Settlement Press Release], *available at*: https://www.atg.wa.gov/news/news-releases/ag-ferguson-announces-fast-food-chains-will-end-restrictions-low-wage-workers.

may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Rule 23 is to be liberally interpreted to foster its policy in favor of class actions." *Baumann Farms, LLP v. Yin Wall City, Inc.*, Case No. 16-CV-605, 2017 WL 3669616, at *2 (E.D. Wis. Aug. 25, 2017) (citing *King v. Kansas City S. Indus., Inc.*, 519 F.2d 20, 25 (7th Cir. 1975)). "Concentrating separate actions based on the same underlying conduct in one action promotes judicial economy and efficiency and consistency of judgments." *Villanueva v. Davis Bancorp, Inc.*, No. 09 CV 7826, 2011 WL 2745936, at *3 (N.D. Ill. July 8, 2011).

The Supreme Court has long recognized that class actions play an important role in antitrust enforcement. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262, 266 (1972); *see also In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1179 (N.D. Cal. 2013) ("Thus, 'to open [ ] the door of justice' to individuals harmed by antitrust violations while at the same time penalizing antitrust violators, Congress chose to allow individuals to serve as private attorneys general in antitrust actions and to recover treble damages for their injuries." (alteration in original)).[21]

B.    **The Class Satisfies Rule 23(a)**

1.    **Numerosity**

In the Seventh Circuit, "[n]o specific minimum number of members is required, but the number forty is often cited as the point at which joinder becomes impracticable." *Smith v. Family Video Movie Club, Inc.*, 311 F.R.D. 469, 476 (N.D. Ill. 2015) (collecting cases). Here, the proposed Class includes hundreds of thousands of members, (Singer Rep., ¶ 85), making joinder of all Class members impracticable and satisfying the numerosity requirement.

2.    **Commonality**

"The weight of authority in antitrust cases indicates that the question of the existence of a conspiracy in restraint of trade is one that is common to all potential plaintiffs, and the

---

[21] Unless otherwise noted, citations are omitted and emphasis is added.

importance of this question usually warrants treating them as a class." *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 336–37 (N.D. Ill. 1997) (collecting cases). Whether McDonald's and its franchisees entered into an unlawful agreement not to hire one another's employees is "'a common question . . . at the heart of the case', [and] enough to satisfy 'commonality.'" *In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 408 (S.D. Ind. 2001) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)).[22]

In addition to the existence of the No-Hire Agreement, there are numerous other common questions of law and fact, including whether the No-Hire Agreement should be judged unlawful; whether it suppressed Class members' compensation; and if it did, the magnitude of that effect. The commonality of these issues of liability and damages is intrinsic to an agreement to restrain competition, and therefore courts routinely find commonality satisfied in cases like this one. *See Ploss v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003, 1014–15 (N.D. Ill. 2020) ("In antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification.") citing cases)); *In re Fla. Cement & Concrete Antitrust Litig.*, No. 09-23187-CIV, 2012 WL 27668, at *3 (S.D. Fla. Jan. 3, 2012) ("[C]ourts have consistently held that the nature of the antitrust conspiracy action compels a finding that common questions of fact and law exist." (citing cases)); *D&M Farms v. Birdsong Corp.*, No. 2:19-cv-463, 2020 WL 7074140, at *3 (E.D. Va. Dec. 2, 2020) ("In the antitrust context, courts have generally held that an alleged conspiracy or monopoly is a common issue that will satisfy Rule 23(a)(2) . . . .").

### 3. **Typicality**

"Typicality in the antitrust context will be established by plaintiffs and all Class members alleging the same antitrust violation by the defendants." *Ready-Mixed Concrete*, 261 F.R.D. at 168. *See also Sebo*, 188 F.R.D. at 316 ("[Plaintiff's] claims are typical of the class's in that she alleges that she was a patient at Parkside and that defendants' alleged conspiracy to raise the

---

[22] *See also Sebo v. Rubenstein*, 188 F.R.D. 310, 314 (N.D. Ill. 1999); *Serv. Spring, Inc. v. Cambria Spring Co.*, Nos. 81 C 1835, 82 C 3901, 1984 WL 2925, at *2 (N.D. Ill. Jan. 6, 1984); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 167 (S.D. Ind. 2009).

