**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LEINANI DESLANDES, on Behalf of Herself and All Others Similarly Situated, | Civil Case No. 17-cv-04857 |
| Plaintiff, | Judge Jorge L. Alonso |
| | Magistrate Judge M. David Weisman |
| v. | |
| McDONALD'S USA, LLC, *et al.*, | |
| Defendants. | |
| STEPHANIE TURNER, on Behalf of Herself and All Others Similarly Situated, | Civil No. 19-cv-05524 |
| Plaintiff, | |
| v. | |
| McDONALD'S USA, LLC, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF CLASS CERTIFICATION**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................... 1

II.    ARGUMENT ...................................................................................... 2

    A.    Antitrust Violation Is a Common Question with a Common Answer ................... 2

    B.    Antitrust Impact May Be Proved with Common Evidence ................................. 8

    C.    Damages Can Be Measured on a Classwide Basis ............................................ 12

    D.    Plaintiffs Are Adequate and Have Typical Claims ............................................ 12

    E.    Classwide Adjudication Is Superior .................................................................. 15

III.    CONCLUSION ................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
683 F.3d 328 (7th Cir. 2012) ....................................................3

*Am. Airlines v. Christensen,*
967 F.2d 410 (10th Cir. 1992) ...................................................7

*Bd. of Regents v. Nat'l Collegiate Athletic Ass'n,*
468 U.S. 85 (1984)...................................................................5

*Beatrice Foods v. F.T.C.,*
540 F.2d 303 (7th Cir. 1976) ....................................................4

*Blackburn v. Sweeney,*
53 F.3d 825 (7th Cir. 1995) ......................................................3

*Blumenthal v. U.S.,*
332 U.S. 539 (1947)..................................................................5

*Broussard v. Meineke Discount Muffler Shops, Inc.,*
155 F.3d 331 (4th Cir. 1998) ....................................................5

*Brown v. Yellow Transp., Inc.,*
No. 08 C 5908, 2011 WL 1838741 (N.D. Ill. May 11, 2011) .................................14

*D&M Farms v. Birdsong Corp.,*
C.A. No. 2:19-cv-463, 2020 WL 7074140 (E.D. Va. Dec. 2, 2020) ................................10, 11

*DeKoven v. Plaza Assocs.,*
599 F.3d 578 (7th Cir. 2010) ....................................................9

*E&G, Inc. v. Am. Hotel Register Co.,*
No. 17-CV-1011, 2018 WL 1334934 (N.D. Ill. Mar. 15, 2018) (Alonso, J.)........................13

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l,*
695 F.3d 330 (5th Cir. 2012) ....................................................4

*Hedlund & Hanley, LLC v. Bd. of Trustees of Comm. Coll. Dist. No. 508,*
376 Ill. App. 3d 200 (2007) ......................................................7

*Hewitt v. Joyce Beverages of Wisconsin, Inc.*
721 F.2d 625 (7th Cir. 1983) ....................................................6

*In re Copper Antitrust Litig.*,
    436 F.3d 782 (7th Cir. 2006) ...................................................................................13

*In re Fine Paper Antitrust Litig.*,
    82 F.R.D. 143 (E.D. Pa. 1979) ..................................................................................8

*In re High-Tech Emp. Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) .......................................................5, 11, 12

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ......................................................................................6

*In re Johnson*,
    760 F.3d 66 (D.C. Cir. 2014) ............................................................................14, 15

*In re Sulfuric Acid Antitrust Litig.*,
    703 F.3d 1004 (7th Cir. 2012) ...................................................................................3

*Interstate Circuit v. U.S.*,
    306 U.S. 208 (1939).....................................................................................................5

*Jones v. City of Chicago*,
    856 F.2d 985 (7th Cir. 1988) .....................................................................................5

*Kleen Prods. LLC v. Int'l Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) .................................................................................8, 12

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)...................................................................................................13

*Kohen v. Pacific Inv. Mgmt. Co. LLC*,
    571 F.3d 672 (7th Cir. 2009) ...................................................................................15

*Kotteakos v. U.S.*,
    328 U.S. 750 (1946)......................................................................................................6

*La. Firefighters' Retirement Sys. v. N. Trust Investments, N.A.*,
    312 F.R.D. 501 (N.D. Ill. 2015) (Alonso, J.) ..........................................................13

*Law v. Nat'l Collegiate Athletic Ass'n*,
    134 F.3d 1010 (10th Cir. 1998) ............................................................................3, 5

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*,
    624 Fed. App'x 23 (2d Cir. 2015).............................................................................4

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) .....................................................................................6

*Martino v. McDonald's Sys., Inc.*,
    81 F.R.D. 81 (N.D. Ill. 1979)..................................................................5

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
    62 F.3d 967 (7th Cir. 1995) ..................................................................7

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ................................................................7

*Package Shop, Inc. v. Anheuser-Busch, Inc.*,
    Civ. A. No. 83-513, 1984 WL 6618 (D.N.J. Sept. 25, 1984) ...................8

*Parko v. Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014) ..............................................................12

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014)..............................................................................13

*Photovest Corp. v. Fotomat Corp.*,
    606 F.2d 704 (7th Cir. 1979) ................................................................4

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (11th Cir. 2016) ............................................................7

*Puffer v. Allstate Ins. Co.*,
    255 F.R.D. 450 (N.D. Ill. 2009).............................................................14

*Randall v. Rolls-Royce Corp.*,
    637 F.3d 818 (7th Cir. 2011) ................................................................14

*Republic Tobacco Co. v. N. Atlantic Trading Co., Inc.*,
    381 F.3d 717 (7th Cir. 2004) ................................................................4

*Riffey v. Rauner*,
    910 F.3d 314 (7th Cir. 2018) ................................................................12

*Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*,
    786 F. Supp. 2d 1190 (S.D. Tex. 2009) ................................................7

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ..............................................................12

*Sample v. Aldi, Inc.*,
    No. 93 C 3094, 1994 WL 48780 (N.D. Ill. Feb. 15, 1994)......................15

*Sapperstein v. Hager*,
    188 F.3d 852 (7th Cir. 1999) ................................................................11

*Seaman v. Duke Univ.*,
　　2018 WL 671239 (M.D.N.C. Feb. 1, 2018)............................................................12

*Sheridan v. Marathon Petroleum Co. LLC*,
　　530 F.3d 590 (6th Cir. 2008) ........................................................................4

*State of Ala. v. Blue Bird Body Co., Inc.*,
　　573 F.2d 309 (5th Cir. 1978) ........................................................................4

*Staton v. Boeing Co.*,
　　327 F.3d 938 (9th Cir. 2003) ......................................................................14

*Times-Picayune Publ'g Co. v. U.S.*,
　　345 U.S. 594 (1953)........................................................................................6

*Tinner v. United Ins. Co. of Am.*,
　　308 F.3d 697 (7th Cir. 2002) ......................................................................13

*Toys 'R' Us, Inc. v. F.T.C.*,
　　221 F.3d 928 (7th Cir. 2000) ........................................................................6

*Turner v. McDonald's USA, LLC*,
　　No. 19 C 5524, 2020 WL 3044086 (N.D. Ill. Apr. 24, 2020)................................13

*Tyson Foods, Inc. v. Bouaphakeo*,
　　577 U.S. 442 (2016)........................................................................................9

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*,
　　313 F. Supp. 2d 213 (S.D.N.Y. 2004)................................................................9

*U.S. v. Apple, Inc.*,
　　791 F.3d 290 (2d Cir. 2015)............................................................................6

*U.S. v. Continental Can Co.*,
　　378 U.S. 441 (1964)........................................................................................4

*U.S. v. Falstaff Brewing Corp.*,
　　410 U.S. 526 (1973)........................................................................................7

*Wagner v. Magellan Health Servs., Inc.*,
　　121 F. Supp. 2d 673 (N.D. Ill. 2000) ................................................................6

*Wagner v. Taylor*,
　　836 F.2d 578 (D.C. Cir. 1987)......................................................................14

*Worldwide Basketball & Sports Tours, Inc. v. N.C.A.A.*,
　　388 F.3d 955 (6th Cir. 2004) ........................................................................4

**Other Authorities**

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE
  254 (3rd ed. 2011).......................................................................................................................9

Floyd J. Fowler, Jr., SURVEY RESEARCH METHODS
  45 (5th ed.) ...............................................................................................................................9

William Cochrane, SAMPLING TECHNIQUES
  24-25 (John Wiley & Sons 3rd ed. 1977) ................................................................................9

## I.   **INTRODUCTION**

The core of McDonald's opposition is a ***merits*** argument that the No-Hire Agreement was incapable of achieving its obvious purpose: to keep Class wages down by reducing competition for Class labor.   This argument only confirms that Plaintiffs' motion should be granted, because whether the No-Hire Agreement suppressed Class pay is a common question that will be resolved, either way, with common evidence.

McDonald's papers only prove the point.   In a misguided attempt to justify its misconduct, McDonald's own expert opines ███████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████   Murphy Rept. (Dkt. 310-12), ¶¶284-86.   McDonald's admits this dynamic is Classwide, and applied equally to McDonald's restaurants nationwide. Declaration of Walter W. Noss ("Noss Decl."), Ex. 1 (Murphy Dep.) at 185: 6-8 ██████████ ███████████████████████████████.   Of course, lower expected turnover meant that McDonald's employers set pay levels lowe███████████████████████████████████████████ ███████████████████████████   Murphy Rept., ¶36.   And this wage suppression impacted all Class members████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████   *Id.*, n.47 (quoting Duggan Dep.).   Thus, McDonald's cannot even defend itself without relying on Classwide arguments and evidence that confirm Plaintiffs' theory of the case.

This case presents ideal circumstances for class certification.   Every member of the Class complains about the same thing: the No-Hire Agreement.   Proof of the violation will rely entirely upon common evidence: an identical, express restraint written into every franchise agreement, and nationwide policies McDonald's implemented to enforce and reciprocate it.   The Class will rely upon common evidence for impact and damages: witness testimony, contemporaneous

business records, economic theory and research, and expert analysis all demonstrate the No-Hire Agreement accomplished its unlawful objective and reduced Class pay. Part of that common proof includes powerful econometric models , through common explanatory variables such as local minimum wage and local unemployment rate. Singer Rept. (Dkt. 271-5), ¶¶45-57. One of those explanatory variables is the No-Hire Agreement, showing that the misconduct at issue suppressed Class pay ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, ¶52. McDonald's proposes no alternative dataset, no omitted control variable, and no meritorious reason to ignore the results of Dr. Singer's reliable and standard econometric methods.

Plaintiffs' antitrust claims will rise or fall on common evidence and should proceed on behalf of all the workers whom McDonald's injured with its unlawful conduct.

