**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEINANI DESLANDES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 4857 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| McDONALD'S USA, LLC, | ) | |
| McDONALD'S CORPORATION, and | ) | |
| DOES 1 through 10, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

After a hiring restriction prevented plaintiff Leinani Deslandes ("Deslandes") from taking a better-paying position with a rival McDonald's outlet, she filed this suit seeking relief under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Deslandes and Stephanie Turner ("Turner"), who filed a related suit (19-cv-5524), move for certification of a nationwide class of persons who were employed by a McDonald's restaurant during a five-year period. For the reasons set forth below, plaintiffs' motion is denied.

## I. BACKGROUND

Deslandes filed suit against two defendants. The first is McDonald's USA, LLC, which is a wholly-owned subsidiary of the second defendant, McDonald's Corporation. Together ("McDonald's"), these entities are the franchisors of the popular restaurants ("McDonald's restaurants"), with McDonald's Corporation serving as franchisor for franchise agreements signed until 2005 and McDonald's USA, LLC serving as the franchisor for franchise agreements signed after that time. Although most (90-95%) of McDonald's restaurants are owned and

operated by franchisees, the rest are operated by McDonald's USA, LLC (Def. Brief at 3/Docket 299 at 10) and are commonly referred to as McOpCos.

For many years, including at least 1973 to 2017, the franchise agreement contained a provision that stated:

> Franchisee shall not employ or seek to employ any person who is at the time employed by McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant or otherwise induce, directly or indirectly, such person to leave such employment. This paragraph 14 shall not be violated if such person has left the employ of any of the foregoing parties for a period in excess of six months.

Plaintiffs allege that this provision violated the Sherman Antitrust Act and suppressed their wages.

In or about March 2017, McDonald's Corp. announced to the McOpCos and the franchisees that it would discontinue enforcement of the no-hire provision. (Singer Report at ¶ 3). In July 2018, McDonald's Corp. entered an agreement with the Washington State Attorney General that it would neither include the hiring provision in future franchise agreements nor enforce it with respect to the franchise agreements that already include the provision. (Singer Report at ¶ 3).

## II.   DISCUSSION

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). "A class action may be maintained if Rule 23(a) is satisfied and" if the case falls within at least one of the categories outlined in Rule 23(b). Fed.R.Civ.P. 23(b); *see also Wal-Mart Stores*, 564 U.S. at 345. Rule 23(a) allows "[o]ne or more members of a class" to "sue or be sued as representative parties on behalf of all class members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Rule 23(b)(3) allows class certification where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Rule 23(c)(1)(A) requires that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed.R.Civ.P. 23(c)(1)(A).

To support a motion for class certification, a "party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 564 U.S. at 350. Thus, the "party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence." *Chicago Teachers Union, Local No. 1 v. Board of Ed. of City of Chi.*, 797 F.3d 426, 433 (7th Cir 2015). A court considering a motion for class certification must engage in "a rigorous analysis" that "will frequently" overlap with the merits, because the considerations "are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (citations omitted).

Plaintiffs seek to certify a class of:

> All persons who were employed at a McDonald's-branded restaurant in the United States from June 28, 2013 to July 12, 2018. Excluded from the Class are Defendants' directors and officers, the Judge, and the Judge's staff and immediate family members.

(Plfs. Brief at 1/Docket 268 at 7).

### 1.    **Numerosity**

First, the Court agrees that the number of class members makes joinder impracticable. Plaintiffs assert that there are "hundreds of thousands" of class members. (Docket 268 at 8). Defendants say there are "millions" of class members. (Docket 299 at 8). Either way, the class contains far more members than would be practicable to join. *See Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017) ("While there is no magic number that applies to every case, a forty-member class is often regarded as sufficient to meet the numerosity requirement.").

### 2.    **Common issues and whether they will predominate**

Next, the Court considers whether plaintiffs have shown the existence of one or more common issues and whether such common questions will predominate over individual questions. The Supreme Court has described what makes an issue common. It has said:

> Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law. . . . Their claims must depend upon a common contention[.] . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Wal-Mart*, 564 U.S. at 349-50 (citations omitted). In describing the difference between common and individual questions, the Supreme Court has explained:

> An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question.") (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

To be suitable for class action treatment, a case must not only involve common questions (Fed.R.Civ.P. 23(a)(2)), but those common questions must predominate (Fed.R.Civ.P. 23(b)). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Rule 23(b)(3)'s "predominance criterion is far more demanding" than "Rule 23(a)'s commonality requirement[.]" *Amchem*, 521 U.S. at 623-34. "Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Messner*, 669 F.3d at 815 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184 (2011)).

The parties agree[1] that the elements of plaintiffs' cause of action are: (1) a violation of the antitrust laws; (2) injury resulting from the violation, which is to say that plaintiffs suffered antitrust "impact;" and (3) damages. *Messner*, 669 F.3d at 815. The parties do not agree, however, on the proper analysis of plaintiff's antitrust claim, so the Court must first resolve that issue.

---

[1] *See* Plfs. Brief at 20/Docket 268 at 26; Def. Brief at 11, 16, 18/Docket 299 at 18, 23, 25.

*Quick look versus Rule of Reason*

The parties disagree about whether plaintiffs' antitrust claim may be considered under a quick look analysis or whether it will require rule of reason analysis.[2]

This Court has previously explained:

> Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . " 15 U.S.C. § 1. This language has long been interpreted to "outlaw only *unreasonable* restraints" of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Some restraints are deemed so anti-competitive (and, thus, unreasonable) that they are illegal *per se*, while other restraints, which may have procompetitive effects, are judged under the rule of reason (or its subset: the quick look).