- 18 -

prices for the services she received injured her.").  Here, Plaintiffs Deslandes and Turner both worked for McDonald's restaurants within the class period; allege the same antitrust violation by McDonald's (the No-Hire Agreement); and seek compensation for the same injury under the same theory (wage suppression).  Typicality is satisfied.

### 4. Adequacy

To satisfy adequacy, a "plaintiff must not have claims antagonistic to or in conflict with those of other Class members, and must have sufficient interest in the case's outcome to be a vigorous advocate."  *In re Sulfuric Acid Antitrust Litig.*, MDL No. 1536, 2007 WL 898600, at *4 (N.D. Ill. Mar. 21, 2007).  Here, Plaintiffs Deslandes and Turner have the same interest as the Class in proving that Defendants' conduct violated the antitrust laws and depressed compensation as a result.  Plaintiffs Deslandes and Turner and their counsel do not have any claims in conflict with Class members.

Both Plaintiffs have dutifully performed their obligations as Class representatives to date. Each reviewed relevant portions of their respective complaints before filing.  Shaver Decl., Ex. 74 (Declaration of Leinani Deslandes ("Deslandes Decl.")), ¶ 2; *id.*, Ex. 75 (Declaration of Stephanie Turner ("Turner Decl")), ¶ 2.  Each responded to interrogatories and document requests.  *Id.*  Each appeared for a deposition.  *Id.*  They are adequate Class representatives.

Plaintiffs retained highly experienced counsel with an extensive record of success in prosecuting antitrust cases, employment cases, and class actions.[23]  Plaintiffs' counsel are particularly experienced in antitrust class actions challenging no-poach agreements.  *Id.* Plaintiffs' counsel have vigorously prosecuted, and will continue to vigorously prosecute, this litigation on behalf of Plaintiffs and the Class.

---

[23] While the Court's appointment of Class Counsel is addressed in Rule 23(g)(1), it formerly was considered as part of the Rule 23(a) adequacy analysis. The qualifications of counsel are available at their respective web pages. *See* http://www.scott-scott.com; http://www.mccunewright.com; https://www.lieffcabraser.com/pdf/firm_resume_20191220.pdf (all cites last visited Jan. 14, 2021).

- 19 -

### C.     The Class Satisfies Rule 23(b)

Rule 23(b)(3) sets forth two requirements.  First, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Second, "a class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy."  *Id.*  Both requirements are satisfied here.

### 1.     Common Questions of Liability, Impact, and Damages Predominate Over Individualized Issues

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Winsor*, 521 U.S. 591, 623 (1997).  This requires the Court to consider the "relation between common and individual questions in a case."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016).  An individual question requires class members to present evidence that varies from member to member, while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *Id*.  "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."  *Id*.  When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Id*.

Analysis of predominance begins with the elements of the underlying cause of action. *Messner*, 669 F.3d at 815.  Here, those elements are: (1) a violation of the antitrust law, (2) injury resulting from that violation (also called "impact"), and (3) damages.  *Id*.; *see also In re Bromine*, 203 F.R.D. at 412 (same).  Common issues predominate with respect to all three elements.

### a. <u>Common Evidence Will Prove An Unlawful Agreement to Restrain Competition</u>

The existence of the No-Hire Agreement is a central question in this case and will be established by common evidence. "To prove each element of a conspiracy, virtually all class members would be relying on the same evidence that Plaintiffs have submitted in support of class certification—namely the documents, emails, phone records, and other indirect evidence necessary to prove that Defendants conspired in violation of antitrust laws. This type of alleged conspiracy is the prototypical example of an issue where common questions predominate." *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015), *aff'd sub nom. Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016); *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002) (Allegations of price fixing "will focus on the actions of the defendants, and, as such, proof for these issues will not vary among class members."). Here, evidence either proving or disproving the existence of the restraint will be common to the Class. For example, the standardized franchise agreement is common evidence that ***each and every*** McDonald's franchisee agreed to abide by Paragraph 14's restrictions. McDonald's communication records and deposition testimony will likewise prove that the agreement was actively enforced and reciprocated through, *e.g.*, McOpCo's release requirement for managers and the hiring moratorium.