## II.   ARGUMENT

### A.   Antitrust Violation Is a Common Question with a Common Answer

**Relevant Market**: An elaborate market-definition exercise is not required to answer whether the No-Hire Agreement was anticompetitive. McDonald's assumes the full-blown rule of reason will apply, but common evidence confirms the Court's earlier decision to apply the quick-look test. Dkt. 53 at 10-16. McDonald's and the franchisees are direct, horizontal competitors for labor, and their agreement to limit competition suppressed worker pay, as "a rudimentary understanding of economics" would predict. *Compare id.* at 12 *with* Singer Rept., ¶¶21-28 *and* Cappelli Rept. (Dkt. 271-6), ¶¶79-103. McDonald's describes the restraint as "vertical" and "intrabrand" to suggest more proof is needed to evaluate anticompetitive potential, but the Court has already rejected that characterization. *Compare* Dkt. 53 at 15 ("In the employment market, the various McDonald's stores are competing brands.") *with, e.g.,* Murphy Rept., ¶¶17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; 18 ▮▮▮▮▮▮▮▮▮▮▮; 23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮; 112 ▮▮▮▮▮▮▮ ▮▮▮▮▮▮; 135 ▮▮▮▮▮▮▮▮▮▮. Most damningly, McDonald's contends the No-Hire

2

Agreement is justified because it prevented employee movement between McDonald's restaurants, *see, e.g.*, Murphy Rept., ¶¶284-86, but that "defense" concedes an anticompetitive market division. As the Court recognized, there are lawful ways, like paying employees more, "to encourage . . . [them] to stay without resorting to unlawful market division." Dkt. 53 at 15. Dr. Singer's regression confirms this: McDonald's and its franchisees paid their employees more after ending the No-Hire Agreement. Singer Rept., ¶¶51-59. In any case, the validity of McDonald's justifications, the necessity of McDonald's restraint to serve those justifications, and the reasonableness of the restraint after considering both anticompetitive effects and McDonald's defenses are all classwide common questions. *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1019 (10th Cir. 1998) (explaining burden-shifting for quick-look claim); *see also Blackburn v. Sweeney*, 53 F.3d 825, 828-29 (7th Cir. 1995) (rejecting ancillarity).

When a challenged restraint is so facially anticompetitive, Plaintiffs need only identify the "rough contours" of a commercial market. *See, e.g.*, *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 346 (7th Cir. 2012) (agreeing "a labor market for student athletes . . . would meet plaintiffs' burden of describing a cognizable market").[1] The "rough contours" are the service market for McDonald's restaurant workers. Common evidence demonstrates the robust, specific training McDonald's employees must receive to ensure products and customer experiences are identical at restaurants across the country. *See* Cappelli Rept., ¶¶48-62; Cappelli Rebuttal (Dkt. 329-2), ¶¶71-101; Noss Decl., ¶3, Table 1. It also proves that this training has special value to McDonald's employers.[2] That is why McDonald's tracked worker training history, even when restaurants changed ownership or workers returned to different restaurants,

---

[1]     *See also In re Sulfuric Acid Antitrust Litig*., 703 F.3d 1004, 1007-08 (7th Cir. 2012) (observing that "even if a challenged practice doesn't quite rise to the level of per se illegality, it may be close enough to shift to the defendant the burden of showing that appearances are deceptive" without market definition).

[2]     *E.g.*, Noss Decl., Ex. 3 at 59:2-59:11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *id.* 100:13-24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 4 at 76:15-77:3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See also* Cappelli Rebuttal., ¶72 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

confirming the training had system-wide value. Noss Decl., Ex. 2 at 14:12-15:4; 57:17-58:3; Cappelli Rebuttal, ¶69. Indeed, McDonald's purported justification – that the No-Hire Agreement "protects" franchisees' investments in training – is itself premised on the specific value of such training to employers within the McDonald's system.[3] These facts distinguish McDonald's cases, which also involved the rule of reason, vertical restraints, statements in dicta, and are inconsistent with *Agnew*, the more recent authority.[4]

Contrary to McDonald's suggestion, Plaintiffs' cognizable market is not limited to a "single brand."[5] The Court has held McOpCos and each franchisee are different brands in the employment market, giving the restraint a horizontal orientation. Dkt. 53 at 11. Moreover, given the recognized and unique value of McDonald's-specific training to employers within that system, a "market" for such labor services is cognizable, notwithstanding the presence of other employers.[6] Dr. Singer's regression accounts for the presence of those employers to isolate the effects of the No-Hire Agreement. Singer Rept., ¶58; Singer Rebuttal, ¶¶73-76.

McDonald's also argues that Plaintiffs must delineate the geographic dimensions of the labor market or markets at issue, but that is unnecessary. Dr. Singer's regression controls for national, state, county, municipal, and store-level economic data, and sufficiently accounts for

---

[3] McDonald's rule of reason case, *Worldwide Basketball & Sports Tours, Inc. v. N.C.A.A.*, 388 F.3d 955 (6th Cir. 2004), involved challenge to an NCAA rule limiting the number of certified events per school, but it was unclear what market, if any market was affected. No such ambiguity exists here.

[4] *See Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 348-50 (5th Cir. 2012) (in rule of reason/group boycott claim, no common evidence of nationwide conspiracy, unlike the uniform language of Paragraph 14); *State of Ala. v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 327-28 (5th Cir. 1978) (in dicta, court emphasized importance of ensuring that local factors are accounted for in nationwide class, but did not hold it was impossible/impermissible); *Republic Tobacco Co. v. N. Atlantic Trading Co., Inc.*, 381 F.3d 717, 736 (7th Cir. 2004) (involving vertical, not horizontal, agreements).

[5] Moreover, the cases McDonald's cites involved very different facts. *Compare Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590 (6th Cir. 2008) (gasoline is a commodity not differentiated by franchise, unlike the standardized, specific labor at McDonald's); *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 Fed. App'x 23, 28 (2d Cir. 2015) (vertical agreements between buyers and sellers at different levels of market and "unusual agreement" re: union bargaining rights).