> As the Supreme Court has explained, restraints that are "unlawful *per se*" are those that "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit" that it is obvious they are unreasonable restraints of trade. *Khan*, 522 U.S. at 10. The *per se* rule applies to restraints "'that would always or almost always tend to restrict competition and decrease output.'" *Leegin*, 551 U.S. at 886. Accordingly, the *per se* rule is reserved for restraints with respect to which "courts have had considerable experience" such that they "can predict with confidence that [the restraint] would be invalidated in all or almost all instances under the rule of reason[.]" *Leegin*, 551 U.S. at 886-87.

> Most restraints are not *per se* unlawful but are instead analyzed under the rule of reason. *Khan*, 522 U.S. at 10. Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Khan*, 522 U.S. at 10. Generally, this requires a plaintiff to show the defendant has "market power—that is the ability to raise prices significantly without going out of business—without which the defendant could not cause anticompetitive effects on market pricing." *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). In this case, market power would be the power to suppress wages.

---

[2] The Court notes the Supreme Court issued its decision in *NCAA v. Alston*, __ U.S. __, 141 S.Ct. 2141 (2021), after the parties had briefed their motion for class certification. The Court allowed each party to file a brief discussing the impact of that case on this motion.

Courts sometimes apply a third test of reasonableness, the quick look, which is a short form of rule of reason analysis. *Illinois Corp. Travel, Inc. v. American Airlines, Inc.*, 806 F.2d 722, 727 (7th Cir. 1986) ("This is the sort of short form or quick look Rule of Reason analysis endorsed in *NCAA v. Board of Regents*, 468 U.S. 85, 109-10 & n. 42 (1984). As the Seventh Circuit has explained:

> the quick-look approach can be used when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets,' but there are nonetheless reasons to examine the potential procompetitive justifications.

*Agnew*, 683 F.3d at 336 (internal citation omitted) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)). Under quick-look analysis, if the defendant lacks legitimate justifications for facially anticompetitive behavior then the court "condemns the practice without ado" without resort to analysis of market power. *Agnew*, 683 F.3d at 336; *Chicago Prof. Sports Ltd. Partnership v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992); *see also National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 109-10 n. 42 (1984) ("While the 'reasonableness' of a particular alleged restraint often depends on the market power of the parties involved, because a judgment about market power is the means by which the effects of the conduct on the market place can be assessed, market power is only one test of 'reasonableness.' And where the anticompetitive effects of conduct can be ascertained through means short of extensive market analysis, and where no countervailing competitive virtues are evident, a lengthy analysis of market power is not necessary.").

*Deslandes v. McDonald's USA, LLC*, Case No. 17 C 4857, 2018 WL 3105955 at *4-5 (N.D. Ill. June 25, 2018).

Plaintiff now argues, "[t]his Court has already held that an abbreviated from of the rule of reason—the quick-look test—is appropriate given the predictable effects that ensue" from the alleged conduct. (Docket 371 at 4). That is imprecise. The Court said plaintiff had *stated a claim* for a restraint that *might* be unlawful under a quick look. Specifically, the Court stated:

> Here, plaintiff argues that she has alleged the existence of a horizontal agreement in restraint of trade. Plaintiff alleges that McDonald's franchisees signed written franchise agreements pursuant to which each agreed not to hire employees (including former employees who left within the prior six months) from other McDonald's restaurants. Specifically, the franchisees were not allowed to hire anyone who was employed (or had been employed in the prior six

7

months) by "McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant[.]" (Am. Complt. ¶ 87). Plaintiff alleges that the McOpCos were similarly restricted.

Defendants argue that this is merely a vertical restraint, because it was spearheaded by the entity at the top of the chain. The Court agrees that the restraint has vertical elements, but the agreement is also a horizontal restraint. It restrains competition for employees among horizontal competitors: the franchisees and the McOpCos. Plaintiff has alleged that McOpCos run McDonald's-brand restaurants and, thus, compete directly with franchisees for employees. Plaintiff has also alleged that the McOpCos are subsidiaries of defendant McDonald's and that the restraint explicitly restricts franchisees from hiring employees of McDonald's subsidiaries, i.e., the franchisees' competitors. Thus, McDonald's, by including the no-hire provision in its agreement with franchisees, was protecting its own restaurants (i.e., *itself*) from horizontal competition for employees. *Cf. Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) ("the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act"). The Court finds that plaintiff has alleged a horizontal restraint of trade.

Naked horizontal agreements (i.e., those among competitors) to fix prices or to divide markets are *per se* unlawful. *Leegin*, 551 U.S. at 886; *Federal Trade Comm'n v. Superior Court Trial Lawyers Assoc.*, 493 U.S. 411 (1990) (horizontal agreement among lawyers not to accept appointments to represent indigent criminal defendants until fees increased was a naked price restraint and *per se* unlawful); *Blackburn v. Sweeney*, 53 F.3d 825, 827 & 828 (7th Cir. 1995) ("reciprocal agreement [among attorneys] to limit advertising to different geographical regions was . . . an agreement to allocate markets so that the *per se* rule of illegality applies"). This includes naked agreements to set wages. *Arizona Hosp.*, 2009 WL 1423378 at * 3 (plaintiff's allegations that hospital association set prices for temporary nurses stated claim for *per se* violation of the Sherman Act).