As to the legality of the Agreement, the Court has previously held that "plaintiff has stated a claim for a restraint that might be unlawful under quick-look analysis." ECF No. 53 at 15. Under the quick-look analysis, "if the defendant lacks legitimate justifications for facially anticompetitive behavior then the court 'condemns the practice without ado' without resort to analysis of market power." *Id.* at 9 (citing cases). Therefore, at the merits stage of a quick look case, Plaintiffs need only prove that there was a facially anticompetitive agreement (see above). While McDonald's may argue that the agreement has legitimate justifications in encouraging franchisees to invest in training their workforce (*see* Shaver Decl., Ex. 76 at pp. 14-19), both that argument and Plaintiffs' rebuttal thereto will rely solely on common evidence—

contemporaneous business records and expert testimony. For example, documents show that McDonald's did not change its training standards in any way after the elimination of Paragraph 14, so franchisees had no option to reduce training.[24] And Dr. Singer opines that the No-Hire Agreement did not create any economic efficiencies for workers, as required to be legally cognizable under the antitrust laws.[25]

### b. Common Evidence Will Prove Class-wide Impact

The "antitrust impact" element of an antitrust claim requires proof of causation that Class members were injured (as distinct from the third element, damages, which quantifies how much they were injured). *Kleen Prods.*, 306 F.R.D. at 594. "[P]laintiff's 'burden at the class certification stage [is] not to prove the element of antitrust impact, but only to demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members.'" *Messner*, 669 F.3d at 818. Plaintiffs need not prove that *every* Class member suffered some impact from the alleged violation. *Kleen Prods.*, 831 F.3d at 927 (citing *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 750 (7th Cir. 2014)). It is sufficient to show common evidence that "the plaintiff class as a whole has been injured by the defendants' conspiracy." *Rohlfing*, 172 F.R.D. at 337.

Plaintiffs have retained two experts, Dr. Singer and Dr. Cappelli, to evaluate whether and how common evidence can be used to demonstrate the impact of the No-Hire Agreement on Class members' pay.

### i. Dr. Singer's Analysis Shows That The No-Hire Agreement Suppressed Pay Class-Wide

Dr. Singer found that common evidence and standard statistical methods show that the No-Hire Agreement generated substantial anticompetitive effects through wage suppression, and

---

[24] Shaver Decl., Ex. 11 (Lopez Dep.) at 260:16-261:8 ██████████████████████████████████████████████████████████████████ ); *compare* Shaver Decl., Ex. 77 at -827 (National Franchising Standards, 2018) *to* Ex. 10 at -503 (NFS, 2016).
[25] Singer Rep., ¶ 90; *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963).

impacted all or nearly all Class members. Dr. Singer's opinion is supported by: (1) an overview of economic research demonstrating that employers exercise significant monopsony power over their employees, and that no-poach agreements exacerbate that monopsony power; (2) a multivariate regression establishing that the McDonald's No-Hire Agreement lowered the wages Class members received; and (3) two alternative methods of demonstrating common impact to the Class, one based on predictive modeling and the other based on the existence of a compensation structure.

(1) Economic Research: Dr. Singer provides a thorough review of economic research demonstrating that employers exercise significant market power (monopsony) over their employees, including in low-wage markets. Singer Rep., ¶¶ 11-20. Dr. Singer also evaluated the economic significance of no-hire agreements like the one at issue. *Id*., ¶ 21-28. Dr. Singer then reviewed the record evidence and confirmed that, in line with what the literature predicts, McDonald's No-Hire Agreement did restrain labor mobility. *Id*., ¶¶ 30-38. He found that in part McDonald's monopsony power stems from the fact that employees who receive McDonald's-specific training have skills that are primarily of value to other McDonald's-branded restaurants. "In the absence of brand-specific monopsony power, [the No-Poach Agreement] would not make economic sense." *Id.*, ¶ 28.