[6] *See, e.g.*, *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 713-716 (7th Cir. 1979) (recognizing that kiosk photo services, as opposed to in-store photo services, were cognizable submarket notwithstanding customers sometimes switch between them); *Beatrice Foods v. F.T.C.*, 540 F.2d 303, 307-08 (7th Cir. 1976) (similar); *cf. U.S. v. Continental Can Co.*, 378 U.S. 441, 457-58 (1964) ("That there may be a broader product market . . . does not necessarily negative the existence of submarkets[.]").

4

any dynamics that may be driven by varying local market conditions, regardless of how those local markets are defined. Singer Rept., ¶¶42, 49, 51, 53, 58, 62. Dr. Singer's regression is representative and comprehensive: regression data spanning 42 states, additional payroll data spanning 49 states, and Profit & Loss statement labor cost data spanning all states. Singer Rept., ¶42; Singer Rebuttal, ¶¶55-58. A nationwide class means only that the anticompetitive effect of the No-Hire Agreement can be measured nationwide, not that there are no relevant local factors. This is the same approach experts used in other no-poach cases, notwithstanding the existence of employers other than the conspirators. *See In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013) (certifying nationwide class).

**Proof of Agreement:** McDonald's is also incorrect that there is no common proof of a horizontal agreement. Paragraph 14 is an ***identical*** hiring prohibition included in ***every*** franchise agreement (at least through April 2017), and there is sufficient common evidence of McDonald's enforcement and reciprocation that a jury could find for Plaintiffs.[7] There is no requirement that Plaintiffs also prove the existence of thousands of other agreements between every franchisee.[8]

McDonald's reliance on hub-and-spoke case law is inapposite. The Court has already determined the agreement is horizontal, because each member of the conspiracy is horizontally aligned in the labor market. Dkt. 53 at 11. That franchisees were brought into the conspiracy through the franchise agreement does not change this orientation. But even if viewed through a hub-and-spoke lens, Paragraph 14 includes express proof of the "rim" – it specifies not only franchisees' agreement not to poach McDonald's employees, but also their agreement not to

---

[7] *See*, *e.g.*, *Martino v. McDonald's Sys., Inc.*, 81 F.R.D. 81, 89-90 (N.D. Ill. 1979) (commonality satisfied based on franchise agreement); *compare Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340-41 (4th Cir. 1998) (no uniform contract provisions).

[8] *Blumenthal v. U.S.*, 332 U.S. 539, 556-57 (1947) (proof of conspiracy does not require "evidence of [conspirators'] knowledge of all its details or of the participation of others"); *Interstate Circuit v. U.S.*, 306 U.S. 208, 226 (1939) (despite lack of direct communications, "[i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it"); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (no proof needed that conspirators "even know who the other conspirators are"). *Cf. Bd. of Regents v. Nat'l Collegiate Athletic Ass'n*, 468 U.S. 85 (1984) (each member institution's adherence to a common rule sufficient to show agreement without need for proof of ***additional*** direct agreements with each other); *Law*, 134 F.3d 1010 (same). Nor does every conspirator need to know each and every detail of a conspiracy.

poach **each other's** employees. A franchisee would not agree to such a restraint without assurances that other franchisees would do the same, Cappelli Rept., ¶¶100-03, and such action against unilateral self-interest bolsters an inference of the franchisees' agreement to an anticompetitive scheme. *See Toys 'R' Us, Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000) (horizontal agreement among "spokes" where "they were willing to [adopt the restraint] only if [the hub] could protect them against cheaters"); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 331 (3d Cir. 2010) (agreeing horizontal agreement between "spokes" possible without evidence of "direct communication" if restraint is otherwise contrary to self-interest); *U.S. v. Apple, Inc.*, 791 F.3d 290, 319-20 (2d Cir. 2015) (even a vertical agreement "prove[s] the existence of a horizontal cartel . . . where multiple competitors sign vertical agreements that would be against their own interests" (cleaned up)). Further, McDonald's instructed franchisee employees to seek releases from the franchisees themselves, not McDonald's, confirming that franchisees **did** play a role in enforcing the No-Hire Agreement directly between themselves. Dkt. 271-78. These facts prove a "rim" amongst the franchisees and distinguish this case from hub-and-spoke cases cited by McDonald's. *Compare Ins. Brokerage*, 618 F.3d 300 (no contract explicitly referencing agreement re: how insurance brokers would or would not compete with one another); *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020) (plaintiffs did not allege parallel conduct, let alone defendants' assent to a scheme).[9]

Nor is there any basis in law for McDonald's proposition that every franchise must have intended wage suppression in order to form a conspiracy. First, the "requisite intent is inferred whenever unlawful effects are found," which Dr. Singer shows. *Times-Picayune Publ'g Co. v. U.S.*, 345 U.S. 594, 614-15 (1953); *see also Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 679 (N.D. Ill. 2000). Second, the execution of the franchise agreement "'show[s]

---

[9]     The other cases are also inapposite. *Kotteakos v. U.S.*, 328 U.S. 750, 758 (1946) (non-antitrust criminal prosecution alleged a single conspiracy but the evidence showed eight conspiracies that involved "different persons who did not know or have anything to do with one another"). In *Hewitt v. Joyce Beverages of Wisconsin, Inc.*, the plaintiffs "conceded that no writing exists" to prove a manufacturer coerced distributers to abide by resale-price agreements, so individual testimony would be needed. 721 F.2d 625, 628 (7th Cir. 1983). Here, all franchisees expressly agreed to Paragraph 14.

mutuality or assent,'" *i.e.*, acquiescence, to Paragraph 14. *Hedlund & Hanley, LLC v. Bd. of Trustees of Comm. Coll. Dist. No. 508*, 376 Ill. App. 3d 200, 206 (2007) (citation omitted); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 973 (7th Cir. 1995) ("acquiescence in an illegal scheme" is sufficient to create an unlawful conspiracy). McDonald's purported authorities do not involve contracts between competitors and are thus inapplicable.[10]