A horizontal agreement not to hire competitors' employees is, in essence, a market division. *See United States v. eBay, Inc.*, 968 F.Supp. 2d 1030, 1039 (N.D. Cal. 2013) ("The court thus finds that the United States' allegations concerning agreement between eBay and Intuit [not to hire each other's employees] suffice to state a horizontal market allocation agreement."). The Department of Justice, which enforces rather than interprets the law, has warned employers that it considers naked no-hire agreements to be *per se* unlawful. (Press Release, U.S. Dep't of Justice, *Justice Department and Federal Trade Commission Release Guidance for Human Resource Professionals on How Antitrust Law Applies to Employee Hiring and Compensation* (Oct. 20, 2016), *available at* https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-release-guidance-human-resource-professionals.). Thus, because a

no-hire agreement is, in essence, an agreement to divide a market, the Court has no trouble concluding that a naked horizontal no-hire agreement would be a *per se* violation of the antitrust laws. Even a person with a rudimentary understanding of economics would understand that if, say, large law firms in Chicago got together and decided not to hire each other's associates, the market price for mid-level associates would stagnate. With no competition for their talent (aside from lower-paying in-house or government jobs), associates would have no choice but to accept the salary set by their firms or to move to another city. Thus, such a claim would be suitable for *per se* treatment.

Not all horizontal restraints are *per se* unlawful, however. Some horizontal restraints are *ancillary* to agreements that are procompetitive, usually in the sense of enhancing output (i.e., producing either a greater quantity of goods or a new good that would not otherwise exist). *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985) ("A court must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote."). A restraint is ancillary if it "promoted enterprise and productivity when it was adopted." *Polk Bros.*, 776 F.2d at 189. When a restraint is ancillary, it is judged either under the rule of reason or given a "quick look." For example, no-hire agreements that are ancillary to the sale of a business can have procompetitive effects, so they are judged under the rule of reason. *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001).

Similarly, where the horizontal restraint is necessary in order for the product to exist at all, a restraint will not be judged *per se* unlawful but rather will be judged under the rule of reason, including by "quick look." *Law v. National Collegiate Athletic Assoc.*, 134 F.3d 1010 (10th Cir. 1998); *see also Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1 (1979); *National Collegiate Athletic Ass'n. v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984). In *Law*, a group of college basketball coaches brought suit challenging the NCAA's rule limiting annual salaries for certain assistant basketball coaches to $16,000 per year. Because some restraints were necessary in order to make college sports available, the court concluded that the horizontal price restraint should be analyzed under the rule of reason, and, in particular, the "quick look." *Law*, 134 F.3d at 1018 & 1020 ("We find it appropriate to adopt such a quick look rule of reason in this case.")

In this case, plaintiff has alleged a horizontal restraint that is ancillary to franchise agreements for McDonald's restaurants. Each time McDonald's entered a franchise agreement, it increased output of burgers and fries, which is to say the agreement was output enhancing and thus procompetitive. (That is not to say that the provision itself was output enhancing. The very fact that McDonald's has managed to continue signing franchise agreements even after it stopped including the provision in 2017 suggests that the no-hire provision was not necessary to

9

encourage franchisees to sign.)  Because the restraint alleged in plaintiff's complaint is ancillary to an agreement with a procompetitive effect, the restraint alleged in plaintiff's complaint cannot be deemed unlawful *per se*.  Plaintiff's claim does not rise and fall on *per se* treatment, though.  She claims in the alternative that the restraint is unlawful under quick-look analysis.

The next question, then, is whether plaintiff has plausibly alleged a restraint that might be found unlawful under quick-look analysis.  The Court thinks she has.  Even a person with a rudimentary understanding of economics would understand that if competitors agree not to hire each other's employees, wages for employees will stagnate.  Plaintiff herself experienced the stagnation of her wages.  A supervisor for a competing McDonald's restaurant told plaintiff she would like to hire plaintiff for a position that would be similar to plaintiff's position but that would pay $1.75-2.75 more per hour than she was earning. Unfortunately for plaintiff, the no-hire agreement prevented the McOpCo from offering plaintiff the job.  When plaintiff asked her current employer to release her, plaintiff was told she was too valuable.  The Court agrees that an employee working for a below-market wage would be extremely valuable to her employer.

*Deslandes*, 2018 WL 3105955 at *6-7.

The Court specifically stated, "Though the Court has concluded that plaintiff has stated a claim for a restraint that might be unlawful under quick-look analysis, the evidence at a later stage may not support it."  *Deslandes*, 2018 WL 3105955 at *8.  Accordingly, the Court gave plaintiff leave to amend to add a claim under the rule of reason.  *Id.*  Plaintiff declined.[3]

*Alston*

Since that time, the parties have engaged in discovery, and the Supreme Court has clarified when quick-look analysis applies, which is rarely.  In *NCAA v. Alston*, __ U.S. __, 141 S.Ct. 2141 (2021), college athletes brought suit against the NCAA, claiming its agreement with member schools to limit compensation to student athletes amounted to an unlawful restraint of trade in violation of the Sherman Antitrust Act.  The NCAA argued that the court should apply a quick look, but the Supreme Court disagreed.

---

[3] Likewise, plaintiff Turner failed to state a claim under the rule of reason.  Her complaint is limited to a quick look claim.  [Case No. 19-cv-5524, Docket 1].

The Supreme Court, in a unanimous decision, first noted that claims regarding restraints of trade "presumptively" call for rule of reason analysis. *Alston*, 141 S.Ct. at 2151. It went on to explain that a quick look suffices:

> *only* for restraints at opposite ends of the competitive spectrum. For those sorts of restraints—rather than restraints in *the great in-between*—a quick look is sufficient for approval or condemnation.

*Alston*, 141 S.Ct. at 2155 (emphasis added). On one end of that spectrum, the Supreme Court explained, are restraints that are "so obviously incapable of harming competition that they require little scrutiny," such as joint ventures commanding such a small share of the market (say, 5-6%) that any reduction in output would be made up by the rest of the market. *Alston*, 141 S.Ct. at 2155-56. On the opposite end of the spectrum are those "agreements among competitors" that "so obviously threaten to reduce output and raise prices that they might be condemned" after a quick look. *Alston*, 141 S.Ct. at 2156. The Supreme Court said such quick-look condemnations should be rare, explaining, "we take special care not to deploy these condemnatory tools until we have amassed 'considerable experience with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances.'" *Alston*, 141 S.Ct. at 2156 (citing *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-887 (2007)).