(2) Pay Suppression Model: Dr. Singer employed an econometric model, using well-accepted principles, to show the anticompetitive effects of the No-Hire Agreement by comparing a) the wages paid to Class members when the Agreement was in effect to b) the wages paid to employees after the Agreement was officially terminated in mid-2018 (the "but-for" period), while controlling for other relevant factors. Singer Rep., ¶ 41. This "before and after" approach is the most reliable method possible.[26] The availability of actual class pay data both during and after the misconduct allows Dr. Singer to use standard econometric techniques to measure the

---

[26] *See*, *e.g.*, Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 305 (3rd ed. 2011); *Kleen Prods.,* 306 F.R.D. at 599 ("Such a [before and after] method is a common way that courts have allowed experts to demonstrate impact.").

impact of the misconduct and control for other relevant factors, without resorting to a benchmark comparison with a different market.

Dr. Singer used a multivariate regression, "[p]erhaps the leading tool" used by social scientists "to isolate the effects of multiple variables and determine how they influence one dependent variable." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). *See also Kleen Prods.*, 306 F.R.D. at 595 ("One way of demonstrating predominance is to show that there is a common method for proving that the class plaintiffs paid higher actual prices than in the but-for world, such as using an econometric regression model incorporating a variety of factors to demonstrate that a conspiracy variable was at work during the class period, raising prices above the 'but-for' level for all plaintiffs."). Specifically, Dr. Singer designed a regression in which the "dependent variable to be explained is the hourly compensation paid to a given Class Member at a given point in time, and the key independent variable captures the effect of the [No-Hire Agreement], holding constant other factors that may affect compensation." Singer Rep.*,* ¶ 46. To test for the effect attributable to the No-Hire Agreement, Dr. Singer controlled for other variables that might influence wages, such as local labor market conditions, federal, state, or local minimum wages, local unemployment rates, local per capita income, store-specific attributes, and employee-specific attributes like job title. *Id.*, ¶¶ 49-50.

Dr. Singer's wage regression demonstrates that the No-Hire Agreement negatively impacted Class member wages, and that the impact was highly statistically significant at the one percent level. *Id.*, ¶ 52. This level of significance "mean[s] that there is less than a one percent chance" that the observed difference in wages is due to pure happenstance rather than to the No-Hire Agreement. *Id.* This is well beyond the 5% level of significance that peer-reviewed economic publications typically expect.[27] Dr. Singer also accounted for the fact that Class pay did not instantly move to competitive levels upon removal of the No-Hire Agreement, but instead gradually adjusted to increased competition. Dr. Singer estimates that, without the No-

---

[27] David Kaye & David Freedman, *Reference Guide on Statistics*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 251-252 (3rd ed. 2011).

Hire Agreement, Class members employed by franchisees would have earned 6.7% more, and Class members employed by McOpCo would have earned 3.5% more. *Id.*, ¶ 57.

Dr. Singer also performed a number of sensitivity tests to confirm the robustness of his analysis by controlling for additional variables, including distance to the nearest McDonald's with a different owner, county population density, and the local county wages in fast food restaurants as reported to the Bureau of Labor Statistics Quarterly Census. *Id.*, ¶ 58. These sensitivity tests further confirmed Dr. Singer's results. In addition, Dr. Singer's ran separate regressions for crew members and managers, and found that the No-Hire Agreement suppressed compensation for both. *Id.*, ¶ 59. Dr. Singer's regression is common evidence that the No-Hire Agreement had a Class-wide direct effect on Class members' wages.

(3) Common Impact Analysis: Dr. Singer presents two mutually reinforcing methods of demonstrating that the No-Hire Agreement harmed all or nearly all Class members: a predictive model and a compensation structure-based theory of impact.