McDonald's also argues that commonality is defeated because it signed new franchise agreements omitting Paragraph 14 for less than 15% of its restaurants at some unspecified time between April 2017 and July 12, 2018. Defs' Ex. 119, ¶5. This boils down to a disagreement about whether McDonald's fully acquitted itself of the conspiracy in March 2017 or in July 2018, a classwide question. Plaintiffs do not need to prove that every single franchisee continued to partake in the conspiracy through July 2018, just that all Class members were harmed, and Dr. Singer's regressions demonstrate that impact was spread Classwide, as does the shared wage structure. Singer Rept., ¶¶66-82, Singer Rebuttal, ¶¶91-102. If the jury agrees with McDonald's, the class period end date may be changed to March 2017.[11]

Finally, McDonald's argues certain aspects of the conspiracy were not reflected in Paragraph 14, such as McOpCo's reciprocation or the requirement for releases. But there is no rule that a conspiracy must be fully set forth in an express contract. *See U.S. v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13 (1973) ("[C]ircumstantial evidence is the lifeblood of antitrust law."). In any case, these questions – McOpCo's reciprocation and the release requirement – are answered by common evidence, including Defendant's deposition testimony, email records, and

---

[10]    *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1198-99 (S.D. Tex. 2009) (sales contract between non-competing buyer and seller re: prices is not, alone, proof of collusion); *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081-82 (11th Cir. 2016) (contract between joint venture participants who were not competitors "was lawful at the outset" and was not "transformed into an illegal agreement between two or more parties" when one participant withdrew when its counterpart acquired another company in a horizontal relationship with the former); *Am. Airlines v. Christensen*, 967 F.2d 410, 413-14 (10th Cir. 1992) (user agreement between non-competing airline and its customers restricting customer's sale of rewards points did not create concerted action).

[11]    *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (problems "can and often should be solved by refining the class definition rather than by flatly denying class certification"). Dr. Singer's regressions show statistically and economically significant wage suppression even assuming a March 2017 end date. Singer Rebuttal, ¶2 n.6.

HRC call logs.[12] *See also* Cappelli Rebuttal, ¶4, 38, 40 ; Noss Decl., Ex. 5 at 154:10-155:4 . It is the province of the jury to weigh this common evidence and decide whether Plaintiffs have proven an unlawful agreement. *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016) (disputes about conspiracy allegations go to merits, not suitability for class treatment).

      **B.**    **Antitrust Impact May Be Proved with Common Evidence**

      **Dr. Singer's Models Are Reliable:**  McDonald's is wrong that Dr. Singer's models are not based on representative data and thus cannot reliably answer the question whether the No-Hire Agreement impacted the Class as a whole, as set forth in detail in the *Daubert* opposition. Singer *Daubert* Opp. at 8-10; Singer Rebuttal, ¶¶54-61. McDonald's refused to produce all of its McOpCo data, resulting in an agreement to use a random sample of its pay data. McDonald's did not have franchisee data. Brass Decl., Ex. 125. As a result, the franchisee data had to be obtained via subpoena, which McDonald's opposed, resulting in an effort that took 12 months under Magistrate Judge Weisman's supervision.[13] Plaintiffs obtained the franchisee data by targeting the largest payroll providers. Singer Rebuttal, ¶56. McDonald's only argument that the data is somehow unrepresentative is geography. However, the data is geographically representative with the primary data used in the regression spanning 42 states. Singer Rept., ¶42. Dr. Singer used two additional franchisee payroll datasets spanning 49 states, as well as McDonald's Profit & Loss data spanning all 50 states, to corroborate the findings from the primary dataset. *Id.* The results were consistent, meaning that nothing about the geography of the primary data was skewing results – nor could it, given Dr. Singer's controls for location.

---

[12]     *In re Fine Paper Antitrust Litig.* lacked ***any*** proof of a vertical agreement, let alone common proof. 82 F.R.D. 143, 156 (E.D. Pa. 1979) (though horizontal conspiracy was susceptible of common proof, plaintiffs had no similar proof of vertical agreements), *aff'd*, 685 F.2d 810, 822 (3d Cir. 1982). McDonald's cites *Package Shop, Inc. v. Anheuser-Busch, Inc.*, Civ. A. No. 83-513, 1984 WL 6618, at *22 (D.N.J. Sept. 25, 1984), but that case actually found that the written "brewer-distributor agreements . . . would commonly tend to establish [an agreement] and would not require individualized evidence," and that "[e]vidence of an express intent to create exclusive territories is not required." *Id.*, at *24.

[13]     *See* Dkt. 108 at 13; *see also* Dkts. 174, 188, 192, 199, 247.

McDonald's real quarrel is with the sample size of the franchisee pay data. However, there is nothing statistically improper in using a small sample to study a large population. Singer Rebuttal, ¶¶62-63. "One common misconception is that the adequacy of a sample depends heavily on the fraction of the population included in that sample . . . . The vast majority of survey samples, however, involve very small fractions of populations."[14] *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004) ("As long as a sample is representative - that is, it was not selected in a biased manner - sample size will not skew the results of the analysis."). There is nothing "statistically inadequate," about Dr. Singer's models. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016). In fact, *Tyson* held that plaintiffs **may** use representative samples to "fill in evidentiary gaps" left by a lack of employer records – precisely the situation here. Dr. Singer's analyses are reliable common evidence from which the jury may find common impact. Each Class member can rely on this data to prove her case, including Ms. Deslandes in Florida. Dr. Singer shows wage suppression in every state. Singer Rebuttal, ¶67.