This case falls in "the great in-between" of restraints that require rule-of-reason analysis. This Court cannot say that it has enough experience with no-hire provisions of franchise agreements to predict with confidence that they must always be condemned, which means, under *Alston*, that the Court must apply rule of reason analysis to this case. The Supreme Court's recent unanimous decision in *Alston* is not, however, the only reason the Court must apply the rule of reason. Two additional reasons support applying the rule of reason.

*Pro-competitive effects*

First, defendants have put forth sufficient evidence of pro-competitive effects of the hiring restriction to warrant full rule of reason analysis. Specifically, defendants put forth the expert report of Dr. Justin McCrary ("Dr. McCrary"), who holds a Ph.D. in Economics and is a Professor at Columbia University.[4] (Plaintiffs do not challenge the admissibility of either Dr. McCrary's report or the report by Dr. Kevin M. Murphy ("Dr. Murphy"), defendants' other expert witness.)

Dr. McCrary first describes the benefits of a franchise business model and the free-rider problem that can be expected with such a model. Without franchising, an owner of a chain of restaurants will face several problems in trying to expand quickly. In addition to needing a significant amount of capital, the owner might have difficulty ensuring the non-owner manager of each outlet has an incentive to maximize sales and profits. This is where the franchise model can help. When each outlet is owned and operated by a franchisee, the franchisee's compensation is "directly tied to *the profits*" of running the outlet. (McCrary Rep. at ¶ 32).

The franchise model allows for quicker growth of the brand but comes with a free-rider problem. As with any brand or trademark, the benefit of the brand to the consumer is the consistency the consumer can expect each time he makes a purchase from that brand and the reduced search costs inherent in sticking with what is known. For such branding to be effective in a franchise model, each franchisee must be delivering a product and experience that is nearly identical. Any given franchisee, however, (and particularly one with an outlet along, say, an interstate highway that receives few repeat customers) has an incentive to cut corners (either in

---

[4] The Court is not suggesting that this evidence is undisputed or that a fact-finder would find it persuasive. The point is merely that in the face of defendants' significant evidence of pro-competitive effects, a full analysis under the rule of reason, rather than a quick look, is necessary.

food quality or customer service) in order to boost its own profits. That hurts the brand, because when a customer has a bad experience at one outlet, he might refrain from visiting other outlets in the future. Dr. McCrary describes how franchisors, in order to control the free-rider problem and promote a consistent brand, include in their franchise agreements provisions and restraints to control quality. The franchisor, thus, requires, among other things, a particular level of quality, cleanliness and service. Dr. McCrary argues that these sorts of restrictions are procompetitive, because they strengthen the quality of the brand, thereby encouraging additional franchisees to open outlets and increasing the output of the end product.

Dr. McCrary goes on to describe the exponential growth in the number of McDonald's restaurants after 1955, when Ray Kroc ("Kroc") began including brand restrictions in franchise agreements. Among the restrictions Kroc included were:

> specific requirements related to: the look of the store, the neon sign, and the parking lot; employee appearance, product appearance (containers, bags, napkins, spoons, etc. had to meet . . . specifications); advertising and marketing (all 'signs, cards, notices, displays or decorations' were required to be supplied or approved by McDonald's), product and service quality, operations, and inspections of financial books and operation methods.

(McCrary Rep. at ¶ 67). Kroc also added a royalty payment of 1.9 percent of gross sales and included an employment restriction similar to the one at issue in this case. Specifically, those early franchisees agreed "'not [to] employ or seek to employ any person who is at the time employed' by McDonald's or a 'similar establishment' licensed by McDonald's, i.e., one of McDonald's other franchisees.'" (McCrary Rep. at ¶ 69). After Kroc's changes, McDonald's grew from nine outlets in 1955, to 229 in 1960, to more than 2000 by the early 1970's, to about 6,000 by 1980, and to more than 14,000 today.

Today, McDonald's restaurants are still required to maintain consistency. Franchisees are required to comply with standardized employee uniforms and appearance, hours of operation

and restaurant appearance. McDonald's has specific rules for menu and food preparation (including the strict procedure for cooking fries), inventory control and bookkeeping. McDonald's restaurants are audited regularly to ensure compliance with the brand standards.

To that end, Dr. McCrary reports, McDonald's also imposes strict training guidelines. Although franchisees make their own hiring and compensation decisions, they are required to follow certain training guidelines. Each restaurant must be managed by a person who has taken a week-long training class at McDonald's Hamburger University. Defendant does not charge for that course, but the franchisee must pay the trainee's travel expenses and must also pay the trainee for the time spent there. In fact, all employees must be paid for all the time they spend training. Department managers complete about 45 weeks of training, and shift managers take about fourteen weeks of training. In 2015, McDonald's estimated the cost of training a new manager to be $4,392 and the cost to train a shift manager to be $2,744. Crew members, too, must learn restaurant maintenance, customer service and how to operate each food preparation station.

Dr. McCrary opines that the hiring restriction encourages franchisees to train their employees without fear that other outlets will free-ride on this training by hiring away employees trained in the McDonald's way. It also encourages cooperation among franchisees. For example, franchisees are required to manage their restaurants personally and are required to complete significant training (which can take years if the potential franchisee has no McDonald's experience) before signing a franchise agreement. That training sometimes involves on-the-job training in an existing franchise restaurant. Absent the hiring restriction, current franchisees would be reluctant to allow potential franchisees to train in their restaurants for fear they would use the opportunity to recruit employees.