The first method (the predictive model) compares the compensation that each Class member actually received to the compensation they would have received in the absence of the No-Hire Agreement, as determined by Dr. Singer's pay suppression model discussed above. Under this method, a Class member suffers antitrust injury whenever her actual compensation in any given payment period during the Class Period is below the compensation she would have received per the pay suppression (prediction) model in the absence of the No-Hire Agreement. Singer Rep., ¶ 67. This standard form of in-sample prediction allows Dr. Singer to compute the proportion of Class members that sustained antitrust injury on one or more occasions. This method has been successfully employed in several antitrust class actions to demonstrate common impact[28] and is discussed in the introductory chapter of the Federal Judicial Center's *Reference*

---

[28] *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014). *See also In re Capacitors Antitrust Litig.* (*No. III*), Case No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018); *In re Packaged Seafood Prods. Antitrust Litig.* 332 F.R.D. 308 (S.D. Cal. 2019).

*Manual on Multiple Regression.*[29]  Using the predictive model, Dr. Singer estimates that at least 99% of Class Members sustained antitrust injury as a result of the No-Hire Agreement.  *Id.*, ¶ 68.

Dr. Singer's second method relies on a two-pronged approach that has been approved in other antitrust litigation involving employee claims for lost pay, as described in § III.C.1.b.iii., below.  The first prong requires Class-wide evidence demonstrating that the No-Hire Agreement had a generally suppressive effect on Class member compensation.  This prong is established by the pay suppression model discussed above.  Singer Rpt., ¶ 69.  For the second prong, Dr. Singer evaluates "whether there is class-wide evidence of a compensation structure that would transmit the artificially reduced compensation (found by the first prong) broadly across the Class."  *Id.* Dr. Singer finds support for the existence of a compensation structure in both an econometric analysis and in record evidence.  With respect to the econometric analysis, Dr. Singer performed "compensation structure regressions" to test the relationship between an individual Class members' pay to the pay of others in the same job title, controlling for other relevant factors.  *Id.*, ¶¶ 71-73.  He found that pay changes are shared across the Class to a high degree of statistical confidence, indicating a shared common wage structure.  *Id.*

Dr. Singer also examined the record evidence and found it consistent with his compensation structure regressions.  Specifically, he reviewed evidence that McDonald's shared its wage structure with franchisees and encouraged its use.  *See* § II.C, *infra*; Singer Rpt., ¶¶ 74-82.  He found that "record evidence indicates that the compensation paid to Class Members followed a formulaic compensation structure, consistent with considerations of compression and the results of my compensation structure regressions."  *Id.* at ¶ 82.  From this, Dr. Singer concludes that the compensation-suppressing effects of the No-Hire Agreement were not confined to a subset of Class members, but instead would have been broadly shared across the Class.  *Id.*

---

[29] Rubinfeld, *supra,* at n. 4.

ii.    **Dr. Cappelli's Analysis Shows That The No-Hire Agreement Transmitted Impact Class-Wide**

Dr. Cappelli also investigated whether the No-Hire Agreement would have suppressed the compensation of all or nearly all members of the Class. Dr. Cappelli reviewed only common evidence: McDonald's corporate witness testimony, contemporaneous business records, and publicly-available research.

Dr. Cappelli first describes how the franchise model works, and why franchisors like McDonald's are heavily invested in ensuring that all franchisees maintain brand standards to provide a uniform customer experience and build brand loyalty. Cappelli Rep., ¶¶ 10-43. He shows how McDonald's training requirements result in employees with some general skills that are of some modest value to any employer, but a high quantity of specific skills that are only valuable to other McDonald's employers. *Id.*, ¶¶ 44-62. "The greater productivity and value associated with a worker already endowed with firm-specific skills and training should raise the demand for such workers within the chain, which would drive up the worker's wages. That is how an unfettered labor market works: demand bids up the wages of valuable workers." *Id.*, ¶ 62. Dr. Cappelli concludes that the existence of this brand-specific training, of value principally to McDonald's restaurants and not transferable or valuable to other restaurant chains or employers, means that the No-Hire Agreement would impact Class Members' wages, notwithstanding that they may seek employment with companies outside the McDonald's system. *Id.*, ¶¶ 60-62.