McDonald's next argues that Dr. Singer's regressions do not demonstrate that the No-Hire Agreement caused wage suppression because its expert Dr. Murphy used Dr. Singer's regression to find injury on datasets (average wages at LSRs, Full Service Restaurants, and Drinking Places) where there is no alleged conspiracy. As explained in detail in Dr. Singer's Rebuttal Report, this is incorrect. Singer Rebuttal, ¶¶80-83. Dr. Murphy did not actually apply Dr. Singer's models, but a warped version of them lacking important control factors, such as store and worker-specific variables. *Id*. And McDonald's ignores that Dr. Singer's models always controlled for local labor market conditions including applicable minimum wages, which

---

[14]     Floyd J. Fowler, Jr., SURVEY RESEARCH METHODS 45 (5th ed.) (cited by *DeKoven v. Plaza Assocs.*, 599 F.3d 578, 581 (7th Cir. 2010)); *see also* William Cochrane, SAMPLING TECHNIQUES 24-25 (John Wiley & Sons 3rd ed. 1977) ("[A] sample of 500 from a population of 200,000 gives almost as precise an estimate of the population mean as a sample of 500 from a population of 10,000."); Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 254 (3rd ed. 2011) ("Small samples also can provide useful information. Indeed, when confidence intervals and p-vales can be computed [as Dr. Singer does], the interpretation is the same with small samples as with large ones.").

would account for the "LSR-wide trend" to which McDonald's points. Singer Rept., ¶¶49-50. Even so, Dr. Singer re-ran his regressions, controlling for the average wages at LSRs, Full Service Restaurants, and Drinking Places, and found that the increase in Class member compensation after the No-Hire Agreement was above and beyond what can be explained by any of them, independently or in combination – *i.e.*, there is no false positive. Singer Rebuttal, ¶82. *See D&M Farms v. Birdsong Corp.*, C.A. No. 2:19-cv-463, 2020 WL 7074140, at *8 (E.D. Va. Dec. 2, 2020) (rejecting "false positives" argument as bar to class certification "[b]ecause the model can account for non-conspiracy-related variables").

**There Are No Uninjured Groups of Class Members:** Dr. Singer's model shows ██████████████████████. Singer Rept., ¶68. McDonald's is wrong that certain categories of employees could not have been harmed. First, McDonald's misrepresents the results of Dr. Murphy's state-level regressions: he found some degree of wage suppression in nearly all states, and statistically significant wage suppression in the vast majority of them. Singer Rebuttal, ¶65. Even so, Dr. Murphy's models are fundamentally unreliable, as they omit critical control variables and drop millions of observations. *Id*., ¶¶65-71. When Dr. Singer corrects these deficiencies, the data show statistically significant effects in all states. *Id*., ¶67. Finally, as the restraint was nationwide, there is no reason to disaggregate to the state level, and Dr. Murphy offers no justification for this blatant data-mining. Singer Rebuttal, ¶¶65-71.

Second, harm to new hires is entirely consistent with the economic theory underlying Plaintiffs' claim. Plaintiffs' experts explained that McDonald's and franchisees adhered to principles of internal equity in employee pay, building in pay gaps between each job level, starting at the crew level. Cappelli Rept., ¶¶128-34; Singer Rept., ¶¶74-82. Dr. Singer tested the relationship empirically, finding that changes to wages in a worker's cohort are predictive of changes to wages for the individual worker. *Id*., ¶¶71-73. Given this, it is unremarkable that the effects of the No-Hire Agreement flowed across workers, including new hires. Cappelli Rebuttal, ¶¶167-83 ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████.

Third, McDonald's argument that workers hired after March 2017 could not have been harmed rests on the faulty presumption that its March 2017 internal announcement to franchisee owners ended adherence with the agreement. The evidence suggests otherwise.[15] Critically, there was no company-wide announcement to employees. McDonald's did not make any public announcements until July 2018. And Dr. Singer demonstrated empirically that it took time for the effects of the No-Hire Agreement to end. Singer Rept., ¶¶54-55. Regardless, the proper end date for the conspiracy is a common question for the jury to decide at the merits stage.

**There Is Ample Common Proof of Transmission of Wage Suppression:** McDonald's claims there is no common proof that wage suppression would have spread throughout the Class. That is plainly false, as Plaintiffs provided ample common evidence from the record and from Drs. Singer and Cappelli. Br. at 25-28. McDonald's presents declarations from franchisee managers stating that they did not use McDonald's compensation tools, but these declarations are inherently unreliable. *See Sapperstein v. Hager*, 188 F.3d 852, 856 (7th Cir. 1999). Moreover, when deposed, their testimony contradicted the statements in their declarations or supported Plaintiffs' theory.[16] At most, this competing evidence presents a common question for the jury, underscoring that class treatment is appropriate here.

McDonald's specific attacks on this evidence are unfounded. Dr. Singer's use of so-called "averages" is a standard econometric presentation of wage-suppression coefficients from regression models using individual-specific variables and showing classwide impact. *See High Tech Emps.*, 985 F. Supp. 2d at 1218 ("averaging aggregate data is an appropriate statistical tool" in wage transmission regressions); *D&M Farms*, 2020 WL 7074140, at *8 ("It is a common

---

[15]    Shaver Decl. (Dkt. 271), Ex. 79; *id.*, Ex. 78 (MCDAT00376796 at CASE_IDs 5356144, 5540592, and 5530952; MCDAT00376797 at CASE_ID 5713111).