14

Dr. McCrary opines that the hiring restraint increases output in the hamburger market, because it encourages the very training that enhances the brand (by ensuring uniform food quality, customer service and building cleanliness). Dr. McCrary says his opinion is consistent with labor theory developed by Gary Becker, who noticed that "firms are more willing to invest in training that is specific to their firm because there is a smaller chance they will lose that investment to competing firms." (McCrary Rep. at ¶ 331; *see also* ¶¶ 120-130). The hiring provision makes the training related to the brand specific to the franchisee (rather than just to the brand), because it prevents other outlets from free riding on that training. All that training leads to greater brand consistency, better food quality and customer satisfaction, which is to say a strong brand. (McCrary Rep. at ¶ 145). A strong brand with satisfied customers leads to additional franchise outlets, thereby increasing output of hamburgers and fries. Dr. McCrary cites evidence that many franchisees chose a McDonald's franchise (over other potential branded restaurants) to open, because of the hiring provision. (McCrary Rep. at ¶ 131). That suggests the provision itself was output enhancing in the market for hamburgers and fries. When new outlets open, the outlets must be staffed. Thus, new restaurants also increase output in the labor market (i.e., demand for labor).

Dr. McCrary also opined that it does not make economic sense for McDonald's, as franchisor, to enable its franchisees to act as monopsony purchasers of labor. In simple terms:

> [T]he alleged monopsony conspiracy does not make economic sense for McDonald's because it would lead to a reduction in labor at each franchisee, which would lead [to] a reduction in sales at McDonald's restaurants. Indeed, a basic tenet of franchising economics is that franchisors do not benefit when their franchisees gain market power because franchisees will then sell less of their products, which undermines the brand's growth.

(McCrary Rep. at ¶ 201(a)). To the extent a franchisee is a labor monopsonist, the franchisee would hire less labor (reduce labor output) at a lower price. In the process, the franchisee would

increase his profit but would be limited in his output of hamburgers, which, in turn reduces revenue. That is because the monopsonist franchisee is still selling into a competitive market for lunch and cannot increase price. His revenue per unit is the same, but he is selling fewer burgers, so his revenue goes down even as his profit goes up. This is good for the franchisee, but it is terrible for the franchisor, who is paid based on franchisees' revenue, not profit. So, while it might be good for the franchisee to be a labor monopsonist, it is terrible for the franchisor, who wants to increase output of hamburgers and fries. The case of McDonald's is slightly different, because it also operates restaurants, the McOpCos. As Dr. McCrary points out, however, defendant's revenue from franchise royalties is far greater than its revenue from operating restaurants.

Defendants have offered enough evidence of procompetitive effects to warrant rule of reason analysis.

### Vertical restraint in many locations

Second, the evidence plaintiffs put forth in connection with their motion for class certification does not show that all of the plaintiffs faced horizontal restraints ancillary to output-enhancing agreements. The reason the Court concluded that the plaintiff had adequately *alleged* a restraint that might be subject to quick look analysis is that plaintiff had alleged a horizontal restraint (albeit one that is ancillary to an output-enhancing agreement) by alleging that McOpCos compete directly with franchisees for labor. "[I]n the market for employees, the McDonald's franchisees and McOpCos *within a locale* are direct, horizontal competitors." *Deslandes*, 2018 WL 3105955 at 8 (emphasis added). In her complaint, plaintiff had alleged a provision of the franchise agreement that prohibited franchisees from hiring McDonald's Corp. employees within six months. That provision is part of a vertical franchise agreement (between

franchisor and franchisee), but it is also a horizontal agreement because entities (McOpCos) owned by the franchisor (McDonald's Corp.) compete with the franchisees, both in selling hamburgers and in hiring employees.

At the class certification stage, plaintiffs want to certify a nationwide class. They have not, however, put forth evidence that McOpCos compete with franchisees in every part of the United States. Plaintiffs agree that only "5-10%" of the McDonald's restaurants were owned by McOpCos, but they do not say where those McOpCos operated. (Plfs Brief at 3/Docket 268 at 9). The total number of McDonald's restaurant locations exceeds 14,000. (Docket 299 at 10). Record evidence shows that, as of 2015, only 900 out of 3000 franchisees (many of whom owned multiple locations) operated a McDonald's restaurant near a McOpCo-owned McDonald's restaurant. (King Dep. at 99/Docket 270-14 at 20). Defendants put forth evidence that in many parts (some twenty states) of the United States, no McDonald's restaurants are owned by McOpCos. (Murphy Rep. at p. 10). In locations where no McOpCos compete with franchisees, the hiring provision cannot be said to be horizontal.[5] In locations where only franchisees compete, the hiring provision is merely vertical. Vertical restraints are judged under the rule of reason. *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007).

For all of these reasons, the Court must apply rule of reason analysis to this case. The upshot of applying rule of reason analysis to this case is that the question of whether defendants engaged in an unreasonable restraint of trade is not a common question. It cannot be answered

---

[5] Plaintiffs also put forth evidence that, in 2015, the McOpCos, after raising their starting wages by $1 per hour, decided not to hire employees from franchisees for a period of one year. Whether that constituted a unilateral act or a horizontal agreement in connection with a vertical relationship is not clear from the evidence. Even if it is the latter, it still would be horizontal only where McOpCos compete with franchisees, not nationwide.

for all of the members of the proposed class with the same evidence, because not all of the plaintiffs sold their services in the same relevant market.

*Relevant market*

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, "outlaw[s] only *unreasonable* restraints" of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (emphasis added). The rule of reason, thus,:

> requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition. The goal is to 'distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'

*Ohio v. American Express Co.*, __ U.S. __, 138 S.Ct. 2274, 2284 (2018) (citations omitted). To establish a claim under the rule of reason, a plaintiff must first "prove that the challenged restraint has a substantial anticompetitive effect that harms consumers *in the relevant market*" by either using "[d]irect evidence" of "actual detrimental effects . . . such as reduced output, increased prices, or decreased quality in the *relevant market*" or "[i]ndirect evidence" of "proof of market power plus some evidence that the challenged restraint harms competition." *AmEx*, 138 S.Ct. at 2284 (emphasis added). The burden then shifts to the defendant "to show a procompetitive rationale for the restraint." *AmEx*, 138 S.Ct. at 2284. Finally, the "burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *AmEx*, 138 S.Ct. at 2284.