Next, Dr. Cappelli reviews the record evidence of Paragraph 14's limitations on franchisee hiring and McDonald's reciprocal practices and confirms it restrained competition for restaurant employees. Cappelli Rep., ¶¶ 64-78. Dr. Cappelli provides an overview of the economic literature on labor mobility, and why it pays to switch employers. *Id.*, ¶¶ 79-96. In an unfettered labor market, employers pay to retain good employees, because the costs of hiring and training replacements are high. *Id.*, ¶ 86. He opines this dynamic is even truer in the franchise context where brand-specific skills dominate over general skills. *Id.*, ¶ 89. He reviews existing

- 27 -

studies demonstrating that restrictions to employee mobility do in fact depress wages, including among low-wage fast food workers. *Id*., ¶¶ 92-96.

Finally, Dr. Cappelli explains why organizations adopt formal compensation systems, and the importance of "internal equity" (also called compression) — fairness in how people are paid relative to one another within the same job and across the job hierarchy. Cappelli Rep., ¶¶ 104-114. He finds that the record evidence shows that McDonald's adopted a formal compensation system and adhered to principles of compression. *Id*., ¶¶ 115-134. Further, not only did McDonald's share its actual pay ranges and wage structure tools with franchisees, but the franchise model left them with little choice but to adopt it or something very similar. *Id*. He concludes that because all McDonald's restaurants share a common pay structure, the No-Hire Agreement would have caused system-wide suppression of wages. *Id*., ¶¶ 135-138.

### iii.  Plaintiffs' demonstration of impact has been widely accepted in no-poach cases

Dr. Singer's and Dr. Cappelli's methods have been successfully employed and accepted as common proof of impact by courts in other no-poach antitrust actions. In *High-Tech Employee*, for example, the plaintiffs alleged that the defendants agreed not to recruit each other's employees with "cold calls," thereby suppressing wages not just for employees who would have received cold calls in the but-for-world, but also for all approximately 64,000 technical employees across seven companies nationwide. 985 F. Supp. 2d at 1193. The court found that the plaintiffs' documentary and expert evidence satisfied predominance because that evidence demonstrated that cold calls put "upward pressure" on the salaries not of just individual employees, but of all employees "who were part of the same salary structure." *Id.* at 1192. Similarly, in *Seaman v. Duke University*, 1:15-CV-462, 2018 WL 671239, at *4-6, 8, (M.D.N.C. Feb. 1, 2018), the court held that antitrust impact could be proved with common evidence. That evidence included general economic theory that competition would have spurred preemptive salary increases; that pay structures would have transmitted this effect to all class members, not just those who were recruited or received offers; and that a "sharing" regression analysis

- 28 -

showing that the compensation of Class members moved together, suggested a compensation structure. *See also Merenda v. VHS of Mich., Inc.*, 296 F.R.D. 528, 544 (E.D. Mich. 2013) (expert analysis demonstrated predominance in wage suppression case where class members were part of compensation systems, adjustments to which "'affected the compensation of all or almost all individual Class members'"); *Johnson v. Ariz. Hosp. & Healthcare Ass'n*, No. 07-1292, 2009 WL 5031334, at *8, 11 (D. Ariz. July 14, 2009) (same); *Nitsch v. DreamWorks Animation SKG Inc.*, 315 F.R.D. 270, 300 (N.D. Cal. 2016) (same). Using evidence and methods that are common to the Class, Plaintiffs thus demonstrate that all or nearly all Class members were impacted by the No-Hire Agreement.