[16]    Noss Decl., ¶3, Tables 1-3. Similarly, McDonald's statement that it did not adopt a uniform framework until 2015 is misleading. The documents show █████████████████████████████████ Brass Decl., Ex. 35 (2013); Ex. 101 (2014).

practice to use averages to determine whether class members suffered a common antitrust injury in cases such as this one."). McDonald's claim that McOpCo and franchisee pay did not move together is false. Dr. Murphy notes that franchisee pay rose after the 2015 McOpCo pay hike, albeit not as high as McOpCo's. A wage structure requires only structured relationships, not identical pay rates. Dr. Singer's analysis shows that structured relationship across McDonald's-branded restaurants. *See High-Tech Emps.*, 985 F. Supp. 2d at 1193 (finding common impact with evidence of shared salary structure within and across seven firms nationwide, from regression showing sharing of wage effects across workers); *Seaman v. Duke Univ.*, 2018 WL 671239, at *4-6, *8 (M.D.N.C. Feb. 1, 2018) (same, with respect to two universities).

### C. Damages Can Be Measured on a Classwide Basis

McDonald's damages arguments are red herrings. Courts have accepted Dr. Singer's method: multiplying the wage effect from the pay suppression regression by the aggregate compensation paid to Class members. Br. at 29 (citing cases). This bears no resemblance to the "trial by formula" concern voiced in *Wal-Mart v. Dukes*. The *Kleen* Court rejected McDonald's argument: "The Purchasers here are doing nothing of the sort [in *Wal-Mart*]: they assert that every person or entity in North America paid the overcharges that resulted from Defendants' collusive practices." *Kleen Prods.*, 831 F.3d at 928-29.[17] Nor does Plaintiffs' damages model run afoul of *Comcast*. Plaintiffs allege a nationwide conspiracy, and account for local factors with the controls in Dr. Singer's regressions. The model is consistent with the theory of harm.

### D. Plaintiffs Are Adequate and Have Typical Claims

**Typicality:** Plaintiffs' claims are typical because they assert the same theory of harm for themselves and the Class: generalized wage suppression caused by the No-Hire Agreement. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Typicality "is analyzed in reference to

---

[17] *Riffey v. Rauner* is similarly inapposite, as in the union agency fee context, the court found that a putative class member was not damaged as a matter of law if she supported the union and did not want her fee returned; here, all Class members were damaged by transmitted wage suppression. 910 F.3d 314, 319 (7th Cir. 2018). *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014), has no application here (remanding to district court for "treat[ing] predominance as a pleading requirement" and relying on "unsubstantiated allegations").

the defendant's actions," *E&G, Inc. v. Am. Hotel Register Co.*, No. 17-CV-1011, 2018 WL 1334934, at *2 (N.D. Ill. Mar. 15, 2018) (Alonso, J.), and is not defeated where the same defense is asserted against a large number of class members. *See La. Firefighters' Retirement Sys. v. N. Trust Investments, N.A.*, 312 F.R.D. 501, 508-09 (N.D. Ill. 2015) (Alonso, J.).

McDonald's typicality arguments fail. First, McDonald's argues that Plaintiffs face a statute-of-limitations defense because they knew about the No-Hire Agreement years ago. The Court already rejected this argument, holding that "each time plaintiff was paid a depressed wage for her labor, she was injured and the four-year statute of limitations for that injury began," "'*regardless of the plaintiff's knowledge of the alleged illegality at much earlier times*.'" *Turner v. McDonald's USA, LLC*, No. 19 C 5524, 2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020) (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)). To argue otherwise, McDonald's relies on an irrelevant case about the continuing violation doctrine in the Title VII employment context. *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697 (7th Cir. 2002). McDonald's also distorts the discovery rule, which "postpones" the tolling period, rather than accelerates it. *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006). Finally, the doctrine of laches does not apply to damages claims filed within a statutorily defined limitations period. *See*, *e.g.*, *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 679 (2014) ("[I]n face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief[.]"). McDonald's cites two cases to argue otherwise, but neither involves the Sherman or Clayton Acts and both pre-date *Petrella*. *See* Opp. at 28 n.12. In short, Plaintiffs are typical. Like all Class members, they only seek damages within the four-year statutory period beginning June 2013.[18]

Second, McDonald's claims that Ms. Turner and Ms. Deslandes "leveraged their experience into other jobs" and testified that the experience had some value to outside

---

[18]     Contrary to McDonald's assertion, neither Plaintiff claimed that the No-Hire Agreement ended in 2017; they merely alleged that McDonald's stopped including it in new franchise agreements at that time, but not that existing agreements were modified or ended. *See* Dkt. 32, ¶¶92-96; Turner Compl., ¶¶93-96. In any case, the specific end-date will be the same for the whole Class.

employers. Opp. at 28. But McDonald's main argument is that *all* Class members could use their McDonald's experience to obtain jobs outside the system, so this defense is not unique to Plaintiffs. Further, Ms. Turner and Ms. Deslandes merely acknowledged what Dr. Cappelli explained – that some of their training or experience had general value, but much of it was specific to the McDonald's system. Cappelli Rept., ¶46; Noss Decl., Ex. 8 at 112:18-113:11, 118:14-20, 122:15-21, 166:1-9; Ex. 9 at 96:12-97:18, 104:3-105:8, 168:4-19, 242:17-243:19.

Third, McDonald's claims that Ms. Turner's experience disproves the Class's theory because she left the McDonald's system and "us[ed] her experiences at motels and restaurants to vault into *higher* positions at McDonald's – despite not first receiving the training for those positions." Br. at 29. All of these assertions are false. McDonald's cites no evidence that any of her McDonald's employers cared at all about her intervening jobs, let alone knew about them, nor that they did not train her with her promotions. Even if there were such evidence, it is irrelevant to the Classwide wage-suppression theory.