Thus, the definition of a relevant market is essential on a rule of reason claim. *AmEx*, 138 S.Ct. at 2285 ("courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market"); *Alston*, 141 S.Ct. at 2158 ("Whether an antitrust violation exists necessarily depends on a careful analysis of market realities."). How precisely that

18

relevant market must be defined depends on whether the alleged restraint is vertical or horizontal. In the case of vertical restraints, a relevant market must always be defined. *AmEx*, 138 S.Ct. at 2285 n. 7. That is because "[v]ertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market." *AmEx*, 138 S.Ct. at 2285 n. 7; *see also Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, 381 F.3d 717, 737 (7th Cir. 2004) ("As horizontal agreements are generally more suspect than vertical agreements, we must be cautious about importing relaxed standards of proof from horizontal agreement cases into vertical agreement cases."). In some cases of horizontal restraint, the definition of the market can be somewhat less precise, although the general contours of the market must be apparent. *AmEx*, 138 S.Ct. at 2285 n. 7 ("Given that horizontal restraints involve agreements between competitors not to compete in some way, this Court concluded that it did not need to precisely define the relevant market to conclude that these agreements were anticompetitive.") (citing *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460-61 (1986)). In *Indiana Federation of Dentists*, the Supreme Court did not require a precise definition of the relevant market, where it was clear the competitors had 100% of the market in one town and 67% in the other, "in light of the reality that markets for dental services tend to be relatively localized[.]" 476 U.S. at 460-61. In other words, "if a plaintiff *can show the rough contours of a relevant market*, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendant's market power—in lieu of the usual showing of a precisely defined relevant market." *Republic Tobacco*, 381 F.3d at 737 (emphasis added) ("Economic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market.").

Plaintiffs have made no attempt to identify a relevant market, beyond arguing that "the 'rough contours' are the service market for McDonald's restaurant workers," (Plfs. Reply at 3/Docket 346 at 10) as though a relevant market could be limited to one brand or as though all the plaintiffs live in one "company town." The evidence plaintiffs have put forth in an attempt to establish anticompetitive effects *assumes* that plaintiffs sell their labor in one national market, as does their proposed class definition.

Plaintiffs have not, however, put forth evidence that they sell their labor in a national market, and it defies logic to suppose that they do. *See* Ioana Marinescu & Herbert Hovencamp, "Anticompetitive Mergers in Labor Markets" 94 *Indiana Law Journal* 1031, 1048 ("The boundaries of labor markets are driven mainly by employee skills or training. Geographic markets are driven mainly by the location and mobility of current or prospective employees. . . . [A]pplications for a job decline rapidly with distance[.] . . . Traditional geographic markets for products are frequently defined in terms of shipping costs . . . Measuring geographic markets for labor is more complex. Commuting 'costs' include not merely the price of a subway ticket or gasoline, but also time and convenience, and these things frequently vary from one commuter to another."); *see also* Herbert J. Hovencamp, "Competition Policy for Labour Markets" (2019) *Faculty Scholarship at Penn Law.* 2090 at ¶ 12 ("most labour markets are geographically quite small, many of them no larger than the commuting range of employees.").

The Court has no doubt that national labor markets exist for certain jobs. The market for Chief Executive Officers is an obvious example. In the market for Chief Executive Officers, companies recruit nationally (or internationally), pay for the new hire to relocate and sometimes allow (or require) her to commute home via the company's private jet until she relocates. Likely, there are many other high-skill, high-earning jobs (such as dermatologist or computer engineer)

for which the relevant market is essentially national or regional. That could be true in any labor market where positions are so highly-skilled or highly-paid that employers can recruit from across the nation, because the labor is worth enough to the employer to pay for relocation and/or the salary is sufficiently high to incentivize an employee to move. That is not, however, the market in which these plaintiffs offer their services. As this Court has previously said about the markets in which plaintiffs sell their labor:

> The relevant market for employees to do the type of work alleged in this case is likely to cover a relatively-small geographic area. Most employees who hold low-skill retail or restaurant jobs are looking for a position in the geographic area in which they already live and work, not a position requiring a long commute or a move. That is not to say that people do not move for other reasons and then attempt to find a low-skill job; the point is merely that most people do not search long distances for a low-skill job with the idea of then moving closer to the job.

*Deslandes*, 2018 WL 3105955 at *8. Even looking at the rough contours of the relevant markets in which plaintiffs sell their labor suggests there are hundreds or thousands of local relevant markets in this case.

The evidence put forth at the class certification stage bears out the intuition that the proposed class members sell their labor in local geographic markets, generally within easy commuting distance. Defendants, for example, put forth evidence of McOpCos in Kearney, Nebraska that, in 2015, sought approval to increase starting wages from $9.00 per hour due to competition from local employers (which they listed as Arby's, KFC, Taco Bell, HyVee, Walmart, Hotels, Qdoba, Jimmy Johns, Applebees, Buffalo Wild Wings, Perkins, Burger King, Culvers and The Buckle), many of whom paid $10 per hour. (Docket 310-4 at 10-12). Defendants put forth evidence of franchisees' declaring that they compete for employees with local employers. [Docket 310-12 at 5 ("We sometimes offer raises to retain employees sought by other local employers, including quick-service restaurants like Wendy's and retail stores like