### c. Common Evidence Provides a Reliable Method of Measuring Class-wide Damages

"To establish predominance, a plaintiff must produce a reliable method of measuring classwide damages based on common proof." *Kleen Prods.*, 306 F.R.D. at 601. The Seventh Circuit has held that "plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages." *Kleen Prods.*, 831 F.3d at 929 (citing *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002)). "[A]t the class certification stage, plaintiffs are not obliged to drill down and estimate each individual Class member's damages." *Id.*

Not only have Plaintiffs proposed a common methodology to measure aggregate Class damages, Dr. Singer has actually calculated it, using standard econometric methods. Using the generalized wage effect shown in his regression model and the aggregate compensation paid to Class members while the No-Hire Agreement was in effect, Dr. Singer calculates that Class members lost approximately $█ per Class member per year. Singer Rep., ¶¶ 83-85. Other courts have held that similar methods for calculating damages in no-poach cases satisfy predominance. *See Duke*, 2018 WL 671239, at *6, 8-9 (regression analysis to determine class-wide damages satisfied predominance); *High-Tech Emp.*, 985 F. Supp. 2d at 1223-26 (same); *Johnson*, 2009 WL 5031334, at *10 (same); *Nitsch,* 315 F.R.D. at 308 (same).

- 29 -

### 2.   A Class Action Is A Superior Way to Litigate These Claims

Rule 23(b)(3) provides that certification is warranted if a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). If common issues predominate over individual issues, then a class action will generally be a superior method for adjudicating the Class members' claims. *See Amchem,* 521 U.S. at 615. Class certification is more efficient than any other procedure available for resolving the common factual and legal issues raised here. As the Court held in *Kleen Products*, "it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence." 831 F.3d at 925.

In finding superiority satisfied, courts have explained that an alternative to a class action—litigating hundreds or thousands of lawsuits individually—would be wasteful, inefficient, and infeasible. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("'[T]he more claimants there are, the more likely a class action is to yield substantial economies in litigation.'"). Class litigation is particularly superior in actions where, as here, it would be unduly costly for Class members to pursue litigation on their own. *See Suchanek*, 764 F.3d at 759 ("'The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'"); *Carnegie v. Household Int'l, Inc*., 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." (emphasis in original)). Class treatment is the superior way for this case to proceed. *See High-Tech Emp.*, 985 F. Supp. 2d at 1228-29 ("[T]he nature of Defendants' alleged overarching conspiracy and the desirability of concentrating the litigation in one proceeding weigh heavily in favor of finding that class treatment is superior to other methods of adjudication of the controversy.").

## IV.   CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for class certification.

Dated:  January 15, 2020                       /s/ *Anne B. Shaver*

Dean M. Harvey*
Anne B. Shaver*
Lin Y. Chan*
Yaman Salahi*
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Tel: (415) 956-1000
dharvey@lchb.com
ashaver@lchb.com
lchan@lchb.com
ysalahi@lchb.com

Derek Y. Brandt (#6228895)
Leigh M. Perica (#6316856)
Connor P. Lemire*
**MCCUNE WRIGHT AREVALO, LLP**
231 North Main Street, Suite 20
Edwardsville, Illinois 62025
Tel: (618) 307-6116
Fax: (618) 307-6161
dyb@mccunewright.com
lmp@mccunewright.com
cpl@mccunewright.com

Richard D. McCune*
Michele M. Vercoski*
**MCCUNE WRIGHT AREVALO, LLP**
3281 East Guasti Road, Suite 100
Ontario, California 91761
Tel: (909) 557-1250
rdm@mccunewright.com
mmv@mccunewright.com

Walter W. Noss*
Stephanie A. Hackett*
Sean C. Russell*
**SCOTT+SCOTT, ATTORNEYS AT LAW,
LLP**
600 West Broadway, Suite 3300
San Diego, California 92101
Tel: (619) 233-4565

- 31 -

wnoss@scott-scott.com
shackett@scott-scott.com
sean.russell@scott-scott.com

Michelle E. Conston*
**SCOTT+SCOTT, ATTORNEYS AT LAW,
LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
Tel: (212) 223-6444
mconston@scott-scott.com

*Attorneys for Individual and Representative
Plaintiffs Leinani Deslandes and Stephanie
Turner*

* Admitted *pro hac vice*

- 32 -

<u>**CERTIFICATE OF SERVICE**</u>

I, Anne Shaver, an attorney, hereby certify that Plaintiffs' Motion for Class Certification was electronically filed on January 15, 2020 and will be served electronically via the Court's ECF Notice system upon the registered parties of record.

*/s/ Anne B. Shaver*

- 33 -