**Adequacy:** McDonald's argues that supervisory and non-supervisory employees cannot be in the same class, but there is no such categorical rule and, in this case, all Class members (supervisory and otherwise) were subject to the restraint. Even in employment cases, supervisors and non-supervisors may be included in the same certified class when, as here, both are subject to the challenged policy or practice. *See*, *e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 958-59 (9th Cir. 2003) (distinguishing *Wagner v. Taylor*, 836 F.2d 578 (D.C. Cir. 1987))[19]; *Brown v. Yellow Transp., Inc.*, No. 08 C 5908, 2011 WL 1838741, at *4 (N.D. Ill. May 11, 2011). *See also Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 469-70 (N.D. Ill. 2009) (adequacy found, though class contained "numerous individuals who reported to, and were evaluated by, other putative class

---

[19]     McDonald's cites *Wagner*, but the D.C. Circuit later confirmed in *In re Johnson*, that there is no categorical rule that managers and non-managers "cannot" be members of the same class. 760 F.3d 66, 74 (D.C. Cir. 2014) ("[i]f class members neutrally applied a flawed rating system and thereby reached a discriminatory result, then they were not themselves discriminating and therefore have no apparent interest that is in conflict" with the interests of other class members). *Randall v. Rolls-Royce Corp.* is inapposite. The Court found the class representatives inadequate on the bases that they were positioned strategically to generate evidence of the challenged discrimination and that they had themselves participated in discriminatory compensation decisions. 637 F.3d 818, 824 (7th Cir. 2011).

14

members"). *Sample v. Aldi, Inc.*, did not hinge on "supervisory" and "nonsupervisory," but between those who could have filed an EEOC charge ***consistent with the statute of limitations***. No. 93 C 3094, 1994 WL 48780, at *4 (N.D. Ill. Feb. 15, 1994).

McDonald's imagines that some otherwise undeserving Class members were "winners" under the No-Hire regime and separately suggests that those who were denied releases have a different injury or damages. This is baseless. Plaintiffs seek to certify an opt-out damages class under a theory of harm – wage suppression caused by the No-Hire Agreement – that pervades all, or nearly all, Class members. *Deslandes* Dkt. 268 at 1; Singer Rept., ¶66; *Turner* Dkt. 64 (holding McDonald's argument "misses the point of plaintiff's alleged injury: plaintiff alleges she suffered depressed wages"). An employee who was denied a release and wishes to bring a separate injunctive relief action can exclude herself from this suit if she wishes. In any event, this case challenges a conspiracy among ***owners*** of McDonald's-branded restaurants, not the actions of employees compelled to carry out the owners' labor restraint. *Johnson*, 760 F.3d at 74. Plaintiffs' wage-suppression claim thus does not require inquiry into which employee made which hiring or pay decisions, or whether any particular employee requested, or was granted or denied, a release, rendering McDonald's speculation about manager conflicts meaningless. *See Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 680 (7th Cir. 2009) (affirming trial court's certification over "hypothetical" conflicts among class members).

### E.     Classwide Adjudication Is Superior

The individual issues that McDonald's imagines would predominate at trial are fiction because they are unrelated to the case that Plaintiffs have brought. If Plaintiffs prove to the jury with the common evidence laid out above that nearly all class members were injured, it is irrelevant whether any given individual sought to move stores or worked for a franchisee that granted releases, that information is absorbed in the wage effect. Instead, the trial will hinge on common records, testimony, and the experts' competing analyses of common data.

## III.     CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for class certification.

Dated: May 28, 2021                    Respectfully submitted,

                                        *s/* Walter W. Noss
                                        Walter W. Noss*
                                        Sean C. Russell*
                                        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                        600 West Broadway, Suite 3300
                                        San Diego, California 92101
                                        Tel: (619) 233-4565
                                        wnoss@scott-scott.com
                                        sean.russell@scott-scott.com

                                        Michelle E. Conston*
                                        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                        The Helmsley Building
                                        230 Park Avenue, 17th Floor
                                        New York, New York 10169
                                        Tel: (212) 223-6444
                                        mconston@scott-scott.com

                                        Dean M. Harvey*
                                        Anne B. Shaver*
                                        Lin Y. Chan*
                                        Yaman Salahi*
                                        **LIEFF CABRASER HEIMANN &**
                                        **BERNSTEIN, LLP**
                                        275 Battery Street, 29th Floor
                                        San Francisco, California 94111-3339
                                        Tel: (415) 956-1000
                                        dharvey@lchb.com
                                        ashaver@lchb.com
                                        lchan@lchb.com
                                        ysalahi@lchb.com

                                        Derek Y. Brandt (#6228895)
                                        Leigh M. Perica (#6316856)
                                        Connor P. Lemire*
                                        **MCCUNE WRIGHT AREVALO, LLP**
                                        231 North Main Street, Suite 20
                                        Edwardsville, Illinois 62025
                                        Tel: (618) 307-6116
                                        Fax: (618) 307-6161
                                        dyb@mccunewright.com
                                        lmp@mccunewright.com

Richard D. McCune*
Michele M. Vercoski*
**MCCUNE WRIGHT AREVALO, LLP**
3281 East Guasti Road, Suite 100
Ontario, California 91761
Tel: (909) 557-1250
rdm@mccunewright.com
mmv@mccunewright.com

*Attorneys for Individual and Representative
Plaintiffs Leinani Deslandes and Stephanie Turner*

* Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I, Walter W. Noss, an attorney, hereby certify that the **Plaintiffs' Reply Memorandum of Law in Support of Class Certification** was electronically filed on May 28, 2021 and will be served electronically via the Court's ECF Notice system upon the registered parties of record. Additionally, consistent with Local Rule 26.2(e), unredacted copies of the documents provisionally filed under seal will be served electronically on all parties of record via email.

 _s/_ Walter W. Noss
Walter W. Noss*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, California 92101
Tel: (619) 233-4565
wnoss@scott-scott.com

*Admitted _pro hac vice_

18