Wal-Mart, among many others."); Docket 310-12 at 14 ("The McDonald's stores I oversee [in Orlando] compete for employees with the theme parks nearby, such as Disney and Universal, as well as Culver's, Wendy's, Chipotle, and other retail establishments."); Docket 310-12 at 21-22 ("The main competitors for labor in the Jacksonville market are the other quick service restaurants in the vicinity of our restaurants. Comparatively, the main competitors for labor in the Orlando market are the other quick service restaurants, as well as theme parks, Wal-Mart, Sam's Club, and Costco. . . . [W]e have offered raises to retain employees sought by other local employers. These employers include other quick-service restaurants, such as Krystals, LongHorn Steakhouses, KFCs, Papa John's, Panera Breads, Starbucks, Chick-fil-A's, Burger Kings, Little Caesars, Panda Expresses, Wendy's, and Fire House Subs—all of which (among others) are located throughout Jacksonville near the restaurants operated by [us]."; Docket 310-12 at 29 & 31 ("The main competitors for both workforce and customers to my McDonald's-brand restaurants in the Northern Kentucky region are other quick service restaurants such as Wendy's and Burger King." . . . "The turnover rate for my restaurants at the hourly crew person level is 139%. Most of the employees who leave fall into three categories: 1) Looking for a more specific shift (9:00 a.m. to 5:00 p.m. and/or no weekend shifts); 2) the company can provide more hours then we can; or 3) increased pay. For example, the local Amazon distribution center offers higher pay and more consistent weekly hours.")].

The expert opinions are consistent with that evidence. Even Dr. Peter Capelli ("Dr. Capelli"), one of plaintiffs' experts, recognized that crew members likely sell their labor in local markets. (Capelli Dep. at 235-36/Docket 302-1 at 608-09) ("My testimony is that for the restaurant employees in particular, the crew employees, there may be labor markets of different geographic size and that the key issue there might not even be size, it might be commuting

distance."). Dr. McCrary said something similar. (McCrary Rep. at ¶ 288) ("McDonald's franchisees also report surveying competitors *in their geographic location* in order to set market-driven wages.") (emphasis added). Dr. Murphy, defendants' other expert (the admissibility of whose report plaintiffs did not challenge), similarly opined:

> For low-skilled and relatively low-wage workers, such as the majority of those in the putative class, evidence suggests that labor markets generally are local. Commuting time and costs likely are too high for distant employers to be reasonable alternatives for most employees. There are certain fixed time and monetary costs of relocating (finding a new place to live, moving children into new schools) and those costs likely are relatively high the lower the expected increased earnings from relocating. Given average wages at [quick service restaurants], and other employers that individual McDonald's restaurants consider to be their competitors, it is unlikely that employees will seek opportunities more than a few miles from where they reside.

(Dr. Murphy Rep. at ¶ 109). Dr. Hal J. Singer ("Dr. Singer"), plaintiffs' expert, calculated that only 8% of McDonald's employees commute ten or more miles to work. (Singer Rep. at ¶ 64/Docket 270-5 at 54). Thus, about 92% of McDonald's employees work within ten miles of home. The relevant market for each plaintiff's labor is a small, geographic area. There are likely hundreds or thousands of relevant markets among the class members.

Any given plaintiff can establish that the restraint is anticompetitive only by showing anticompetitive effects in the relevant market where she sells her labor. Those markets vary by plaintiff, which means this is not a question that can be answered with common evidence. It is simply not a question that is common to a nationwide class. To be sure, this might be a common question as to the subset of plaintiffs who work in each of the respective relevant markets across the country. For example, this is likely a common question as to every plaintiff in the relevant market of, say, the Chicago Loop (which relevant market perhaps includes areas within a mile or two radius thereof). It is not, however, a common question as to the nationwide class these plaintiffs ask to certify. Plaintiffs do not seek to certify smaller subclasses.

The issue of anticompetitive effects in relevant markets will predominate. It will undoubtedly be true that in some relevant markets, McDonald's restaurants will have so many competitors for labor that the restraint will have no anticompetitive effect. In other markets, McOpCos and franchisees may have so little outside competition for employees that the restraint will impact the market. The anticompetitive effects of the restraint will have to be judged separately for each of the hundreds (or thousands) of relevant markets, and that will be the predominant issue, especially if, as plaintiffs assert, antitrust impact is a common question (an issue this Court need not address).[6]

The proposed class does not meet the predominance requirement of Rule 23(b).

### 3. Adequacy

Rule 23(a)'s requirement that "the representative parties will fairly and adequately protect the interests of the class," has two components: the adequacy of the named plaintiffs and

---

[6] Because the Court has determined that the question of whether the restraint caused anticompetitive effects in the hundreds (or thousands) of relevant markets will predominate, the Court need not consider whether the question of antitrust impact is a common question. (It is difficult, though, to imagine that it could be a common question, as opposed to a question that would need to be answered separately for each relevant market. Each person's injury is the amount his or her wages were suppressed multiplied by the hours worked. The amount each person's wages are suppressed will almost certainly vary depending on the amount of labor market power McDonald's possessed in each relevant market. *See, e.g. State of Ala. v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 327-28 (5th Cir. 1978) ("This proof of injury in a price-fixing case will generally consist of some showing by the plaintiff that, as a result of this conspiracy, he had to pay supracompetitive prices for school buses. . . . [W]e do not understand how the plaintiffs can make this proof without examining the relevant school bus market where each individual plaintiff is located.").) Because the Court need not consider whether impact is a common question, the Court need not decide whether to exclude the report and testimony of plaintiff's expert, Dr. Singer. *See Messner*, 669 F.3d at 812 ("When an expert's report or testimony is 'critical to class certification,' we have held that a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification."). Here, the outcome of this motion is the same with or without Dr. Singer's report and testimony. The same is true as to the report and testimony of Dr. Capelli.

the adequacy of proposed class counsel.  *See Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583,

592 (7th Cir. 2011) (citations omitted).

One of the reasons why courts insist that class counsel be adequate is:

the incentive of class counsel, in complicity with the defendant's counsel, to sell
out the class by agreeing with the defendant to recommend that the judge approve
a settlement involving a meager recovery for the class but generous compensation
for the lawyers[.]

*Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011).

The Seventh Circuit recognizes:

There is . . . a much greater conflict of interest between the members of the class
and the class lawyers than there is between an individual client and his lawyer.
The class members are interested in relief for the class but the lawyers are
interested in their fees, and the class members' stakes in the litigation are too
small to motivate them to supervise the lawyers in an effort to make sure that the
lawyers will act in their best interests.

*Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 744 (7th Cir. 2008) (citations omitted).

That is of "particular significance" where class members "lack both the monetary stake and the

sophistication in legal and commercial matters that would motivate and enable them to monitor

the efforts of class counsel on their behalf."  *Creative Montessori*, 662 F.3d at 917.

Accordingly, "[a]nything 'pertinent to counsel's ability to fairly and adequately represent

the class,'" bears "on the class certification decision."  *Reliable Money Order, Inc. v. McKnight*

*Sales Co., Inc.*, 704 F.3d 489, 498 (7th Cir. 2013) (citations omitted).  Among other things, a

court "must . . . consider counsel's work on the case to date."  *Reliable Money Order*, 704 F.3d

at 498 n. 7; *see also Nagel v. ADM Investor Services, Inc.*, 65 F. Supp.2d 740, 746 (N.D. Ill.

1999) (Easterbrook, J.) ("One important part of a judge's job under Rule 23 is to protect putative

class members from self-appointed champions whose work is not up to snuff.").

Even were it not the case that individual issues will predominate, the Court would be hesitant to certify the proposed class. One unusual aspect of this case is that, while plaintiffs cannot prevail as class, they could lose as one. That owes to the fact that counsel for the named plaintiff made a strategic decision early in this case not to amend the complaint to add a claim under the rule of reason. If the Court certified a nationwide class (which, again, would not be appropriate for the reasons outlined above), it would be to the great detriment of the class. The class members would lose on a rule-of-reason claim, because their attorneys waived it.[7] Dr. Singer, plaintiffs' expert, calculated aggregate class damages at $2.74 billion. (Singer Rep. at ¶ 5/Docket 270-5 at 9). It is no surprise, then, that attorneys might take a shot at a nationwide-class jackpot (of which they might hope to collect a third, which is about $913,000,000.00) rather than propose a small, local class under the rule of reason. The reward to any given plaintiff would likely be quite similar whether he proceeded as part of a small, local class or a massive nationwide class. Only the lawyers had something to gain by foregoing a claim under the rule of reason, which makes one wonder whether the attorneys were looking out mostly for themselves when they chose not to amend to add a claim under the rule of reason. Perhaps these attorneys took a gamble, choosing not to pursue a rule-of-reason claim in the hopes of the huge reward of certifying a nationwide class under quick-look analysis. Such a self-interested decision would not instill confidence that the attorneys would adequately represent the class.

---

[7] One might think this would have prompted defendants to consent to certification of a class, such that they could win with one fell swoop. *Thomas v. UBS AG*, 706 F.3d 846, 850 (7th Cir. 2013) ("[Defendant] opposed [class] certification even though a defendant with a winning case has much to gain from it—the judgment for a defendant will be *res judicata* in any suit by a class member who had not opted out of the class, provided 'that the named plaintiff at all times adequately represent the interests of absent class members.'") (citation omitted). Perhaps defendants assume most plaintiffs will opt out of a doomed-to-fail class. In any case, defendants do not want a nationwide class certified, and they will get their wish.

This case will not proceed as a class action.[8]  When plaintiff filed her complaint, it "toll[ed] the applicable statute of limitations for all persons encompassed by the class complaint."  *China Agritech, Inc. v. Resh*, __ U.S. __, 138 S.Ct. 1800, 1804 (2018) (citing *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)); *see also Collins v. Village of Palatine, Ill.*, 875 F.3d 839, 843 (7th Cir. 2017) ("the filing of a proposed class action immediately pauses the running of the statute of limitations for all class members.").  Each class member remains free to pursue his or her own claim.  *China Agritech*, 138 S.Ct. at 1810.

## III.    CONCLUSION

For all of these reasons, plaintiffs' motions [268, 269] for class certification are denied.  Defendants' *Daubert* motions [301, 307] to exclude the expert testimony of Dr. Singer are denied (without prejudice) as moot, and defendants' *Daubert* motions [300, 304] to exclude the expert testimony of Dr. Capelli are denied (without prejudice) as moot.  Plaintiff's unopposed motion [288] to file supplemental expert report is granted.  Defendants' motion to [348] file surreply is granted.

---

[8] The problems discussed above are not the only problems with the proposed class definition.  As defendants point out, the proposed class is overly broad in that it contains individuals who could not have been injured by the alleged wrongful conduct.  "[I]f the [class] definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad."  *Kohen v. Pacific Inv. Mgt. Co., LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *Messner*, 669 F.3d at 824 ("If, however, a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.").  Here, plaintiffs challenge a hiring restriction that applies only to current employees or employees who have left in the past six months.  It can have no effect on new hires or on employees within the first few weeks of work.  More than 2% of new hires leave within two weeks.  More than 11% leave within a month.  More than 20% leave within two months.  (Figure 12 of Dr. Murphy Rep. at p. 67).  It is clear the proposed class definition was too broad, but the Court need not decide by what degree.

This case is set for status hearing on October 5, 2021 at 9:30 a.m.

**SO ORDERED.**                                        **ENTERED: July 28, 2021**

                                                       _____
                                                       **HON. JORGE ALONSO**
                                                       **United States District Judge**